CRAIG J. TILLERY
ACTING ATTORNEY GENERAL

David D. Floerchinger
Assistant Attorney General
Office of the Attorney General
1031 W. 4th Ave., Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-5190
Fax: (907) 258-0760
Email: TWC_EFC@law.state.ak.us

Attorney for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| ARTHUR J. PORTER and | ) | |
| KRISTIE L. PORTER, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.: 3:05-cv-00142-TMB |
| | ) | |
| v. | ) | |
| | ) | |
| ARTHUR J. OSBORN and JOSEPH | ) | |
| WHITTOM, individually, | ) | **DEFENDANTS' MOTION** |
| | ) | **FOR SUMMARY JUDGMENT** |
| Defendants. | ) | |
| | ) | |

## I.    INTRODUCTION

Arthur and Kristie Porter have sued two Alaska State Troopers for the death

of their adult son Casey Porter.[1]  The Porters are suing in their individual capacities only,

not as representatives of Casey Porter's estate.

---

[1]    Defendants Bowman, Grimes and Tandeske were never served with the first amended complaint and were voluntarily dismissed by the plaintiffs on February 10, 2006 at docket 35.  The dismissal of these defendants was ordered by the court at docket 36.

The plaintiffs bring their complaint pursuant to 42 U.S.C. § 1983 and also seek relief, "pursuant to [the] Alaska Constitution, common law, and those causes permitted under Alaska law."[2]  Defendants Osborn and Whittom now move for summary judgment on the following grounds.

(1)    The Porters are not the personal representatives of Casey Porter's estate and do not have standing to assert any constitutional violation or other cause of action personal to Casey Porter.

(2)    Without a right to assert a claim under Alaska's wrongful death or survivor statutes, the only claim available to the Porters under 9th Circuit law is a violation of their individual Fourteenth Amendment due process rights to the association with and society of their adult son.

(3)    The defendant officers are entitled to summary judgment on the basis that they have qualified immunity.  To prove a violation of their Fourteenth Amendment rights the Porters must prove that the officers acted with a purpose unrelated to the legitimate object of an arrest that shocks the conscience.  Under the facts of this case, there was no violation of the Porters Fourteenth Amendment rights.

(4)    The Porters have no state law claims.

---

[2]        ¶ 6 of plaintiff's first amended complaint.

## II.    FACTUAL BACKGROUND

In the early morning hours of January 4, 2003 Troopers Osborn and Whittom were doing DUI enforcement in the Kenai Soldotna area.[3]  They received a report of a suspicious vehicle and responded to an area known as the Kenai Keys.  The report indicated that a blue sedan had been parked in this pullout for approximately 2 ½ hours and that every time a Department of Transportation road maintenance worker would come by, the vehicle would turn its lights on.[4]  Trooper Osborn arrived first at the scene and on arrival saw a small car backed up against a snowy area.[5]  It was a very dark night[6] and Trooper Osborn could not tell if the vehicle was occupied and in fact thought it could be abandoned.[7]

Trooper Osborn pulled his patrol vehicle somewhat in front of the suspect vehicle.[8]  Osborn had his headlights on and they were shining directly on the suspect vehicle.[9]  As he started to radio in the license plate number an individual sat straight up in

---

[3]    Exhibit A, Deposition of Trooper Arthur J. Osborn, p. 28.

[4]    *Id.* at p. 40-42.  *See*, *Ozhuwan v. State*, 786 P.2d 918, 922 (Alaska App. 1990) (police officers, as community caretakers, are justified in conduct that would amount to an investigative stop if they are aware of "at least some specific circumstances supporting a reasonable belief that the occupants of a vehicle need assistance").

[5]    *Id.* at p. 31.

[6]    *Id.* at p. 39.

[7]    *Id.* at p. 41.

[8]    *Id.* at p. 43.

