1              IN THE FEDERAL DISTRICT COURT

2               FOR THE DISTRICT OF ALASKA

3  ARTHUR J. PORTER and         )
    CHRISTIE L. PORTER,         )

4                          )
               PLaintiffs,   )

5                          )
        vs.               )

6                          )
    ARTHUR J. OSBORN and        )

7  JOSEPH WHITTOM,           )
                          )

8               Defendants.   )
    _____)

9  Case No. A05-4142 CV (JWS)

10           **DEPOSITION OF ARTHUR J. OSBORN**

11  APPEARANCES:

12        **FOR THE PLAINTIFFS:**    **MR. MARK D. OSTERMAN**
                                  Attorney at Law

13                            215 Fidalgo, Suite 106
                                  Kenai, Alaska  99611

14                            (907) 283-5660

15        **FOR THE DEFENDANTS:**    **MR. DAVID D. FLOERCHINGER**
                                  Attorney General's Office

16                            Assistant Attorney General
                                  1031 West 4th Avenue

17                            Suite 200
                                  Anchorage, Alaska  99501

18                            (907) 269-5190

19        **ALSO PRESENT:**           **MR. JOSEPH WHITTOM**

20                    * * * * * *

21

22

23

24

25

Exhibit ___A___

Page __1__ of _220_

1        PURSUANT TO NOTICE, the Deposition of **ARTHUR J.**

2  **OSBORN**, was taken on behalf of the plaintiffs before Meredith

3  Downing, Notary Public in and for the State of Alaska, and

4  Reporter for R & R Court Reporters, Inc., at the offices of

5  R & R Court Reporters, 811 G Street, Anchorage, Alaska, on the

6  30th day of August, 2006, commencing at the hour of 8:30

7  o'clock a.m.

8                     **TABLE OF CONTENTS**

Direct Examination by Mr. Osterman                    04
9  Cross Examination by Mr. Floerchinger               190
Redirect Examination by Mr. Osterman                 210

10

11 EXHIBITS MARKED:

   55 - Handrawing                                    211
12 56 - Handrawing                                    211

13 EXHIBITS PROFFERED:

14  6                                                  41
    65                                                 46
15  29                                                 56
    19                                                 66
16  1                                                  73
    21                                                 88
17  22                                                 89
    30                                             89/102
18  2                                                  97
    37                                                108
19  53                                                112
    48                                                114
20  33                                                118
    28                                                128
21  20                                            123/201
    17                                                131
22  50                                                134
    4                                                 149
23  11 and 14                                         166
    10                                            167/202
24  49                                                168
    45                                                202
25  15                                                170

Exhibit ___A___
Page __2__ of __220__

3

1            P R O C E E D I N G S

2          (On record)

3                    COURT REPORTER:  My name is Meredith Downing.

4    My business address is 811 G Street, Anchorage, Alaska.  A

5    court reporter in and for the State of Alaska, and a Notary

6    Public.  Today's date is August 30th, 2006 and the time set for

7    the deposition is 8:30 a.m.  The case is in the Federal Court

8    for the District of Alaska.  Case number A05-0142 CV (JWS),

9    Arthur J. Porter and Christine L. Porter, plaintiffs, versus

10   Arthur J. Osborn and Joseph Whittom, Defendants.  This is the

11   first tape in the audio tape deposition of Arthur J. Osborn.

12   We are at the offices of R & R Court Reporters, 811 G Street,

13   Anchorage, Alaska.

14                   Counselors, if you will identify yourselves for

15   the record, please, and your representation?

16                   MR. OSTERMAN:  Mark Osterman representing the

17   plaintiff.

18                   MR. FLOERCHINGER:  Dave Floerchinger with the

19   Attorney General's office, representing the defendants.

20                   COURT REPORTER:  Would you raise your right

21   hand, sir?

22                   (Oath administered)

23                   MR. OSBORN:  I do.

24                   **ARTHUR J. OSBORN**

25   having first been duly sworn under oath, testified as follows

Exhibit __A__

Page __3__ of __320__

1  on:

2  <u>**DIRECT EXAMINATION**</u>

3          COURT REPORTER:  Would you state your name for

4  the record spelling your last name?  And you can put your hand

5  down.

6  A      Arthur J. Osborn.  Spelling of last O-a-b-o-r-n.

7          COURT REPORTER:  A mailing address, sir?

8  A      P.O. Box 1036, Ward Cove, that's W-a-r-d, Alaska

9         99928.

10         COURT REPORTER:  And a day time or message

11 phone?

12 A      Yeah.  Just through the state troopers in Ketchikan.

13        And I have never called the main office.  I believe

14        it's (907) 225-5111.

15         COURT REPORTER:  Thank you, sir.

16 A      Thank you.

17 **BY MR. OSTERMAN:**

18 Q      Mr. Osborn, my name is Mark Osterman.  You heard me

19        introduce myself.  And I represent the plaintiffs in

20        this case.  And I want to go over some of the rules of

21        what's going to happen during this particular

22        deposition.  Basically this is courtroom testimony

23        without a judge.  So what will happen is from time to

24        time there will be objections.  There's always an

25        objection to form during a deposition.  If there's not

5

1    somebody to make a deposition to form it's not a

2    deposition.  Despite the fact that there are

3    objections, unless your attorney advised you otherwise

4    you're required to answer.  Now, because there's an

5    objection, if at sometime we need to use your testimony

6    in court, your attorney has the right to bring those

7    objections to the attention of the court and ask that

8    they be stricken from any testimony presented to the

9    jury.

10  A    I understand.

11  Q    Now, because this is recorded, um-hums and unh-unhs

12       look so much alike on written transcripts that it fools

13       even us experts who say um-hum and unh-unh a lot.  So I

14       need you to say yes or no and verbalize an answer.

15       From time to time it may become necessary to describe a

16       specific action, or you may say I did this and I'll say

17       let the record reflect.  I'm not doing so to interrupt

18       you but to make sure that we have a good clean record

19       of what's happening here.

20  A    I understand.

21  Q    I'm not here to ask you any bad, nasty, mean questions.

22       At any time you have the right to stop a deposition and

23       ask to speak to your attorney.  But if you want to

24       speak to him because I've asked you a question you

25       don't like, I want you to answer the question before

Exhibit___A___

Page___5___ of 220

6

1        you leave to talk to your attorney.

2  A    Right.  The question on the table.

3  Q    Yes.  So you can't walk out of here without having

4        answered that question.

5  A    Right.

6  Q    Okay?  If you need to take a break, go to the mens

7        room, raise a hand.  If I ask you a question you're not

8        sure of, Lord knows I can ask some strange questions

9        from time to time that even confuse me.  So don't

10      hesitate to stop me and say please re-ask that question

11      or can you clarify, or what exactly are you describing.

12      Do you understand that so far?

13  A   I understand.

14  Q   Okay.  So Mr. Osborn, you've given me your name.  How

15      old are you?

16  A   Twenty-nine, sir.

17  Q   What's your date of birth?

18  A   12/28/76.

19  Q   Social Security number?

20  A   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.

21  Q   Okay.  How long have you been with the state troopers?

22  A   Five years.  Close to five years.

23  Q   Okay.

24  A   Or actually over five years.  March -- March of 2001 is

25      when I went to the academy.

Exhibit ___A___
Page __6__ of _220_

7

1    Q    So over five years.  Almost five and a half years now.

2    A    Yeah.  Goes fast, yes.

3    Q    Okay.  Prior to being with the state troopers who were

4         you with?

5    A    I worked for the Department of Corrections, State of

6         Alaska as well.

7    Q    Where at?

8    A    Spring Creek Correctional Center in Seward.

9    Q    What was your job?

10   A    Correctional officer.

11   Q    What was your -- did you have any specialized training

12        for that?