[9]    *Id.* at p. 45.

the driver's seat, grabbed the steering wheel and looked directly at him.[10]   After this person "popped up" he started steering the suspect vehicle to get around the patrol vehicle.[11]   Osborn turned on his overhead flashing red and blue lights.[12]   Osborn then pulled his patrol vehicle slightly forward about six inches and the individual in the vehicle cranked his wheel even harder and started to move around the patrol vehicle.[13] As the suspect vehicle pulled out and around the patrol vehicle Osborn made eye contact with the driver and motioned him to stop.[14]

At this point in time Trooper Whittom was just arriving on the scene in a second vehicle.[15]   As the suspect vehicle slowly pulled away Osborn got out of his vehicle and followed on foot at a slow trot all the while ordering the vehicle to stop.[16] Trooper Whittom maneuvered his vehicle to the front of the suspect vehicle and then

---

[10]      *Id.* at p. 53-54.

[11]      *Id.* at p. 61.

[12]      *Id.* at p. 61-62.

[13]      *Id.* at p. 63.

[14]      *Id.* at p. 68.  *See*, *Dimascio v. Municipality of Anchorage*, 813 P2d 696, 698 (Alaska App. 1991) (an unprovoked act of flight is a legitimate factor which the police and the courts can take into account when determining reasonable suspicion for a stop).

[15]      Exhibit B, Deposition of Trooper Joseph Whittom, p. 6.

[16]      Exh. A, pp. 69-70.

backed up a bit thinking he would be struck by the suspect vehicle.[17]  Whittom's vehicle was now approximately twenty feet from the front of the suspect vehicle.[18]

The suspect vehicle came to a stop and Osborn ordered the driver out of the car.  The suspect responded with the words "What's wrong,"[19] to which Osborn again ordered him out of the car.[20]  Osborn also ordered him to show his hands.[21]

The suspect then said he would backup to which Osborn responded "No you won't backup, you will get out of the car now.  Do you understand me?"  The suspect responded "Yes sir."[22]

Osborn said "Show me your hands and get out of the car."  The suspect would show his hands and then quickly put them down concealing them and causing Osborn concern that the suspect was reaching for a weapon.[23]  Having wound his window down, the suspect then grabbed the window crank and started winding up his window.  Osborn who had been unable to open the car door then sprayed pepper spray into the

---

[17]     Exh. B, pp. 9, 14-15.

[18]     *Id*. at p. 35.

[19]     Exh. A, p. 75.

[20]     *Id*. at pp. 75-76.

[21]     *Id.* at p. 79.

[22]     Exhibit 1 to Osborn Deposition.

[23]     Exh. A, pp. 193-194.

vehicle.[24]   The suspect yelled "I didn't do nothing" and sat straight up, grabbed the steering wheel with both hands very forcefully, looked directly ahead at Trooper Whittom's vehicle, and revved the engine and started spinning his tires.[25]

Osborn, believing the suspect was going to run over Trooper Whittom fired his service revolver.  The suspect vehicle struck Trooper Whittom's vehicle and came to a stop.[26]  Just prior to his vehicle being struck Trooper Whittom was out of his vehicle had his weapon drawn and was pulling slack off the trigger.[27]  Trooper Whittom did not fire his weapon.

The entire episode took less than a couple of minutes.  From the point where the suspect vehicle accelerated toward Trooper Whittom's car to when he struck it was a matter of a few seconds.[28]

Trooper Osborn had no idea who he had encountered and who was in the suspect vehicle.[29]  He did not know that Casey Porter had an outstanding arrest warrant for sexual abuse of a minor and he had no personal thoughts towards Casey Porter at

---

[24]     *Id.* at p. 195.

[25]     *Id.* at pp. 197-198; Exh. B, p. 29; *see also* Exhibit C, Affidavit of Ron Heusser.

[26]     Exh. A, p. 198.

[27]     Exh. B, p. 49.

[28]     *Id.* at p. 52.