13   A    No.  I was just a correctional officer I and

14        correctional officer II which is just a correction

15        officer I who's been on for a year.

16   Q    Let's talk about your background.  Where'd you grow up

17        at?

18   A    Seward, Alaska mainly.

19   Q    Okay.

20   A    I was born in Gold Beach, Oregon.

21   Q    Okay.  When did you get to Seward some time in your

22        life?

23   A    I must have been nine or 10.  It was '86.

24   Q    Okay.  After high school what exactly did you do?

25   A    After high school I worked for Shore Side Petroleum.  I

Exhibit  A

Page  7  of 220

8

1       was a truck driver for a fuel company down there.  And

2       shortly after that I hired with the Department of

3       Corrections.

4   Q   Now, I take it -- I assume that you graduated from high

5       school?

6   A   Yes, sir.

7   Q   What year?

8   A   1995.

9   Q   How long were you a corrections officer?

10  A   I'd have to count it up.  It was a little over 15

11      months, I believe, before I transferred to the

12      Department of Public Safety.

13  Q   Okay.  Had you had any special training such as college

14      courses?

15  A   I took a few correspondence courses while I was in the

16      Department of Corrections but not -- I wouldn't call

17      them college courses.

18  Q   Have you had any college courses?

19  A   No.

20  Q   Okay.  You transferred to the Department of Public

21      Safety, Alaska State Police?

22  A   Alaska State Troopers.

23  Q   Alaska State Troopers.  I apologize.

24  A   That's fine.

25  Q   The state troopers -- do you remember what -- and you

Exhibit  A
Page  8  of 220

9

1    said that was March of '03 -- or '01 when you started

2    with them?

3    A    With the state troopers, yes.

4    Q    Yes.  Did you attend their academy?

5    A    Yes.

6    Q    Where?

7    A    Sitka, Alaska.

8    Q    How long was the academy?

9    A    Just a shade over four months, I believe, sir.

10   Q    Okay.  And when did you attend?

11   A    I can't recall the exact date.  But again, it was March

12        of 2001.

13   Q    Okay.  Now, a lot of times they hire people in and put

14        them an FTO scenario?  Working with an officer or

15        riding with an officer before they attend the academy.

16        Did you do that?

17   A    No, I did not.

18   Q    You went directly to the academy?

19   A    Yes, sir.

20   Q    What kind of training did you receive while you were at

21        the academy?

22   A    A lot of different training.  I'll do my best to

23        remember it.  It won't be complete.

24   Q    Well, let's start off, do you remember the first week

25        of training?

Exhibit ___A___

Page __9__ of _220_

1  A    Yes.

2  Q    Do you remember specifically what kind of training you

3       had the first week?

4  A    A lot of push ups.  It's a paramilitary academy.

5  Q    I forgot to ask you.  Have you been in the armed

6       services?

7  A    No, I have not, sir.

8  Q    And it's understandable that you had a breaking in

9       period, so to speak, or kind of a semi-hazing?

10  A    Yeah.  It was -- I would say it was more intense in the

11       first couple weeks.  Of course there's a lot to get

12       used to during that time period.

13  Q    After you adjusted to that do you have any recollection

14       of any specified training as being a patrol officer

15       during that first week?

16  A    Yes.  We had I believe vague introductions to police

17       work during that first week.  I don't remember any very

18       intense training that first week specific in one area.

19  Q    Second week, specific training?

20  A    That was a long time ago, sir.  I don't recall.  I

21       remember just -- we were always busy.  Multi taking was

22       -- was usually what they were trying to get out of us.

23  Q    Okay.  Did you ever have any training out of books or

24       tapes or videos designed by Joseph Wambaugh?

25  A    I don't remember the author, sir.  I'm not fantastic

Exhibit _A_

Page _10_ of _220_

1       with names, though it is possible.  But I don't

2       remember.

3    Q  Do you know who Joseph Wambaugh is?

4    A  No, sir.

5    Q  Okay.  Just thought I'd ask.  Because all the training

6       that I had many years ago about -- as a police officer,

7       the guy who wrote novels about the L.A. Police

8       Department, the Onion Field and several other books

9       were by Wambaugh.

10   A  Yeah.  I haven't read that.

11   Q  Did you have any specialized training in shoot, don't

12      shoot?

13   A  During the academy or during the first two weeks, sir?

14   Q  During the first two weeks?

15   A  I don't believe so.

16   Q  Did you have any weapons training the first two weeks?

17   A  I don't believe so.

18   Q  Let's go into your third week.  Any specialized

19      training your third week that you have a specific

20      recollection of?

21   A  It's possible at that point but I'd be speculating as

22      far as exactly what week training began at the academy

23      with fire arms.  I remember the training I got but

24      broken down week by week -- you know, we were working

25      seven days a week.  So I -- you know, weeks didn't mean

Exhibit ___A___

Page ___11___ of 220

12

1     a whole lot when you're -- when you're at the academy

2     there.

3  Q  Okay.  Do you recall specialized training in shoot,

4     don't shoot?

5  A  Yes, I do.

6  Q  Can you tell me and describe for me the kind of

7     training you received?

8  A  Yes.  I received -- I believe the acronym for it is a

9     FATS scenario where we have a trailer and it's a scene,

10    a scenario playing out on the screen and you have a

11    simulated weapon and you respond to that screen and

12    decide whether or not the situation would warrant using

13    deadly force or not, or if you would try to resolve it

14    informally, etcetera.

15 Q  How many times did you go through those kinds of

16    scenarios?

17 A  I only got to do the FATS simulator scenario once or

18    twice.

19 Q  You didn't do any videotape training or movie type tape

20    training?

21 A  I don't recall if they -- if they videotapes our

22    scenario based training or not.  But it's possible that

23    they videotaped some of that.

24 Q  Did you have any reading material or study material

25    about shoot, don't shoot?

Exhibit ___A___
Page _12_ of _220_

13

| | |
|---|---|
| 1  A | Nothing that I recall titled as shoot, don't shoot. |
| 2 | But the use of force training in general, we had a |
| 3 | large amount of use of force training. |
| 4  Q | The kind of force training that you did have then, can |
| 5 | you break it down into categories? |
| 6  A | No, I wouldn't say so.  I'd say the use of force is |
| 7 | always something that covers the full range of use of |
| 8 | force.  It's -- when we -- it's difficult to explain |
| 9 | but I'll do my best to explain it to you.  Certainly |
| 10 | different situations warrant different levels of use of |
| 11 | force or no force whatsoever.  But of course that can |
| 12 | certainly change rapidly.  And so I don't remember it |
| 13 | being broke down in various schedules like that. |
| 14  Q | Well, identification of necessity for use of force? |
| 15  A | Correct. |
| 16  Q | And the identification of that particular use of force |
| 17 | can be from removing someone from a very loud or bad |
| 18 | bar to removing someone from a -- in a hostage |
| 19 | scenario, correct? |
| 20  A | I -- I believe -- I think what you're asking, but |
| 21 | removing someone from a loud bar doesn't necessarily |
| 22 | require use of force.  So I wouldn't put that in the |
| 23 | use of force scenario. |
| 24  Q | You didn't -- you weren't shown how to use physical |
| 25 | come-alongs? |

Exhibit __A__

Page __13__ of __220__

1   A       Yes, we were.

2   Q       And that's not a physical force?

3   A       It is.  I just don't believe that it might be.....

4   Q       Didn't realize it could be used in a bar scenario?

5   A       No.  It could be used in a bar scenario if you had to.

6   Q       Okay.  You were taught how to deal with traffic stops?

7   A       Yes, sir.

8   Q       And there were -- you received very specific training

9           about traffic stops?