[29]     Exh. A, p. 199.

all.[30]   Osborn's only thoughts were that the suspect was going to run over Trooper

Whittom and he fired his weapon until he heard the engine rev down.[31]

Shortly after the incident Trooper Whittom was interviewed and stated that

he thought the shooting was a little quick.   However, on further reflection on his own

actions he retracted that position.[32]   He realized that at the time Officer Osborn fired his

weapon he himself had already released the safety on his own weapon and was taking up

slack on the trigger.[33]   Trooper Whittom was within a hair of firing his own weapon to

protect himself.[34]

### III.    SUMMARY JUDGMENT STANDARDS

With some variation, traditional standards for summary judgment apply in

this case.   Federal Rule of Civil Procedure 56 provides that a "party against whom a

claim…is asserted…may…move with or without supporting affidavits for a summary

judgment in the party's favor as to all or any part thereof."   Fed. R. Civ. P. 56(b).

Summary judgment is appropriate if the court finds that "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits…show that

there is no genuine issue as to any material fact and that the moving party is entitled to a

---

[30]      *Id*.

[31]      Exh. A, pp. 197-199.

[32]      Exh. B, p. 26.

[33]      *Id*., p. 49.

[34]      *Id*., p. 50.

judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The court will construe all evidence and draw all evidentiary inferences in favor of the non-moving party.[35]

A dispute over a genuine material fact exists if the evidence would allow a reasonable fact-finder to return a verdict for the non-moving party.[36]  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise proper motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."[37]  The non-moving party may defeat a summary judgment motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial.[38]  To produce sufficient evidence, the non-moving party cannot rest solely on the allegations in the pleadings and other legal memoranda, but he must present affidavits or other admissible evidence to carry his burden.[39]  Moreover, when intent is an element of a § 1983 claim, conclusory assertions of intent in affidavits or testimony are not sufficient to defeat summary judgment.[40]

---

[35]    10 A Charles Alan Wright, et al., *Federal Practice & Procedure* § 2727 at 459 & n.5 (3d. ed. 1998).

[36]    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[37]    *Id*. at 247-48 (emphasis in original).

[38]    *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

[39]    *Smith v. Mack Trucks, Inc.*, 505 F.2d 1248, 1249 (9th Cir. 1974).

[40]    *Lindsey v. Shalmy*, 29 F3d 1382 (9th Cir.  1994)

Where an official has moved for summary judgment on the basis of qualified immunity, the issue of whether the law governing the conduct at issue is clearly established is an issue of law for the court.[41]

## IV.    ARGUMENT

**A.    The only claim available to the plaintiffs is a Fourteenth Amendment due process claim to the right of association and companionship with their adult son.**

The plaintiffs, Arthur and Kristie Porter fought long and hard to be appointed personal representatives of their son's estate.  Over the course of nine months and volumes of pleadings the Porters sought to have the mother of Casey Porter's child, Danielle Gordon, removed as personal representative.  Judge Phillip Volland, Superior Court Judge for the State of Alaska, ultimately denied their efforts some nine months after Casey Porter's death and appointed Danielle Gordon as PR.[42]    Ms. Gordon subsequently prosecuted claims against the State of Alaska and Trooper Osborn which resulted in settlement and the state court granted a motion for closed proceedings and to seal the probate file.  The Porters were allowed to participate and were not excluded from the proceedings.[43]  The Estate was subsequently closed.[44]

---

[41]    *Trevino v. Gates*, 99 F.3d 911, 917 (9th Cir. 1996).

[42]    Exhibit D, Order of Judge Volland, September 24th, 2003.

[43]    Exhibit E, Order of Judge Huguelet, February 28th, 2006.

[44]    Exhibit F, Order closing the estate and sealing the file, Judge Huguelet, April 13th, 2006.

In this action, the Porter's have standing only to assert claims individual to themselves.  They can not assert claims based on any violation of Casey Porter's constitutional rights.[45]  With that in mind, a brief review of the federal claims asserted by the Porters is necessary.[46]  No equal protection rights of Arthur and Kristie Porter were violated, nor were any privacy rights violated.  The defendant troopers had no contact whatsoever with Arthur and Kristie Porter and simply did not violate their right to life or any liberty interests.  Further, no rights under the privileges and immunities clause of the constitution were violated such as the right to travel or commerce.[47]

However, when, as here, the plaintiffs have no Fourth Amendment claim to assert, Ninth Circuit law does provide them with their own claim under the Fourteenth Amendment for the loss of society and companionship of their son.[48]  The plaintiffs have no other constitutional violations which they can assert.