10  A       Yes, sir.

11  Q       Describe for me the kind of specific training you

12          received about traffic stops?

13  A       Specific training on traffic stops would be vehicle

14          positioning.

15  Q       How important is vehicle positioning?

16  A       Very important.  In a perfect world you can do it

17          perfectly.  It's not.....

18  Q       In fact, there are certain positions for stopping a

19          vehicle that are highly discouraged?

20  A       Yes.  It's -- they want you to pick the best position

21          available.  The optimal position would be what they

22          call 15 and 2, which is about 15 feet back and about

23          two feet to the left of the vehicle to protect yourself

24          from oncoming traffic.

25  Q       That also at the same time protects you from any

Exhibit ___A___
Page ___14___ of ___220___

15

1          occupant of the vehicle because you'll have the ability

2          to see any movement by them?

3 A    I wouldn't say vehicle positioning would do that for

4          you.

5 Q    Okay.  You don't think that being -- moving along the

6          side of the vehicle and keeping an eye on the mirror is

7          an assistant to a stop?

8 A    It can be.  But there are a lot of obstructions in

9          vehicles.

10 Q    Okay.  And you don't think moving along the side of the

11         vehicle would keep you from being run over from the

12         rear or from the front of the vehicle?

13 A    Can you rephrase that question, sir?

14 Q    Sure.  As you're moving along the side of the vehicle

15         during a routine traffic stop you're not a position

16         where you can be necessarily harmed by the driver by

17         throwing his car in reverse or throwing his car in

18         forward, isn't that correct?

19 A    You're in just about the best available position, I

20         would say.

21 Q    And so that's considered the perfect position is to be

22         along side the vehicle?

23 A    Along side the vehicle is a vague description.  I -- I

24         could explain it in more detail if you like where you

25         -- exactly where you should be.

Exhibit A

Page 15 of 220

1    Q    Go ahead.

2    A    Along side the vehicle, of course, there's a lot of

3         vehicle to be along side of.  Generally you want to be

4         just about within touching distance of the vehicle

5         itself, right behind the driver's door post and remain

6         there.

7    Q    And in that particular position the driver is not in a

8         position to see you except for the mirror, correct?

9    A    They can see you but they may have to turn their head

10        to do so.

11   Q    Okay.  They can't move their body into a position to

12        cause you harm such as have a weapon or a gun or a

13        knife or other weapon?

14   A    They still could.  They still could accomplish that but

15        it -- once again it would be more work for them to do

16        that.  You're not quite as -- it's called the fatal

17        frontal.  And you.....

18   Q    Okay.

19   A    .....try to keep yourself out of the fatal frontal.

20   Q    Okay.  Were you ever taught any of the 10 deadly sins?

21   A    I don't recall a term like that.

22   Q    Okay.  Don't remember the John Wayne syndrome or the

23        fire fight syndrome or any of those other syndromes?

24   A    No.  I don't remember those terms.

25   Q    Okay.  Along with the physical force applications what

Exhibit ___A___

Page __16__ of __220__

1      other physical force besides come-alongs did you learn?

2  A   We -- to clarify, we didn't -- nothing we do is labeled

3      as a come-along.  It would be an escort technique.

4  Q   I apologize then.

5  A   I just want to be clear, sir.

6  Q   I certainly want to be clear.  I got to tell you that

7      the politically perfect world of language just

8      absolutely escapes me sometimes.  But nevertheless, you

9      learned how to do -- I assume that there's something

10     that you might refer to as a take down?

11  A   Yes.

12  Q   Is there a  politically correct phrase for that?

13  A   I -- I'd say that's probably accurate.

14  Q   Okay.  And what kind of take downs did you learn?

15  A   Oh, we've had wrist lock take downs.  Quite a different

16     myriad of take downs that -- you know, it's hard to

17     describe the terms.  But the general -- the general

18     description of the take downs is get in a position

19     available, you know, by manipulating or holding against

20     joints or in whatever position you're int.  They tried

21     to give us a few different take down moves, if you want

22     to call them that.  To use the minimum amount of force

23     necessary to get the person into a position where you

24     can safely control them.  And generally in police

25     training that's on the ground proned out where you can

Exhibit ___A___

Page __17__ of _220_

1        safely search them and -- and -- with their face down

2        so they can't hurt you.

3  Q    Okay.  Did you learn any techniques for dealing with

4        drivers that were uncooperative?

5  A    Yes.

6  Q    Describe those techniques, please?

7  A    Well, there's a lot of different techniques.  First off

8        is verbal.  You know, a lot of the training we get is

9        just in verbal and talking to people and trying to

10       establish communication with them and help them come to

11       a point where they understand what you're asking them.

12  Q   You were also taught as a part of these verbal commands

13       that frequently yelling at a driver in the first

14       contact usually creates difficulties?

15  A   Depending on the situation.

16  Q   Okay.

17  A   Depending on the urgency.

18  Q   How would you describe the urgency then?  Is the

19       urgency subjective or objective?

20  A   I wouldn't label it either of those ways.  I don't

21       completely understand the context of your terms.

22  Q   Well, let's go with objective.  Objectively you --

23       something has been described to you as being a

24       dangerous situation?

25  A   I'd -- if we could I'd like to avoid the word

Exhibit _A_

Page _18_ of _220_

1       objectively because I don't quite understand the

2       connotation it's placing on it.  I can explain to you,

3       you know, how I would feel about a certain situation or

4       what my training says about a certain situation, but I

5       -- I don't want to label it with a word like that

6       because I don't quite understand where you're going

7       with it.

8  Q    You understand that -- it's not a question of where I'm

9       going to go with it, sir.  It's a question of do you

10      understand that if somebody tells you that a dangerous

11      situation exists or described a situation to you, that

12      it's not a situation that you yourself have seen so

13      therefore we could classify that as objective of a

14      third party.

15  A    I -- I'm still not very clear on what you're trying to

16      find.  I'm sorry, I'm not trying to be difficult here.

17      I don't -- I don't know exactly what you want me to

18      answer.

19  Q    I want you to answer if somebody describes a situation

20      to you that's dangerous.....

21  A    Okay.

22  Q    .....okay, how do you approach it?

23  A    Cautiously.

24  Q    And do you approach it by yelling at people?

25  A    If the situation is warranted.  There could be times

Exhibit ___A___

Page __19__ of _200_

1         when you'd need to do that.

2  Q     Tell me when the situation warrants it?

3  A     Well, when possibly the person couldn't hear you or you

4         weren't sure if they could hear you.  Or if they have

5         already ignored lesser forms of contact and attempts to

6         establish communication or attempts to establish

7         control of the situation that needs to be controlled.

8  Q     Do all situations that you engage in have to be

9         controlled?

10  A     No, sir.

11  Q     So when you go into a situation, when does it have to

12         be controlled?

13  A     When the investigation is being conflicted with.  And

14         number one, when -- when safety is at risk.

15  Q     Subjective.  If you see a situation that you believe

16         requires some form of restraint, whether it's a verbal

17         restraint or otherwise, do you engage in the situation

18         subjectively by yelling at somebody?

19  A     You could if you had to.

20  Q     Is that the way that you've been taught to engage in --

21         - engaging a citizen, is that what you've been taught,

22         how to do it?

23  A     Under particular circumstances, yes, sir.

24  Q     So can you describe the particular circumstances you

25         were trained?

Exhibit A

Page 20 of 220

1  A    The situation that comes to mind when you bring that up

2       would be any time that someone is ignoring your command

3       such as in a felony traffic stop where a subject is

4       attempting to flee or attempted to flee, or perhaps at

5       the end of a pursuit where someone has already

6       displayed a disregard for your attempts to control the

7       situation using things like lights and sirens and

8       pursuits.  At that point we're taught to engage

9       cautiously from a distance and yes, yell.