---

[45]     *Moreland v. Las Vegas Metropolitan Police Dept.,* 159 F.3d 365,369 (9th Cir. 1998); *League of Women Voters v. Nassau County Bd. of Supervisors*, 737 F.2d 155, 160 (2nd Cir. 1984), *cert. denied*, 469 U.S. 1108 (1985) (a fundamental principle of § 1983 is that because the rights asserted under § 1983 are personal to the plaintiff, the plaintiff may seek to vindicate only his or her own federally protected rights and not the rights of third parties).

[46]     *See* ¶ 7 of Plaintiff's 1st Amended Complaint.

[47]     *International Organization of Masters, Mates & Pilots v. Andrews*, 831 F.2d 843 (9th Cir. 1987) (the purpose of the privileges and immunities clause is to place the citizens of each state upon the same footing with citizens of other states).

[48]     Moreland v. Las Vegas Metropolitan Police Dept., 159 F.3d 365, 371 (9th Cir. 1998) (plaintiff who could not show entitlement to bring a claim under the wrongful death statute, and thus a Fourth Amendment claim, could still bring a claim pursuant to the Fourteenth Amendment for loss of society and companionship).

**B.    Troopers Whittom and Osborn have qualified immunity.**

The United States Supreme Court has held that when qualified immunity is asserted by public officials that the court, not a jury, must make a two part inquiry before allowing the suit to proceed.  The reason is that, "[t]he privilege is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."[49]

The court must first consider, as a threshold step, whether the facts, taken in a light most favorable to the non-moving party, establish that an officer's conduct violated a constitutional right.  Then and only then does the court move to the second question of whether the right was clearly established as a matter of law.[50]  In this case the court does not need to proceed to the second step because the facts establish that there was no Fourteenth Amendment violation.

A Fourteenth Amendment claim is not analyzed under the "objective reasonableness" standard as is a Fourth Amendment claim.  In *County of Sacramento v. Lewis*[51], the United States Supreme Court considered, "whether a police officer violates the Fourteenth Amendment's guarantee of substantive due process by causing death through deliberate or reckless indifference to life in a high-speed automobile chase aimed

---

[49]    *Saucier v. Katz*, 533 U.S. 194 (2001).

[50]    *Id*. at 200-201.

[51]    523 U.S. 833 (1998).

at apprehending a suspected offender."[52]   In overruling the Ninth Circuit, the Supreme

Court explicitly held that deliberate or reckless indifference was not enough.   "[O]nly a

purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element

of arbitrary conduct shocking to the conscience, necessary for a due process violation."[53]

Finding that there was no reason to believe that an officer's conduct was, "tainted by an

improper or malicious motive", the Supreme Court found that there was no Fourteenth

Amendment violation.[54]

      In *Moreland v. Las Vegas Metropolitan Police Department*,[55] the Ninth

Circuit applied this standard of culpability to situations where officers are required to use

instant judgment to protect either themselves or the public.  The court stated:

> [W]hen unforeseen circumstances demand an officers instant
> judgment, even precipitate recklessness fails to inch close
> enough to harmful purpose to spark the shock that implicates
> the large concerns of the governors and the governed.[56]

The court noted the difference between the deliberate indifference standard, normally

used in Fourteenth Amendment claims, and the standard required under *Lewis*, where

there is simply no time to deliberate.   Because there was no evidence of an ulterior

motive or purpose on the part of the officers that shocks the conscience, the court found

---

[52]    *Id*. at 836.

[53]    *Id.*

[54]    *Id.* at 855.