10  Q   Okay.  Are you taught to be patient with the people

11      that you're dealing with when you yell?

12  A   Yes, sir.

13  Q   How much patience -- do they describe for you how this

14      patience is extended?

15  A   I don't remember any particular training on exactly how

16      much patience is extended.  Again, that's going to be

17      dependent on the situation at hand and what the -- what

18      the urgency of the situation is.

19  Q   How long were you at the Soldotna post?

20  A   I was there about a year when I went to the K-9

21      academy.  That was about three or four months.  I'm

22      going to have to say roughly a year and a half, sir.

23  Q   That's your total time at the Soldotna post?

24  A   Yes, sir.

25  Q   Okay.  What other posts have you served besides

Exhibit ___A___

Page _21_ of _220_

22

1           Soldotna?

2   A       Since Soldotna I served in Palmer and Anchorage.

3           Anchorage Judicial Services and now in Ketchikan.

4   Q       Before Soldotna?

5   A       Before Soldotna was the academy, sir.

6   Q       Okay.  Your time at Soldotna, can you tell me how often

7           you would receive training?

8                   MR. FLOERCHINGER:  Form.  It's pretty vague.

9   Q       Well, let's talk about.....

10                  MR. FLOERCHINGER:  Specific training or any

11  training?

12                  MR. OSTERMAN:  I'll go into it a little bit

13  since it's a little bit vague.

14  Q       At the post you had received training?

15  A       At the Soldotna post?

16  Q       Yes.

17  A       Yes.

18  Q       And the Soldotna post had a designated training

19          officer?

20  A       Depending on the type of training, yes.

21  Q       Okay.  So let's describe for a second the different

22          kinds of training that you believe you received while

23          you were at the Soldotna post, in categories and

24          identifying the trainer?

25  A       Taser training by now Lieutenant Halgo.....

Exhibit __A__

Page _22_ of _220_

23

| | | |
|---|---|---|
| 1 | Q | Okay. |
| 2 | A | .....then Trooper Jim Halgo (ph).  Of course my field |
| 3 | | training was in Soldotna. |
| 4 | Q | By who? |
| 5 | A | My primary TO was Trooper Brad Nelson. |
| 6 | Q | Okay. |
| 7 | A | I had two other FTOs.  Mark Ethridge -- I believe his |
| 8 | | first name was Mark. |
| 9 | Q | Richard? |
| 10 | A | Richard Ethridge, yeah. |
| 11 | Q | Okay. |
| 12 | A | And -- I got him confused with someone else.  I'm |
| 13 | | sorry.  And -- I know the nick name.  I'll think of the |
| 14 | | other one.  I just always called him Shorty.  Everybody |
| 15 | | called him Shorty. |
| 16 | Q | Okay. |
| 17 | A | He was even shorter than me. |
| 18 | Q | Darryl Christenson? |
| 19 | A | Yeah.  Darryl Christenson.  Thanks. |
| 20 | Q | Can you give me the names of the trainers who presented |
| 21 | | training to you for the year and a half that you were |
| 22 | | at the post? |
| 23 | A | I believe I have.  I don't know that I got any other |
| 24 | | specified training besides field training program and |
| 25 | | taser training. |

Exhibit _A_

Page _23_ of _220_

24

1  Q    So there wasn't a periodic training for preparing or

2       writing out complaint forms?

3  A    Yeah.  There was an inservice training which did not

4       take place at post.

5  Q    Where did the inservice training take place at?

6  A    Ft. Richardson.

7  Q    How often was that?

8  A    I went to inservice training once while I was in

9       Soldotna.

10 Q    And you never received any other local training in

11      shoot, don't shoot?

12 A    Not that I recall, sir.

13 Q    Have you had any training for shoot, don't shoot since

14      you became a trooper except at the academy?

15 A    Yes.

16 Q    Where?

17 A    Department of Public Safety.

18 Q    Where is the Department of Public Safety at?

19 A    Training academy in Sitka.  I'm sorry.

20 Q    You went back to Sitka for additional training?

21 A    Yes, sir.

22 Q    And you got more shoot, don't shoot training there?

23 A    Yes, sir.

24 Q    Okay.  You never had any additional training on shoot,

25      don't shoot while you were at the Soldotna post?

25

1  A    Not that I recall, sir, no.

2  Q    Okay.  You don't recall there being any other training

3       except for your inservice time at Ft. Rich?

4  A    That's correct, sir.

5  Q    And except for the times that you were with Ethridge,

6       Christenson or.....

7  A    Nelson, sir.

8  Q    .....Nelson?  I apologize.

9  A    That's fine.  That's correct, sir.

10 Q    And that training that they gave you was training

11      necessary that you had to complete before you were able

12      to be in a car by yourself?

13 A    That's correct.

14 Q    There was no refresher training with them?

15 A    The quarterly training, the inservice training was the

16      refresher training.

17 Q    And so you did the quarterly training at Ft. Rich.....

18 A    Yes, sir.

19 Q    .....and not with any of your training officers?

20 A    Not in a shoot, don't shoot situation.

21 Q    Okay.  But there was never any formal training program

22      at the Soldotna post?

23 A    Only -- I think I see what you're saying.  There wasn't

24      like a scheduled ongoing maintenance training.  There

25      was enough training available to keep everyone current

Exhibit __A__
Page __25__ of __200__

1        in their qualifications with their -- with their

2        different things.  You know, from firearms to tasers

3        to.....

4  Q    CPR, those.....

5  A    Correct.

6  Q    .....kinds of things.

7  A    Right.

8  Q    There was a maintenance and scheduling for that but

9        there was not a maintenance and scheduling for officer

10       safety, situational concerns?

11  A   No, sir.

12  Q   So any time there was any new information, somebody

13       using cell phones and developing them into firearms,

14       you didn't receive any training bulletins on those?

15  A   We received training bulletins, yes, sir.

16  Q   How often did you receive a training bulletins?

17  A   Oh, that's -- that's difficult to answer.  I -- we'd

18       get them on e-mail.  Sometimes they'd be laying on your

19       desk.  Sometimes by word of mouth.  I can't say how

20       often.  You know, sometimes we'd get two or three in a

21       day and then we'd go weeks where we wouldn't get any.

22       So.....

23  Q   There wasn't any watch -- pre watch briefings?

24  A   No, sir.

25  Q   There wasn't any gathering of the people at the time of

1       the shift to talk over with the oncoming sergeant or

2       oncoming lieutenant as to what the anticipations or

3       expectations there would be for the day?

4   A   No, sir.  A lot of times there was just one person on.

5   Q   Okay.  This particular -- never mind.  I'm going to

6       stay with where I'm at.  Were there any requirements to

7       maintain physical fitness?

8   A   Yes, sir.

9   Q   What were those requirements?

10  A   I think they've changed now.  I'm trying to remember

11      what they were.  I believe you have to do a mile and a

12      half run in under 15 minutes approximately.  I believe

13      you have to do 25 push ups and 25 sit ups.  Those three

14      I believe are the minimum standards.  But I'd have to

15      refer to the OPM to be sure.

16  Q   Okay.  You were checked annually for that?

17  A   Yes, sir.

18  Q   Is that an announced situation?

19  A   Announced?

20  Q   In other words, was it announced Trooper Osborn, you

21      are to appear on Friday and do your physical exam?

22  A   Yeah.  They usually give us a heads up.

23  Q   Okay.  Do you know how far in advance you got a heads

24      up?