[55]    159 F.3d 365 (9th Cir. 1998)

[56]    *Id.* at 372.

there was no Fourteenth Amendment violation. **"[T]he officers were responding to the extreme emergency of public gunfire and did not intend to commit any harm unrelated to the legitimate use of force necessary to protect the public and themselves."**[57]

In this case the suspect vehicle was only approximately twenty feet from Officer Whittom and his vehicle when the suspect grabbed the wheel with both hands, looked directly ahead and revved his engine and started spinning his wheels. In seconds, Officer Osborn fired his weapon. His intent is illustrated by his taped comments within seconds thereafter.

JO:     Shots….shots fired. Soldotna, 1-E-16, shots fired. We're 10-60. Get medics 10-19. You okay, WHITTOM?

JW:     Yeah.

**(radio traffic in background)**

JO:     He was headed straight for ya'.

JW:     (To AST Dispatch) Soldotna, 1-E-20,….

JO:     10-4, suspect. It's the Kenai Keys pull-out. I can see his hands. I believe he's 79…I can't see his…I can see his right hand. Are you okay, did your car hit you?

JW:     No, he hit my car.

JO:     God, I thought he was gonna' kill you….he doesn't…he's not wearing any pants.

JW:     Yeah.

JO:     Looks like there's a marijuana pipe in the front. Okay. It doesn't look like he has any weapons, let's get him

---

[57]    *Id.* at 373.

out of there.  I couldn't open the door, I tried.
Okay….I'm gonna' holster my weapon, keep him
covered.  You sure you're okay?

JW:     Yeah, I'm okay.  It's…

JO:     God, I saw him hit that car….
JW:     (indiscernible) the vehicle bumped me a little bit and
kinda'….

JO:     I saw him hit the gas and he was headed straight for
you aiming his steering wheel.  I'm gonna' check
pulse.  I'm gonna handcuff him first, he was still
clenching his fists a second ago.  Alright…that glove's
not working.

Trooper Osborn simply had no ulterior motive or any purpose unrelated to

stopping the suspect from driving his vehicle into Trooper Whittom.  Trooper Osborn had

no idea who the driver of the suspect vehicle was and had no idea that the suspect was

wanted on a warrant.  He encountered an emergency situation where force was required

to protect the life of a fellow officer.  There is no evidence in this case that on the night in

question Osborn possessed any ill will against the suspect or harbored any improper

motive or purpose that "shocks the conscience" such that it rises to the level of a due

process violation.

The required level of conscience shocking behavior is illustrated by a Tenth

Circuit case, *Graves v. Thomas*.[58]  In *Graves*, a police officer named Josh Ford had made

somewhat of a name for himself and had become known for harassing teenagers in town

---

[58]     450 F.3d 1215 (10th Cir. 2006).

by following them with his headlights off and engaging them in high-speed chases.[59]  In fact, Officer Ford actually told Jerred Graves (decedent) and his friend Charles Guinn that he was, "going to get you, one way or another."[60]  As it happened, Officer Ford encountered Jared Graves who was late getting home one evening and driving with his lights off.  The officer, who admitted having never read his department's pursuit policy, pursued Graves and ultimately Graves died when his vehicle left the roadway at over one hundred miles an hour.[61]  Graves' parents brought a § 1983 claim alleging violation of Fourteenth Amendment rights.  The District Court found that in spite of Ford's proclivity to engage teenagers in high speed pursuits and his statements that he was going to get this particular individual, "the record fails to legitimately suggest an intent of Ford to cause harm unrelated to the arrest."[62]  Thus, there was no Fourteenth Amendment violation.

The Tenth Circuit affirmed stating that, "the Graves must show Officer Ford's reaction was motivated by a purpose to cause harm unrelated to the legitimate object of arrest."[63]  Lacking such evidence an allegation of a Fourteenth Amendment violation must fail.

---

[59]     *Id.* at 1218-1219.

[60]     *Id.* at 1219.

[61]     *Id.* at 1219-1220.

[62]     *Id.* at 1223.