25  A   Oh, I believe we did that at quarterly training at Ft.

Exhibit _A_
Page _27_ of _200_

28

```
 1        Rich, so whenever they let me know that we were going

 2        to -- sir, I keep confusing the terms quarterly

 3        training and inservice training.  Those are the same

 4        things.

 5   Q    So when you say quarterly, you mean inservice.....

 6   A    Inservice training.

 7   Q    .....and inservice you mean quarterly?

 8   A    Yes, sir.

 9   Q    Okay.

10   A    I'm sorry.

11   Q    That's fair enough.  I understand.

12   A    And I believe while in Soldotna we did the physical

13        fitness test during inservice training.

14   Q    An incident happened, I believe it happened at

15        approximately 2:00 o'clock in the morning on the 4th of

16        January, 2003.

17   A    Yes, sir.

18   Q    Do you have a recollection of that event?

19   A    I do, sir.

20   Q    Now, how long had you been on that night at the time of

21        this event?

22   A    I can't quote the hours exactly.  I know I came in

23        before my shift to do some DUI enforcement overtime.

24        We get some grants to do specific DUI enforcement.

25   Q    Okay.  If I were to tell you that you mentioned you
```

Exhibit _A_
Page _28_ of _220_

1       came in at 10:00 o'clock that night, would that help

2       your recollection?

3   A   It -- it sounds about right.  But I don't remember

4       exactly what time.  It was a long time ago.

5   Q   There were a lot of tape recorded statements made and

6       you made tape recorded statements.  Is that right?

7   A   When, sir?

8   Q   That night?

9   A   That night?  Yes, sir.

10  Q   And several days after?

11  A   Several days after?

12  Q   Didn't you meet with several officers, Randel

13      McPherren, I believe is one of the officers that you

14      met with?

15  A   Yes, sir.  That's correct.

16  Q   And David Hansen?

17  A   Yes, sir.

18  Q   And do you remember when you met with them?

19  A   I do.

20  Q   That was I think the day following this event, wasn't

21      it?

22  A   I believe so.

23  Q   And then did you give a recorded statement about a week

24      later briefly?

25  A   A week later.  I -- I don't recall giving a recorded

1       statement a week later, or any statement.

2  Q   Have you had a chance to look back through any of this

3       -- or listen to the tapes or look back through any of

4       this incident since you've given those statements?

5  A   Yes, sir.  Not entirely, but somewhat.

6  Q   Okay.  When was that?

7  A   I actually looked through it a couple of days ago.

8       Maybe three.

9  Q   Okay.  Do you recall what information you reviewed?

10  A   Oh, about the first 50 percent of the report starting

11       at the top.

12  Q   Okay.  Did you review any of the transcripts of the

13       tapes that were made?

14  A   A little bit.

15  Q   Okay.  Can you describe -- I'm going to let you begin

16       with a narrative rather than me picking this thing a

17       part. Because if I go statement by statement we'll be

18       here most of the day.  I don't want to do that.

19  A   I understand.

20  Q   You received a call -- or no, I'll take that back.

21       Trooper Whittom received a call.....

22  A   That's correct.

23  Q   .....for a suspicious vehicle?

24  A   That's correct.

25  Q   And you acted on that?

Exhibit A
Page 30 of 220

31

1  A      I followed along to assist.

2  Q      Okay.  And actually you were ahead of him?

3  A      Yes, physically.

4  Q      When you arrived at the scene.....

5          COURT REPORTER:  Sir, could you speak up,

6  please?

7  A      I'm sorry.  Should I move this up or am I just too soft

8          spoken?

9          COURT REPORTER:  You're just a little too soft

10  spoken.

11  A      I'm sorry.

12  Q      When you arrived at the scene describe for me what you

13          found?

14  A      Pardon me, sir.  When I arrived at the scene I saw a

15          vehicle.

16  Q      Can you describe the vehicle for me?

17  A      It was a small car and it was backed up against a snowy

18          area or a snow bank in the right-hand side of the Kenai

19          Keys pull out.

20  Q      Can you describe for me please how that vehicle fit the

21          description of the car you were on call for?

22  A      It fit the vehicle pretty well.

23  Q      Well, as a matter of fact, when you first pulled in you

24          couldn't see this vehicle?

25  A      When I gained full view of the Kenai Keys pull out, I

Exhibit ___A___

Page _31_ of _220_

1    could.

2  Q    But when you initially entered the Kenai Keys area you

3    could not see this vehicle?

4  A    Correct.  Because of the snow berm.

5  Q    Okay.  Which meant that the DOT person who made the

6    report to dispatch, could not see this vehicle either?

7  A    I would be speculating, sir.  He may have had a

8    different vantage point and his vehicle is much taller.

9  Q    To your knowledge he was driving down the Sterling?

10 A    Correct.

11 Q    And any person driving down the Sterling could not have

12    seen this vehicle behind the snow berm?

13 A    That'd be speculation, sir.  I couldn't say that.

14 Q    Okay.  In other words, you had to turn off the -- into

15    the Keys area and then make another turn past a line of

16    snow to see this vehicle?

17 A    No, sir.

18 Q    So can you describe for me, please -- in fact, let's

19    ask you to just simply draw it out on a piece of paper.

20 A    Certainly.  I believe there's some.....

21 Q    I know there is, sir.

22 A    .....schematics in there.  Would you like me to re-draw

23    it?

24 Q    I'd like for you to -- to begin with by drawing the

25    Sterling Highway leaving enough space for this turn out

Exhibit _____ A

Page 32 of 220

1      and its entry way.

2  A    Okay.  I'll do my best, at least to my recollection.

3  Q    Okay.

4  A    Would you like me to label it, sir?

5  Q    I'd like you to label the Sterling Highway.

6  A    Here you are, sir.

7  Q    Okay.  I'd like for you now to draw an X locating --

8      I'm sorry.  Would you describe, and I'm going to put my

9      finger on this area and in fact, let me have that ink

10     pen.....

11  A    Oh, certainly.

12  Q    .....I'm going to shade this using this particular ink

13     pen with right to left slashes starting at the berm and

14     working down the Seward (sic) Highway.  Because I want

15     to ask you about that area that I've just shaded.  Was

16     that area bermed up with snow?

17  A    Some of it, sir.

18  Q    Okay.  What portion of it was not?

19  A    The -- the ditch down here, sir.

20  Q    But otherwise, above the ditch area there was still

21     snow pushed up from the berm -- I'm sorry, from the

22     turn out area?

23  A    That's correct, sir.

24  Q    And that snow was beyond three feet tall?

25  A    I -- I couldn't say for sure, sir.

Exhibit __A__

Page __33__ of __220__

1    Q    You don't know?

2    A    I -- I don't know.

3    Q    Okay.  Can you draw me an X where this vehicle was

4         located at in the turn out area?

5    A    Certainly.  Of course not to scale and I'm not an

6         artist.  But I'll give it my best.

7    Q    Okay.

8    A    This is based on my recollection.  Of course I didn't

9         have a bird's eye view such as we're drawing it

10        now.....

11   Q    I understand.

12   A    .....when I came in so this is subject to my perception

13        being far different than hovering above it.

14   Q    Okay.

15   A    I believe the vehicle was in the position not unlike

16        this, and I'll draw a little triangle, the front of

17        that triangle pointing towards the front of the

18        vehicle.

19   Q    The front of the vehicle and be the direction of its

20        travel if it were in forward motion?

21   A    Correct, sir.

22   Q    Okay.

23             MR. FLOERCHINGER:  Counsel, could I make just a

24   suggestion.  Maybe we should, as we do these, draw vehicles in

25   positioning, put A, B, C, whatever on the vehicle so that later

Exhibit A
Page 34 of 220

1  on we've got.....

2              MR. OSTERMAN:  Not a problem.  I'm just asking

3  him to draw an X at that particular location.  We're going to

4  draw a Y next.  But that's fine.....

5              MR. FLOERCHINGER:  Okay.

6              MR. OSTERMAN:  .....if he wants to go ahead and

7  put an A in there.....