[63]     *Id.*

There is no evidence in this case of an improper motive or purpose on the part of Officer Osborn here, much less evidence of an improper purpose that is unrelated to his efforts to stop the suspect vehicle from running over Officer Whittom. There simply is no evidence of a constitutional violation that shocks the conscience. Pursuant to *Saucier v. Katz,* the court should grant summary judgment to Trooper Osborn at the first level of inquiry; there was no constitutional violation.

With respect to Trooper Whittom, he did not fire his weapon. He did not deprive the Porters of the society and companionship of their son. The Porters have no claim against Trooper Whittom.

**C.     The Porters have no state law claims.**

The Porters make the broad statement in their complaint that they seek relief pursuant to the Alaska Constitution and, "those causes permitted under Alaska law."[64] Recognizing that they have no claims pursuant to Alaska's wrongful death or survivor statutes they seek only non-economic damages for loss of consortium and association. Alaska case law does not provide for loss of consortium damages to the parents of an adult child and the Alaska court has never approved of a "*Bivens* like" remedy under the Alaska Constitution.

---

[64]     Plaintiff's complaint at ¶ 6.

1.      **Claims for loss of consortium or emotional distress.**

*Gillispie v. Beta Construction Co.*[65] is dispositive of the Porter's claims for consortium or emotional distress.   In *Gillispie* the Alaska Supreme Court noted the dichotomy between cases where a decedent left dependents and cases where the decedent did not.   Noting that the personal representative is the real party in interest in a wrongful death case, the court pointed out that the P.R. would hold any recovery for emotional distress in trust for those beneficiaries.   When there were no beneficiaries, the damages would be limited to any loss to the estate.[66]   In addressing a parent's emotional distress claims for the loss of a minor child the court looked to AS 09.15.010 which provides: "A parent may maintain an action as plaintiff for the injury or death of a child below the age of majority."   The court held that this creates an independent action on behalf of the parents.[67]   Looking to the roots of the statute the court noted that at common law the fruits of a minor's labor belonged to his or her parents.   An injury to the minor child thus resulted in loss to the parents.

The court did not, nor could it, extend the private cause of action to the parents of an adult child who are not beneficiaries of the adult child's estate. AS 09.15.010 applies only to minor children.   The Alaska court has never recognized a

---

[65]      842 P.2d 1272 (Alaska 1992).

[66]      *Id.* at 1272-1273.

[67]      *Id.* at 1273.

cause of action held by the parents of an adult child.  The Porters have no recognized

claim under Alaska law for their claims.

> **2.**     **The Alaska Supreme Court has never allowed a *Bivens* – type action to proceed against anyone for violations of Alaska's Constitution.**

The Alaska Supreme Court has considered the *Bivens* issue on at least 13

occasions.[68]  It has never allowed a *Bivens* claim against anyone who was not a federal

officer.   It has never recognized a *Bivens*-type cause of action against anyone for

violation of any right which was protected by the Alaska Constitution.[69]

Prior to 7/22/05, the Court's language in rejecting every claim for a *Bivens*-

type action which had come before it was neutral:

---

[68]     *Lowell v. Hayes*, 117 P.3d 745, 753 (Alaska 7/22/05); *McGrew v. State*, 106 P.3d 319, 324 (Alaska 2/7/05); *Prentzell v. State, Department of Public Safety*, 53 P.3d 587, 596 (Alaska 2002); *Brown v. Ely*, 14 P.3d 257, 261 (Alaska 2000); *Thoma v. Hickel*, 947 P.2d 816, 824 n.5 (Alaska 1997); *Dick Fischer Development No. 2, Inc. v. State*, 838 P.2d 263, 268 (Alaska 1992); *Robinson v. Francis*, 777 P.2d 202, 204 (Alaska 1989); *Vest v. Schafer*, 757 P.2d 588, 594, 598 (Alaska 1988); *Herrick's Aero-Auto-Aqua Repair Service v. State*, 754 P.2d 1111, 1116 (Alaska 1988); *State v. Haley*, 687 P.2d 305, 317-318 (Alaska 1984); *Alaska Pacific Assurance Company v. Brown*, 687 P.2d 264, 275-276 (Alaska 1984); *King v. Alaska Housing Authority*, 633 P.2d 256, 261 (Alaska 1981).  The *Bivens* issue was raised in *Waiste v. State*, 10 P.3d 1141, 1145, n.7 (Alaska 2000), but not discussed because no violation of either the Federal or Alaska Constitutions occurred.