8  A      You're right.  I'm sorry.

9              MR. OSTERMAN:  .....for purposes of this record

10 we'll say that A is the suspect vehicle.

11             MR. FLOERCHINGER:  Okay.

12 A      I could draw another one with an X.....

13 Q      Make a nice big A for me, please.

14 A      Okay.  I did exactly opposite of what you asked me

15        there.

16 Q      Okay.

17 A      I'm so used to drawing schematics with the little car.

18 Q      That's okay.  That's okay.  Now, the area here, and I'm

19        going to point to that particular area and I'm going to

20        ask -- you can borrow the ink pen again if you.....

21 A      Certainly.

22 Q      .....need to, and I'm going to make swirls in this

23        area.  As I understand it there's a ditch right here.

24        Can you draw me where the ditch would be in that area

25        there?

Exhibit __A__
Page __35__ of __220__

36

1  A    I don't recall looking at the ditch over here.

2  Q    Do you know whether there was any bermed snow right

3       there?  And let me do this.  Let me make this swirl

4       motion like this to indicate that I've made a series of

5       what would be like O's or E's at the corner.  By the

6       way, we need to do one other thing, orient north.  Can

7       you orient north for me real quick?

8  A    Boy, I don't know that I can.  I can tell you north

9       bound -- this way on the highway would be.....

10 Q    North bound?

11 A    .....towards Anchorage, which we called north bound

12      because you're going towards Anchorage but looking at

13      it from a compass.....

14 Q    Let's call it north bound.

15 A    Okay.

16 Q    Draw the arrow that way and write the word north bound

17      -- okay.

18 A    I'm going to write north bound to Anchorage.

19 Q    Okay.  Now for the purposes of our diagram, the area

20      I'm talking about is in the north corner and would be

21      the northwest corner of the sheet of paper that we're

22      looking at?

23 A    Yes.

24 Q    Okay.  And do you recall if there was any bermed snow

25      in that location?

Exhibit ___A___

Page 36 of 220

| | | |
|---|---|---|
| 1 | A | No, I don't, sir. |
| 2 | Q | Do you recall a ditch of any kind? |
| 3 | A | No, I don't, sir. |
| 4 | Q | And you never saw this turn out from the vantage point |
| 5 | | of traveling from north to south? |
| 6 | A | No, sir. |
| 7 | Q | You did not see this vehicle when you approached from |
| 8 | | the south until you'd actually entered the turn out |
| 9 | | area? |
| 10 | A | That's correct, sir. |
| 11 | Q | And in fact, you had to enter the turn out area |
| 12 | | completely in order to see it? |
| 13 | A | I -- I don't recall how far I had entered into the turn |
| 14 | | out area.  Completely is fairly vague.  There's a lot |
| 15 | | of the turn out area.  I remember seeing it shortly |
| 16 | | after I -- after I drove into the turn out. |
| 17 | Q | Okay.  You don't know which direction the complaining |
| 18 | | person was traveling at the time that they saw this |
| 19 | | particular vehicle? |
| 20 | A | Both directions I believe. |
| 21 | Q | Okay. |
| 22 | A | Because he was driving back and forth. |
| 23 | Q | And you don't know how long his perspective would have |
| 24 | | been of any visuals? |
| 25 | A | How long had his..... |

Exhibit _A_

Page _37_ of _220_

38

```
 1   Q    How long his perspective would have been?  I mean how

 2        long he would have seen the vehicle as he approached

 3        it?

 4   A    Oh, how far away he would have seen it?

 5   Q    And how long he would have seen it?

 6   A    I believe he stated it had been there a couple hours.

 7   Q    Okay.  But you state that the vehicle that he described

 8        was there for a couple of hours?

 9   A    Yes, sir.

10   Q    Did you ever in any way, shape or form -- let me back

11        up and restate that question to be a bit more

12        affirmative than that.  Did you ever make -- conclude

13        in any fashion the vehicle that's described as vehicle

14        A is the vehicle described by the complainant?

15   A    Oh, I think I see -- I think I understand what you're

16        saying.  You're asking me whether or not I ever doubted

17        this was the vehicle called in?

18   Q    Did you ever find any way to know for certain that it

19        was?

20   A    No.

21   Q    In fact, you don't know whether this vehicle was even

22        the vehicle he saw?

23   A    I -- I believe it was.  It fit the description close

24        enough.

25   Q    It fit the description because it was a car and it was
```

Exhibit ___A___

Page 38 of 220

1     dark?  Give me some other identifier.

2  A  The time of night.

3  Q  Okay.  So the time of night means that it's the same

4     vehicle.  How is that possible, sir?

5  A  No, sir.  It just increases the -- it increased my

6     confidence that it would be because it was the only

7     vehicle he stated would be out there.  It was also a

8     small sedan and we know from police work that car

9     colors is very, very subjective.  Some people are color

10    blind.

11 Q  Particularly in the winter time?

12 A  Particularly in the winter time.  What's that?

13 Q  Because people get all kinds of slush and crap on their

14    cars?

15 A  I suppose that could be true.  Of course mud in the

16    summer will do the same thing.

17 Q  It was dark out?

18 A  Very dark, yes.

19 Q  Were there any lights?

20 A  In this area, artificial?

21 Q  Yes.

22 A  No, sir.

23 Q  Okay.  Did the license plate numbers match?

24 A  We didn't receive license plate numbers on our call.

25 Q  Your caller described more than one person in the

Exhibit ___A___

Page __39__ of __220__

40

```
 1       vehicle?

 2    A   My understanding was it was possible that there was

 3        more than one person in the vehicle.

 4    Q   So you didn't know whether this vehicle for sure was

 5        the vehicle being described to you, did you?

 6    A   I was confident that it was but of course an unknown

 7        suspicious vehicle without a license plate number is --

 8        is just that.  There really is no way to confirm.

 9    Q   Okay.  And the only thing that was suspicious is that

10        it had been there for a long time?

11    A   No, sir.

12    Q   So what was suspicious about it?

13    A   The activity inside the vehicle.  Of course, DOT

14        drivers drive all night every night and they never call

15        in, you know, a cat in the road and -- and little

16        things like that.  They only call in particular things.

17        And -- and there was movement inside the vehicle and

18        something going on with the lights, as I recall.

19        Turning on and off or off when the driver would go by.

20        Something like that.  It was certainly out of the norm.

21    Q   Do you recall specifically what your dispatch.....

22    A   No.....

23    Q   .....stated?

24    A   No, I don't.

25    Q   Isn't it true that to the best of your recollection the
```

Exhibit ___A___

Page ___40___ of ___220___

1         only dispatch you had was a suspicious dark vehicle at

2         the Kenai Key turn out?

3 A    No.  I -- I wouldn't say that's a complete description

4         either, sir.

5 Q    Okay.  So when you approached this vehicle, what made

6         this vehicle suspicious to you?

7 A    When I approached the vehicle I was just investigating

8         based on the call.  The only thing that I thought was

9         suspicious was that -- you know, at that point when I

10        first saw it I thought it might even be abandoned.  I

11        didn't know anything about it.

12 Q    Okay.  Have you ever seen a copy of the actual radio

13        transmission to Trooper Whittom?

14 A    I believe I have.

15                              **(Exhibit 6 proffered)**

16 Q    I'm going to show you what's been marked as Exhibit 6

17        and we're going to look particularly at page three.

18        And I want to identify that Exhibit 6 contains more

19        than one -- it contains a conversation of the DOT

20        driver and the radio traffic and recording of this

21        particular event.  Have you ever had a chance to see

22        it?

23 A    I -- I have briefed over it but I don't recall its

24        detail.