[69]     *Lowell v. Hayes*, 117 P.3d 745, 753 (Alaska 7/22/05); *McGrew v. State*, 106 P.3d 319, 324 (Alaska 2/7/05); *Prentzell v. State, Department of Public Safety*, 53 P.3d 587, 596 (Alaska 2002); *Brown v. Ely*, 14 P.3d 257, 261 (Alaska 2000); *Thoma v. Hickel*, 947 P.2d 816, 824 n.5 (Alaska 1997); *Dick Fischer Development No. 2, Inc. v. State*, 838 P.2d 263, 268 (Alaska 1992); *Robinson v. Francis*, 777 P.2d 202, 204 (Alaska 1989); *Vest v. Schafer*, 757 P.2d 588, 594, 598 (Alaska 1988); *Herrick's Aero-Auto-Aqua Repair Service v. State*, 754 P.2d 1111, 1116 (Alaska 1988); *State v. Haley*, 687 P.2d 305, 317-318 (Alaska 1984); *Alaska Pacific Assurance Company v. Brown*, 687 P.2d 264, 275-276 (Alaska 1984); *King v. Alaska Housing Authority*, 633 P.2d 256, 261 (Alaska 1981).

1997: "…We have neither adopted nor rejected the *Bivens* approach with respect to state constitutional violation…"[70]

2000: "We have neither accepted nor rejected the *Bivens* approach with respect the state constitutional violations."[71]

2002: "We have not previously decided whether to recognize such a cause of action and this case does not provide a suitable opportunity to do so."[72]

2/4/05: "We have never decided whether a *Bivens*-like remedy is available for violations of the Alaska Constitution."[73]

On 7/22/06,[74] the Court's tone of language changed from apparent neutrality to outright hostility: "We have never recognized a *Bivens*-type private right of action…"[75]

The Alaska Supreme Court's actions speak much louder than its words.

Every Superior Court judge who allowed a *Bivens*-claim was reversed on

---

[70]    *Thoma v. Hickel*, 947 P.2d 816, 824, n.5 (Alaska 1997).

[71]    *Brown v. El*y, 14 P.3d 257, 261 (Alaska 2000).

[72]    *Prentzel v. State, Department of Public Safety*, 53 P.3d 587, 596 (Alaska 2002).

[73]    *McGrew v. State*, 106 P.3d 319, 324 (Alaska 2/4/05).

[74]    *Lowell v. Hayes*, 117 P.3d 745, 753-754 (Alaska 7/22/05).

[75]    117 P.3d at 753.

appeal.[76] Every Superior Court judge who rejected the *Bivens*-type cause of action has been affirmed on appeal.[77]

Alaska's Supreme Court has repeatedly emphasized that a *Bivens*-type remedy will not be recognized when a statutory or common law remedy exists to remedy the general kind of conduct and general type of injury which is alleged.[78] The Porters have a statutory remedy recognized by the Ninth Circuit.[79]

---

[76]    Judge Schultz in *State v. Haley*, 687 P.2d 305, 317-318 (Alaska 1984); Judge Souter in *Alaska Pacific Assurance Company v. Brown*, 687 P.2d 264, 275-276 (Alaska 1984); Judge Johnstone in *Robinson v. Francis*, 777 P.2d 202, 204 (Alaska 1989).