25 Q    Okay.  So if I were to tell you that this dispatch says

Exhibit ___A___

Page _41_ of _200_

42

1       DOT reported a blue sedan parked for 2 1/2 hours.

2       Every time he drives by they turn lights on.  It's

3       turned in Kenai Keys, back 19 towards Soldotna.  That's

4       the description you received?

5  A   Sounds accurate, yes.

6  Q   No make of vehicle?

7  A   Not that I recall, no.

8  Q   No license number?

9  A   No, sir.

10  Q   So the information you received about turning lights on

11      when they went by only came from the DOT driver and was

12      dispatched.....

13  A   I don't.....

14  Q   .....to you?

15  A   There wasn't -- it was dispatched to Trooper Whittom.

16  Q   Okay.

17  A   I -- I just heard it over the radio.

18  Q   Okay.  Did you transmit that you would assist?

19  A   Yes.  I said -- I said I'd follow along with Trooper

20      Whittom.

21  Q   What was your call sign that night, do you recall?

22  A   1-E-16.

23  Q   Okay.  Do you know who SPD1 is?

24  A   Soldotna Police Department.  I don't know what the one

25      stands for.

Exhibit _A_

Page _42_ of _220_

43

| | | |
|---|---|---|
| 1 | Q | Okay. |
| 2 | A | I'm -- I believe SPD would be Soldotna Police |
| 3 | | Department. |
| 4 | Q | So if you said Soldotna 1-E-16 (ph), I'm 10-8, I copy, |
| 5 | | I'll 10-19 as well, okay, that was you confirming that |
| 6 | | you're going to go on that particular call? |
| 7 | A | Yes. |
| 8 | Q | Okay.  When you arrived it's my understanding you |
| 9 | | pulled your vehicle somewhat in front of this vehicle? |
| 10 | A | That's correct. |
| 11 | Q | You didn't particularly block the vehicle entirely in? |
| 12 | A | Yes. |
| 13 | Q | Wouldn't your training require that you prevent this |
| 14 | | vehicle from leaving? |
| 15 | A | You can't -- it depends on the scenario.  When I -- |
| 16 | | when I parked my vehicle there I believed it was |
| 17 | | abandoned.  I didn't see anyone in the vehicle. |
| 18 | Q | Okay.  You turned on your lights which included the |
| 19 | | lighting force lights on the grill? |
| 20 | A | I don't know if I had those on that Kenai vehicle or |
| 21 | | not.  I can't recall. |
| 22 | Q | Okay.  You had spotlights? |
| 23 | A | I didn't have a spotlight on that vehicle, no. |
| 24 | Q | Okay.  So you had at least bright lights? |
| 25 | A | Yes, sir. |

Exhibit A
Page 43 220

44

1  Q    And you turned those bright lights on?

2  A    No.  I believe it was just the head lights when I first

3       pulled up, sir.

4  Q    You didn't turn on the bright lights of the head

5       lights?

6  A    I don't recall that detail, sir, no.

7  Q    Okay.  But you would have done that thought, wouldn't

8       you, routinely in a stop?

9  A    No, not necessarily.

10 Q    You do that every time you pull up behind somebody at

11      night, don't you?

12 A    No, sir.  You could blind oncoming traffic that way.

13 Q    Okay.  But you're not worried about blinding oncoming

14      traffic this night, are you?

15 A    No, I wasn't in that particular instance.

16 Q    Okay.  Now your vehicle was a Ford Explorer?

17 A    Correct.

18 Q    And you had a dog with you?

19 A    A canine unit, correct, sir.

20 Q    Okay.  And your canine unit remained in the vehicle the

21      entire time of this incident?

22 A    Yes, sir.

23 Q    So we don't have to make any mention of your dog or any

24      reference to your dog in this particular case?

25 A    I would say there'd be one reference to make.

Exhibit __A__

Page __44__  220

1  Q    What would that be?

2  A    The one reference would be that after the incident

3       occurred I had to return to my vehicle to check on my

4       dog as required and also that I believe -- it's

5       speculation, but I believe that later on Trooper Nelson

6       came and secure my dog for me.

7  Q    Okay.  Some how your dog got home?

8  A    Yes, sir.

9  Q    Okay.

10  A    He was okay.

11  Q    The -- so you pulled up, you had your headlights on,

12       you don't recall having any other bright lights to

13       shine in the windows of this vehicle?

14  A    Not initially, sir, no.

15  Q    And you thought the vehicle was initially abandoned

16       when you approached it?

17  A    Yes.

18  Q    Okay.  You got out of your vehicle and walked forward?

19  A    No, sir.

20  Q    What did you do?

21  A    I just pulled straight up to the vehicle and began to

22       call in the license plate of the vehicle.....

23  Q    Okay.

24  A    .....on my radio.

25  Q    Do you remember what the license plate number of that

Exhibit A

Page 45 ~220

1      vehicle was?

2  A    No, I don't.

3  Q    Do you recall calling in being 10-23 in the area?

4  A    Yes, sir.

5  Q    Do you remember whether you completed the license plate

6      number?

7  A    I believe I did but I'm not sure.

8           MR. FLOERCHINGER:  Counselor, are you referring

9  to Exhibit 6?  I see you were kind of looking through.....

10          MR. OSTERMAN:  Page five.

11          MR. FLOERCHINGER:  Page five?  Okay.

12          MR. OSTERMAN:  Six, page 5, about two, four,

13  six, eight, 10 lines down.  Actually six lines.  Eighth line

14  would be the call for the license plate number.

15  Q    You don't recall calling into dispatch saying Soldotna,

16      we're having a failure to yield?

17  A    No.

18  Q    What is a failure to yield?

19  A    Someone who is refusing to stop.

20                      **(Exhibit 65 proffered)**

21  Q    I'm going to show you what's been marked as Exhibit 65

22      and point to the particular area where it says TJO, and

23      I believe that's your initials, isn't it?

24  A    That would be my identifier number that I didn't say

25      that.

Exhibit ___A

Page ___46 ~ 220

47

1  Q    You didn't say those things?

2  A    No, sir.

3  Q    Okay.  And you didn't say those things either?

4  A    No.  I said this.

5  Q    Okay.

6  A    This may be a typo, sir.  I -- I didn't say that.

7  Q    Okay.

8  A    Yeah.  I did say this.  I called in the plate but I did

9       not say that.

10  Q    So -- and I would indicate to you that this was

11      prepared by your department and this was prepared by a

12      typist from your department.

13  A    I understand.

14  Q    You understand that and you still think there may be a

15      typo there?

16  A    Yes, sir.

17  Q    Okay.  Have you compared this to the actual recording?

18  A    I believe so, yesterday.

19  Q    Okay.  So yesterday you listened to some of this?

20  A    We had that question ourselves yesterday and I remember

21      reviewing it to some extent.  And I don't believe I

22      said that.

23  Q    So you reviewed this with whom yesterday?

24  A    Yesterday with my attorney, sir.

25  Q    Okay.  How many hours did you spend reviewing this

Exhibit _____ A

Page 47 of 220

48

1        information yesterday?

2  A     That information, we probably spent 15 minutes on that

3        subject.

4  Q     Okay.  Total, how much time did you spend preparing for

5        today?

6  A     Oh, I think that we hung out yesterday for about --

7        well, most of the morning until 2:00.

8  Q     Okay.  Do you recall saying Soldotna, 1-E-16, shots

9        fired?

10  A    Yes, sir.

11  Q    Okay.  Between that time though there were no other

12       calls made by you?

13  A    To dispatch, that's.....

14  Q    Right.

15  A    Well, I -- I would have to review, but not to my

16       recollection, sir.

17          MR. FLOERCHINGER:  Go ahead and take an

18  opportunity to look at that.  And you're talking about between

19  time of radioing in the license plate.....