[77]    Judge Greene in *Lowell v. Hayes*, 117 P.3d 745, 753-754 (Alaska 7/22/05); Judge Rindner in *McGrew v. State*, 106 P.3d 319, 324 (Alaska 2/7/05); Judge Beistline in *Prentzel v. State, Department of Public Safety*, 53 P.3d 587, 596 (Alaska 2002); Judge Jahnke in *Brown v. El*y, 14 P.3d 257, 261 (Alaska 2000); Judge Ripley in *Thoma v. Hickel*, 947 P.2d 816, 824, n.5 (Alaska 1997); Judge Carlson in *Dick Fischer Development No. 2, Inc. v. State*, 838 P.2d 263, 268 (Alaska 1992); Judge Souter in *Herrick's Aero-Auto-Aqua Repair Service v. State*, 754 P.2d 1111, 1116 (Alaska 1988); Judge Carpeneti in *Vest v. Schafer*, 757 P.2d 588, 594, 598 (Alaska 1988); Judge Buckalew in *King v. Alaska Housing Authority*, 633 P.2d 256, 261 (Alaska 1981).

[78]    *Lowell v. Hayes*, 117 P.3d 745, 753-754 (Alaska 2005) (defamation claim possible); *McGrew v. State*, 106 P.3d 319, 324 (Alaska 2005) (participation in a CINA proceeding and intentional infliction of severe emotional distress possible); *Brown v. El*y, 14 P.3d 257, 261 (Alaska 2000); *Thoma v. Hickel*, 947 P.2d 816, 824, n.5 (Alaska 1997) (private cause of action for violation for state statute and regulations available); *Dick Fischer Development No. 2, Inc. v. State*, 838 P.2d 263, 268 (Alaska 1992) (claims for breach of contract and preparation expenses available); *Herrick's Aero-Auto-Aqua Repair Service v. State*, 754 P.2d 1111, 1116 (Alaska 1988) (injunctive/declaratory relief available); *Vest v. Schafer*, 757 P.2d 588, 594, 598 (Alaska 1988) (injunctive/declaratory relief available); *State v. Haley*, 687 P.2d 305, 317-318 (Alaska 1984) (AS 09.50.250 contract claims against State available).

[79]    *Moreland v. Las Vegas Metropolitan Police Dept*, supra.

The test for an "alternative remedy" is not whether the plaintiff has any probability of recovery under that particular cause of action, but whether an existing common law or statutory form of action generally encompasses the types of conduct of which plaintiff complains and type of injury which they allege. The "alternative remedy" need not be one in which plaintiff is assured of victory or one in which plaintiff even has a strong chance of proving their case.[80]

## V.    CONCLUSION

Because the Porters can not bring any action under Alaska's survival or wrongful death statutes, the only claim available to them is a § 1983 claim for violation of their Fourteenth Amendment rights to the society and companionship of their son. Under *Saucier v. Katz*[81] the court is required to make a two part inquiry before allowing the case to proceed to trial. The first step is to decide whether there was a constitutional violation and in this case there are no facts to support such a violation. There is no evidence of a purpose unrelated to the legitimate object of protecting a fellow officer, much less any evidence that shocks the conscience of the court. Finally, the Porters have no state law claims as a matter of law. Each of these troopers is entitled to summary judgment.

---

[80]    *McGrew v. State*, 106 P.3d 319, 324 (Alaska 2005); *Lowell v. Hayes*, 117 P.3d 745, 753-754 (Alaska 2005).

[81]    533 U.S. 194 (2001).

DATED this 4th day of December, 2006 at Anchorage, Alaska.

CRAIG J. TILLERY
ACTING ATTORNEY GENERAL

By:    s/ David D. Floerchinger
       Assistant Attorney General
       Office of the Attorney General
       1031 W. 4th Ave., Ste. 200
       Anchorage, AK 99501
       Phone: (907) 269-5190
       Fax:    (907) 258-0760
       Dave_Floerchinger@law.state.ak.us
       TWC.ECF@law.state.ak.us
       Alaska Bar No. 8511156

CERTIFICATE OF SERVICE

This is to certify that on this date, a copy
of the foregoing Motion for Summary
Judgment is being electronically served on:

Mark D. Osterman
mosterman@markostermanlaw.com
mdosterman@alaska.com

s/ David D. Floerchinger 12/4/06