20          MR. OSTERMAN:  Radioing in the license plate

21  number.

22          MR. FLOERCHINGER:  .....and shots fired?

23          MR. OSTERMAN:  Excluding the one he claims

24  is.....

25          MR. FLOERCHINGER:  Right.

Exhibit A
Page 48 of 220

1     MR. OSTERMAN: .....a possible mistake.

2     MR. FLOERCHINGER: Right.

3 A  That's correct, sir.

4 Q  You've had an opportunity to review that?

5 A  Yes, sir. No other radio transmissions in between

6    those times.

7 Q  Okay. What was the time element from the time you

8    called the license plate number in and the time you

9    fired a shot?

10 A  I don't recall, sir.

11 Q  Okay. You had a tape recorder going at some point in

12    time?

13 A  Yes.

14 Q  When did you turn your tape recorder on?

15 A  At some point after I got out of my vehicle and after I

16    begun, you know, trying to communicate with the

17    suspect.

18 Q  Okay.

19 A  I don't recall exactly when, sir.

20 Q  Now, as I understand it then you place a drawing here

21    of where your vehicle was.....

22 A  Yeah.

23 Q  .....and label it number B for me.

24 A  Certainly. I'll do my best here.

25 Q  I'm not asking you to be an artist, sir, but I'd

Exhibit A
Page 49 of 220

1        certainly hate to have you try to do a horizontal view

2        of this rather than a.....

3  A     Yeah.  The angles would get me, I believe.

4  Q     Yeah.

5  A     Well, that's not entirely accurate.  I probably drew it

6        a little.....

7  Q     That's okay.

8  A     .....close.  And Bravo, B, is what you'd like on this

9        vehicle.....

10  Q     Yes.

11  A     .....sir?  There you are, sir.

12  Q     Now, the -- what you're basically stating is that

13        you're mostly on the driver's side of the vehicle with

14        your headlights shining into the vehicle?

15  A     That's -- that's what I remember.  I don't remember if

16        I was exactly straight on or if I was off to the side a

17        little bit.  I can't recall exactly.

18  Q     It was dark?

19  A     It was very dark.

20  Q     All right.  It was an over cast night?

21  A     I don't recall.  It was dark.

22  Q     Do you remember if it had been snowing?

23  A     It may have snowed freshly but the -- but the only

24        reason I believe that is because I think that I --

25        somebody mentioned that in the report, there was a

Exhibit __A__

Page 50 of 220

51

1    fresh skip of snow.  I don't recall.  It was pretty

2    cold.

3  Q    Okay.  The headlights on your Ford Explorer are how

4    high, do you know?

5  A    No, I don't know, sir.

6  Q    Can you give me an approximate height?

7  A    I hate to give it to you.  I could stand up and.....

8  Q    Sure.  Stand up.....

9  A    .....guesstimate for you.

10  Q    .....stand up.

11  A    I'd say if I'm standing up and I'm five foot, eight,

12    the hood of the Ford Explorer is probably about my

13    chest.....

14  Q    Okay.

15  A    .....and the headlights would be right.....

16  Q    Probably about your belt line?

17  A    That might be a little low even.  They might be higher

18    than that.  I don't know.

19  Q    Okay.  Somewhere between your belt line and probably

20    your arm pit?

21  A    Yeah.  That'd be my best guess, sir.....

22  Q    Okay.

23  A    .....but it's only a guess.

24  Q    And we would say that if you're five foot, eight, you

25    said?

Exhibit A
Page 51 of 220

1   A     Something like that.  Seven.

2   Q     Okay.  Five foot, seven, five foot, eight, that would

3         put that at about four foot, seven.  Be about four

4         feet, is that a fair statement?

5   A     I -- I'd hate to give you a number.  That's probably

6         right in the ball park though.

7   Q     Okay.  So you say somewhere around four feet?

8   A     I think that's a fair guess.

9   Q     Okay.  And this particular vehicle, do you remember how

10        tall it was to the roof of the car?

11  A     No.  I didn't take any measurements on it.

12  Q     When you stood up against this particular car do you

13       remember where the hood would have struck you?  Or --

14       I'm sorry, where the top of the car would have struck

15       you if you were standing next to it?

16  A     Yeah.  About average.  Like a small sedan.

17  Q     So would you stand up and give me a demonstration where

18       you think that was?

19  A     Sure.  I'd say maybe about chest height.

20  Q     Okay.  So just a little higher than your arm pit maybe,

21       or about the same height as your arm pit?

22  A     Maybe equal to.

23  Q     So you think maybe that the top of that particular car

24       was about equal to the headlights of your Explorer?

25  A     I wouldn't say the Explorer lights would be that tall.

Exhibit ___A___

Page 52 of 220

1   Q     Okay.

2   A     No.

3   Q     But maybe equal to the hood?

4   A     That's a big difference, you know, from the top of the

5         car to the hood.

6   Q     From the top of the car to the.....

7   A     I'd say more.....

8   Q     .....hood of your Explorer?

9   A     Oh, I see what you're asking.  I was.....

10  Q     Yeah.  So about same in height?

11  A     Maybe -- maybe something like that.

12  Q     Yeah.

13  A     It was probably closer.

14  Q     So undoubtedly the headlights of the Explorer are just

15        about eye level with anybody sitting in that car?

16  A     Yeah.

17  Q     Okay.

18  A     That's probably about right.

19  Q     What happened after you radioed in the license plate

20        number?

21  A     After I radioed in the license plate number somebody

22        sat up on the -- in the driver's seat and just sat up

23        just like that, as I'm describing, very -- very

24        fast.....

25  Q     Okay.

Exhibit ___A___
Page _S3_ of _280_

1  A     .....and grabbed the steering wheel and was looking

2         right at me.

3  Q     Okay.  They were looking right at you?

4  A     (Inaudible response).

5            COURT REPORTER:  Is that a yes?

6  A     I'm sorry.  I nodded.  Yes.

7  Q     We keep her for that reason.  Okay?

8  A     Yes.

9            COURT REPORTER:  Thank you.

10  Q     She keeps us in line.  Thank you, ma'am.

11  A     Yes.

12  Q     Okay.  Undoubtedly -- you said the person looked right

13         at you?

14  A     I wouldn't say undoubtedly.  That's the feeling I got

15         is that we made eye contact.  And I don't know what was

16         going through the person's head.

17  Q     This was a very dark night and you had very bright

18         lights on your car very close to that person?

19  A     Well, once again I don't know if I had my brights on.

20         But I did have my headlights shining in his car.

21  Q     And your headlights are bright.....

22  A     The.....

23  Q     .....by themselves?

24  A     Certainly.

25  Q     And if you would have to go out say about three or four

Exhibit ___A___

Page __54__ of __220__

1        feet away, would that be a fair number to be away from

2        that car?

3   A    A little bit farther I'd say.

4   Q    Okay.  Seven or eight?

5   A    Something like that.

6   Q    Give me a number that works for you.

7   A    I'd say -- I'd say six feet guestimation.....

8   Q    Okay.

9   A    .....from the front of his car.  So add the hood to

10       that we're probably looking at 12 to 14 feet from the

11       headlights to the windshield.

12  Q    Okay.

13  A    Guess.

14  Q    Twelve feet.  We've got two headlights that are about

15       eye level.  We've got two headlights that, as I

16       understand headlights, they focus to a center point?

17  A    Yes.

18  Q    So they're both boring in on the driver.  That's the

19       center point of where your headlights are, aren't they?

20  A    I -- I wouldn't know.  I don't know where they bore

21       into a center point.  They were lighting up the area

22       and I could see inside the car.

23  Q    That person couldn't make eye contact with you through

24       those bright lights, could they?

25  A    That'd be speculation, sir.

Exhibit    A

Page  55  of  220