56

1  Q    Well, you tell me.  How many times have you sat and

2       looked through -- tried to look through bright lights

3       into the hood of a -- through the windshield of a car

4       and see someone?

5  A    Well, I've done that quite frequently.

6  Q    Okay.  And you don't have any problem doing that?

7  A    It can be a problem depending on the situation.

8       But.....

9  Q    But if you had your brights on it would make it even

10      worse, wouldn't it?

11 A    It, once again, depends.  I mean that's possible

12      but.....

13 Q    And if you had ultra bright lights on, it'd be even

14      harder still?

15 A    I don't know.  It depends -- that would be -- that's a

16      loosely described scenario that I just don't think has

17      one straight answer to it.  It would depend on the --

18      it would depend.....

19 Q    Go ahead, you can answer.

20 A    It would depend on where those lights are aimed and if

21      there's any obstructions and, you know, the particular

22      person.  I.....

23                              **(Exhibit 29 proffered)**

24 Q    I'm showing you 29 -- Exhibit 29.  Okay?  That's the

25      front of your canine unit?

Exhibit A

Page 56 of 220

57

| | | |
|---|---|---|
| 1 | A | Yes, sir. |
| 2 | Q | Does it have the ultra brights on it? |
| 3 | A | Yeah.  It has the -- the highway -- moose lights we |
| 4 | | call them on the..... |
| 5 | Q | Yeah. |
| 6 | A | .....just below the headlights mounted on the bumper, |
| 7 | | yes. |
| 8 | Q | Okay.  And the likelihood is if you had those |
| 9 | | particular lights you would have used them? |
| 10 | A | I wouldn't say that's the likelihood. |
| 11 | Q | You were coming into a strange scenario? |
| 12 | A | It -- like I said, I thought it was just an abandoned |
| 13 | | vehicle at the very beginning.  So..... |
| 14 | Q | Okay.  This person sits up and frightens you basically? |
| 15 | A | No, he didn't frighten me. |
| 16 | Q | Okay.  Startled you? |
| 17 | A | I was surprised there was someone in the vehicle. |
| 18 | Q | Surprised you.  And that surprise was that there was a |
| 19 | | person there? |
| 20 | A | Yes. |
| 21 | Q | Surprise was that the -- you're focusing on getting a |
| 22 | | license plate number and suddenly this movement |
| 23 | | appears? |
| 24 | A | Correct, sir. |
| 25 | Q | The surprise was that this person, probably asleep, is |

Exhibit _____ A

Page 57 of 220

58

1    awakened by all the lights and activity outside his

2    car?

3  A    That'd be speculation.  I don't know what he was doing.

4  Q    Well, you don't know what he was doing but certainly in

5    the middle of the -- he'd been there for several hours

6    is in the report, right?

7  A    I don't know if it was several or a couple.

8  Q    Okay.

9  A    He could have been there a long time.

10  Q    And so if he could have been there a long time he could

11    have been sleeping?

12  A    I don't know.

13        MR. FLOERCHINGER:  Object to form.

14        MR. OSTERMAN:  Okay.  There it goes.  We're

15  going to have a standing objection to form.  I've never heard

16  of an objection to form being made in a court room but we're

17  going to take the objection to form and we're going to leave it

18  stand.  Every question I ask from this point on is going to be

19  to form.  Okay?

20  Q    So you are -- you've seen people in turn outs before?

21  A    Yes, sir.

22  Q    You've stopped people in turn outs before and

23    investigated?

24  A    I don't know about stopping.  If somebody's in a turn

25    out they're probably already stopped.

1   Q   If they're -- but you've pulled up next to them?

2   A   Yeah.

3   Q   You've turned on your overhead lights?

4   A   Depends.

5   Q   You've walked up to their cars and shown headlights in?

6   A   No, that's -- that's a subjec- -- I wouldn't agree with

7       those statements a hundred percent.  Showing headlights

8       in, I don't understand.

9   Q   Well, you said it's subjective.  Okay.  Well, you don't

10      pull up and put your headlights in the driver's seat of

11      a car when you're investigating somebody in a turn out?

12  A   If that's the best position I have then that's what I

13      have.

14  Q   Have you ever done that before at night?

15  A   Pulled in like this and approached a vehicle like that?

16  Q   Yes.

17  A   Not that I recall specifically.  But it was the best

18      thing I had with what I had to work with.

19  Q   Okay.  You've never pulled into a turn out and

20      investigated another suspicious vehicle besides this

21      one?

22  A   Yes, I have.

23  Q   And the times you've investigated vehicles, have you

24      found people asleep in their cars?

25  A   I don't know that I have.  I can't remember, sir.

Exhibit ___4___

Page _59_ of _220_

60

1  Q    You know that people pull over into these turn outs

2        sometimes at night and sleep because they're tired?

3  A    I do it myself, sir.

4  Q    Okay.  Because they don't want to fall asleep?

5  A    Absolutely.  It's safe.  That's great.

6  Q    So when this person sits up startled, pull himself up

7        and looks around, it was obvious to you they had their

8        seat reclined?

9  A    At that point it was.

10 Q    Okay.  And it was obvious to you too that whoever it

11       was had just been startled by your appearance?

12 A    Yes.

13 Q    Okay.  So what did you do next after this person sits

14       up immediately in the vehicle?

15 A    I didn't do anything next.  I wanted to -- what I

16       wanted to do, I can tell you, I wanted to.....

17 Q    I don't know what you wanted to do.  I want to know

18       what you did.

19 A    Okay.  I didn't do anything next.  I watched the

20       person's activities for a couple of seconds.

21 Q    Okay.  Then you exited your vehicle?

22 A    No.

23 Q    What'd you do then?

24 A    Then I still watched the person's activities.  I guess

25       probably to walk you through it I'll have to describe

Exhibit __A__

Page __60__ of __220__

61

1    what the activities -- would you like me to do that?

2  Q    Please do.

3  A    The person popped up which was surprising.  I believe I

4       still held the radio mike in my hand.  I was waiting

5       for someone else to get off the radio so I could tell

6       them that there is indeed a person in the vehicle.

7       Then the person in the vehicle started steering his

8       vehicle to go around me.

9  Q    Okay.  Still had -- to your knowledge they had not

10      moved to pull their seat up from the reclining

11      position?

12  A   I don't know.  And in retrospect I know a couple

13      moments ago you asked if I knew that the seat was down

14      at that point.  I have to say, in just brief

15      reflection, that I -- I didn't know what the deal was

16      with the seat.

17  Q   Okay.

18  A   I really didn't.  I -- you know, the person just popped

19      up very quickly.  And that's all I was thinking about.

20      I wasn't thinking about their seat.

21  Q   So they began turning their wheel to leave?

22  A   Right.  To my -- towards my driver's side, that's

23      correct.

24  Q   Had you identified yourself as a police officer?

25  A   That's what I did next.  I turned on my overhead

Exhibit A
Page 61 220

62

1      lights.

2   Q   Okay.  If you had your ultra brights on that we saw in

3      that photograph, would any person have been able to see

4      beyond those ultra brights to see your overhead?

5   A   That's speculation.  I don't know.  I don't know where

6      those brights would have been shining if indeed they

7      were on.  And I don't know that they were on.  I just

8      don't know.

9   Q   Okay.

10  A   I'm trying to recall the best I can.  I just don't

11      know, sir.  I'm sorry.

12  Q   Do you -- you turned on your overheads.  Was there a

13      particular reason why you turned your overheads on?

14  A   Yes.  Because he was trying to be leave.

15  Q   And why wasn't he allowed to leave?

16  A   Because we were investigating a suspicious vehicle.

17  Q   Now, you then did what?

18  A   After I turned on my headlights?

19  Q   Yes.

20          MR. FLOERCHINGER:  Your headlights, you said?

21  Q   Your overheads.

22  A   My overhead flashing red and blue.  Thank you.  I

23      waited for him to stop for a moment and he didn't.

24  Q   Okay.  Then what?

25  A   So then I took my car and I put it back into drive and

Exhibit _A_

Page _62_ of _220_

1        I moved forward about six inches to try to -- to try to

2        keep him from leaving.  To try, you know, to stop him

3        from leaving the area because obviously he was taking

4        off and it was obvious I was a police officer.

5  Q    Okay.  So you're going to stop him because he'd been

6        reported as a suspicious vehicle?

7  A    Yes, sir.

8  Q    Just nothing else would indicate that his conduct

9        required police intervention?

10  A    No.  I felt obligated to contact him based on the

11       complaint.

12  Q    Okay.  You say he then moved -- tried to move around

13       you?

14  A    Yes, sir.

15  Q    What did you do?

16  A    That's when I moved my car about six inches closer.

17       I'm guessing.  Then he stopped his movement and cranked

18       the wheel even harder.  At that point I realized that

19       I'm not going to try to get closer because he may hit

20       my vehicle.  And at that time he -- I can indicate by

21       the drawing.....

22  Q    I'm going to stop you right here for a second.

23  A    Certainly.

24  Q    Where is Trooper Whittom?

25  A    I don't know, sir.

Exhibit ___A___

Page __63__ of __220__

64

```
 1  Q    Okay.  He has not reported in yet at this scene?

 2  A    Not to my recollection, sir.  I haven't seen him yet,

 3       no.

 4  Q    Okay.

 5  A    I don't know.

 6  Q    How long have you now been at this scene?

 7  A    I don't know moment.

 8  Q    You were there and the only one that can tell me how

 9       long you had been there.....

10  A    That's what I'm saying.  Moments.  I had just got

11       there.

12  Q    So we're talking seconds?

13  A    I -- I don't know.  Under a minute, I'd say certainly.

14  Q    Okay.  So absolutely under a minute.

15  A    I -- I feel.  Absolutely.

16  Q    You report the license plate number, somebody moves in

17       the vehicle, you -- you watch them for a moment or two.

18       When we're talking a moment or two, we're talking

19       seconds.

20  A    Right.

21  Q    Okay?  They move their -- try to move their vehicle and

22       you engage your lights and we're under a minute?

23  A    That'd be a pretty good guess.

24  Q    Okay.  You said you suddenly realized you're not going

25       to play this game of moving around and jockeying around
```

Exhibit _A_

Page _64_ of _220_

65

1       trying to block him.  So what'd you do?

2  A    I didn't -- yeah, I didn't consider it a game.  I just

3       didn't want him to hit my car and I didn't want to get

4       any closer to him.

5  Q    Okay.  Why didn't you want him to hit your car?

6  A    I don't want anyone to damage my car.

7  Q    Okay.  Why not?

8  A    You know, nobody likes to get their car damaged whether

9       it's their personal car or their.....

10 Q    When Police cars get damaged it requires a lot of

11      paperwork, doesn't it?

12 A    Well, yeah.  But I mean, you know, nobody wants to get

13      in a collision.  It's just.....

14 Q    Okay.

15 A    .....it's just driving.

16 Q    But nobody wants to have the side of their vehicle

17      particularly damaged in a scenario where you can use

18      your bumpers and push bumpers, right?

19 A    I think I see what you're saying.  That the front of

20      the vehicle is less vulnerable than the side?

21 Q    Yes.

22 A    Well, I'd say that's probably true.  I don't know that

23      that was on my mind at the time.

24 Q    I want to go back to the police academy for a minute.

25      Were you taught anything about vehicle driving and.....

Exhibit _____A_____

Page _65_ of _220_

66

| | | |
|---|---|---|
| 1 | A | Emergency vehicle operations? |
| 2 | Q | Yes. |
| 3 | A | Um-hum.  (Affirmative) |
| 4 | Q | And in the emergency vehicle operations were you taught |
| 5 | | about ramming? |
| 6 | A | Yeah.  We don't ram. |
| 7 | Q | Okay.  But it is a technique that was taught? |
| 8 | A | No. |
| 9 | Q | No? |
| 10 | A | No, pit maneuvers in the Alaska State Troopers. |
| 11 | Q | Okay. |
| 12 | A | That would be exigent circumstances.  We never |
| 13 | | practiced or trained on anything like that. |
| 14 | | **(Exhibit 19 proffered)** |
| 15 | Q | I'm showing you Exhibit 19.  That's the front of your |
| 16 | | canine unit, isn't it? |
| 17 | A | It appears to be, sir. |
| 18 | Q | Okay.  And it has two very large front bumpers up |
| 19 | | there? |
| 20 | A | The -- are you talking about the push bumpers? |
| 21 | Q | Yes. |
| 22 | A | Yeah. |
| 23 | Q | And those are designed for the protection of the |
| 24 | | vehicle? |
| 25 | A | No.  They're more designed to push people off the |

Exhibit __A__

Page __16__ of __220__

67

1      roadway.  That's why the little rubber strip is on

2      there, to help people.

3    Q    Okay.

4    A    They really don't provide an enormous amount of

5      protection.  All it is is flat bar of soft steel.  They

6      really don't provide a lot of protection.

7    Q    Okay.  But if you were going to block this particular

8      vehicle in, you could easily have done it by engaging

9      your vehicle with this vehicle?

10   A    I don't know.  He still -- he still could have damaged

11     it.

12   Q    Okay.

13   A    That's why.....

14   Q    He could have damaged it but you would have stopped it,

15     wouldn't you?

16   A    Yeah.  But I -- I wasn't prepared to do that at that

17     point.

18   Q    Okay.  In less than a minute you engaged your

19     overheads, he's cranking his wheel.  What do you do?

20   A    I'm sorry.  I ran out of water.

21   Q    Fine.  Can we take a break for a second because I need

22     to go to the men's room.

23     (Off record)

24     (On record)

25   Q    The last question I asked was we're less than 60

Exhibit  A

Page 107 of 220

68

1          seconds into this particular call.

2    A    I understand.

3    Q    You've turned on your -- or engaged your overheads.

4          The person has sat up causing you to be surprised.

5          What do you do next?

6    A    An interesting question.  All those things having

7          happened, not necessarily in that order, once again I

8          watched the suspect as he continues his activities.

9    Q    How long?

10   A    The next five seconds before I do anything.

11   Q    And in that five seconds what did he -- he kept turning

12         the wheel trying to escape, that's the thing that

13         you're watching?

14   A    Correct, sir.

15   Q    What did you do then?

16   A    He successfully turned around my vehicle without

17         colliding.....

18   Q    Um-hum.

19   A    .....which I was glad of.  And as he drove by my

20         vehicle I looked out my window, we made eye contact and

21         I pointed and said stop the vehicle.  Or stop,

22         something like that.

23   Q    Was your window down?

24   A    No, it wasn't.

25   Q    So your window was not down.  Was his window down?

Exhibit ___A___
Page 68 of 270

69

1   A    I don't know.

2   Q    Okay.  So you don't know whether he even heard you?

3   A    No.  I made a motion.

4   Q    Okay.  What else did you do?

5   A    Then I got out.

6   Q    Did his vehicle stop?

7   A    No, it didn't.

8   Q    Okay.  Did you have to catch it?

9   A    I wouldn't say I ever caught it.  I kept up with it.

10  Q    Okay.

11  A    He wasn't going very fast.

12  Q    So he's snail pacing then, I guess you'd say?

13  A    Yeah.  I'd say I was probably at a slow trot.  Just a

14       little faster than a walk.

15  Q    Okay.  Do you drive a stick shift?

16  A    My patrol car is not a stick shift.

17  Q    I understand that.  Do you drive a stick shift?

18  A    I do.

19  Q    And how long -- how much experience have you had with

20       this stick shift?

21  A    Quite a bit.  It's what I prefer.

22  Q    And was this vehicle a stick shift?

23  A    I -- I didn't know at that time.  I believe -- believe

24       it was now.

25  Q    Okay.  And to your understanding then basically he let

1      the car roll on the clutch?

2  A    I don't know.

3  Q    You're walking along beside it?

4  A    Right.

5  Q    He's not accelerating the motor?

6  A    No.

7  Q    He's -- the motor is running?

8  A    It is, yes.

9  Q    Was the motor running when you first approached?

10  A    I don't know.

11  Q    You didn't hear it running when you first approached?

12  A    No.

13  Q    Are we past the first minute yet?

14  A    I don't know.  Probably close.

15  Q    Okay.  You're walking along beside the vehicle.  What

16      are you doing?

17  A    Trying to see in the vehicle and I'm telling him to

18      stop.  Ordering him to stop.

19  Q    Okay.  Does he stop?

20  A    No, sir.

21  Q    He never stopped?

22  A    He did eventually.  But not based on my commands.

23  Q    So he never stopped of his own free will?

24  A    I don't know why he stopped.

25  Q    So at some point in time he actually does come to a

Exhibit  A
Page  70  220

71

1       stop.....

2   A   Yes.

3   Q   .....before you shoot him?

4   A   Yes, sir.

5   Q   Okay.  How long after the fact that he starts rolling

6       around your vehicle and you exit, give me a time in

7       seconds that he comes to a stop?

8   A   Boy, in -- I'm going to do my best here but to explain,

9       in situations like this it's so -- so difficult to

10      judge time because things are relative, you know.  And

11      you can sit in an office and try to type for eight

12      hours and it seems like a year.  And, you know, under

13      different circumstances the time just seems to fly by.

14      So it's going to be really hard for me to give you

15      seconds, but I'd say the time it took me to walk the

16      distance from my door -- if I was just to walk it out

17      and time it, from my door to where the vehicle

18      initially stopped, not very long.

19  Q   Do you know how many strides or steps you took?

20  A   No.  No, sir.

21  Q   You weren't in any hurry?

22  A   I wasn't in a -- in a hurry like running hard.  But,

23      you know, I was having to work to keep up with the

24      vehicle somewhat.

25  Q   At some point in time you activated your recorder?

Exhibit A
Page 71 of 220

72

1  A     Yes, sir.

2  Q     It says that the time of the activation is

3       approximately 0207 hours.

4  A     Okay.

5  Q     Do you know what time you said that you were at the

6       scene?

7  A     No, I don't recall, sir.

8  Q     If I were to tell you that based upon Exhibit 6, and

9       the times written down in the dispatch log, you had

10      been there at 0206.

11  A     Okay.

12  Q     Okay.  So we're still approximately one minute.

13  A     I'd say approximately one to two knowing the dispatch

14      will round up or down a minute depending on what time

15      of day it is and what portion of that minute your radio

16      traffic's at.

17  Q     Okay.  Have you seen a transcript of your tape

18      recorder?

19  A     Boy, I think I have but it's been a long time.

20  Q     Okay.

21          MR. FLOERCHINGER:  You're referring to the

22  recorder on -- that he turned on?

23          MR. OSTERMAN:  Yes.

24  A     Yeah.

25  Q     Yes.

Exhibit __A__
Page __72__ of __220__

73

1  A    I think I did at one point but like I said, it's

2       probably been a few years since I've even looked at any

3       of that.

4                                      **(Exhibit 1 proffered)**

5  Q    Okay.  I want to show you what's been marked Exhibit 1.

6  A    Okay.

7  Q    And we're going to talk about Exhibit 1.....

8  A    Where do you want your diagrams, sir?  Do you want to

9       keep all that.....

10 Q    I want to identify -- we're going to that in a second.

11      We're not done with that yet.  Pages one and two of

12      Exhibit 1 are the tape recorder.  And then

13      inadvertently page three, four, five and six are a

14      statement by Trooper Whittom.  And inadvertently they

15      just got attached together.  There's no.....

16 A    Oh, I -- I understand.

17 Q    In the process of sorting and copying all those other

18      fun things they just got stuck together.

19 A    Yeah, I understand.

20            MR. FLOERCHINGER:  Okay.  So we're basically

21 Exhibit 1, page one and two?

22            MR. OSTERMAN:  That's right.

23            MR. FLOERCHINGER:  Okay.

24 Q    Okay.  Take a moment to review that quickly.

25 A    The entire thing?

Exhibit _A_

Page _73_ of _220_

74

1   Q    Just the two pages that are there.  When you're done,

2        look up, sir.

3   A    Yes, sir.  Pardon me.

4   Q    Okay.  That'll be the end of those pages?

5   A    Yes, sir.

6   Q    So have you had a chance to review that particular

7        transcript?

8   A    Yes, sir.

9   Q    Does that accurately depict what your recollection of

10       these events were?

11  A    It accurately depicts the statements I made during the

12       incident but.....

13  Q    Okay.

14  A    .....certainly not all inclusive.

15  Q    So we -- you don't have any qualms -- there's no

16       quibbling over the fact that the -- you turned on your

17       tape recorder probably around the one minute mark?

18  A    No.  I may quibble about that.  I -- I don't -- I don't

19       believe that the -- the tape recorder went on

20       immediately in the incident.  It went on after I had

21       already begun dialogue with the suspect.

22  Q    Okay.  So you're saying that after you began the

23       dialogue that's when you turned your recorder on?

24  A    At some point, yes.

25  Q    How far into the dialogue did you turn it on?

Exhibit A

Page 74 of 220

75

1   A    I'd been giving him commands to stop his vehicle.  It

2        looks to me, and I'll speculate, but the first

3        statements made in there, get out of your car.  So I

4        would make the assumption that his vehicle was already

5        come to a stop and I've been giving him commands to

6        stop his vehicle previous to that.

7   Q    Okay.  So you're telling him to get out of the car and

8        he asks you what's wrong?

9   A    Correct.

10  Q    You never responded to him?

11  A    That's correct.  Well -- can I look at that again while

12       we're talking here?

13  Q    Sure.

14  A    Because I -- I did respond to him.

15  Q    You did?  What did you say?

16  A    I said get out of the car.

17  Q    So when he said what's the matter, you said get out of

18       the car?

19  A    That's correct, sir.

20  Q    So what was the reason for -- you never gave him a

21       reason for why you were stopping him, did you?

22  A    I understand your question.  The -- the contact -- and

23       I'm try- -- I'll try not to give you a lengthy

24       explanation for all of this.  But the contact had

25       already dissolved to a point where he had shown me by

Exhibit ___A___

Page _75_ of _226_

76

1      his actions that he was going to ignore anything but a

2      command such as get out of the car.

3  Q   I want to go back and ask the question.

4  A   Okay.  I'm sorry.  Maybe I didn't answer your question.

5  Q   You didn't answer my question so let's go back to it if

6      we can.

7  A   Okay.

8  Q   He said -- you said get out of the car and he said

9      what's wrong, sir?

10 A   Correct.

11 Q   And you never answered him, correct?

12 A   I answered him with a command.  With the.....

13 Q   To get out of the car?

14 A   Correct, sir.

15 Q   You weren't going to tell him why?

16 A   Not at that point, sir, no.

17 Q   You didn't know why?

18 A   Oh, I knew why.

19 Q   Why?

20 A   Because he was buying time with that answer.

21 Q   Well, what crime had he committed, sir?

22 A   At this point he was eluding a police officer.  I had

23     probable cause to contact him, reasonable suspicion,

24     responding to the incident.

25 Q   Okay.  You tell him -- he says okay, no problem, I'll

Exhibit    A

Page 76 of 200

1          back up.

2                    MR. FLOERCHINGER:  Well, there's some more

3      statements in here.

4                    MR. OSTERMAN:  Okay.

5   Q      Well, let's go through the other statements.

6                    MR. FLOERCHINGER:  Yeah.

7   Q      You say get out of the car and Trooper Whittom says

8          throw up your hands, get in your vehicle, get out of

9          your vehicle?

10  A      (Inaudible response)

11                   COURT REPORTER:  Is that a yes?

12  A      Yes.  I'm sorry.  Once again, yes.

13  Q      Okay.  And he's -- and he says okay, no problem, I'll

14         back up.

15  A      Correct, he said that.

16  Q      Do you think he may be confused by people telling him

17         to get out of the car and people telling him to get in

18         the vehicle?

19  A      No, sir.  It's possible.

20  Q      You don't think that's confusing?

21  A      No, sir.

22  Q      Okay.  You don't -- you say no, get out now?

23  A      Correct.

24  Q      You say do you understand me?

25  A      Correct.

Exhibit _A_

Page _77_ of _220_

78

1   Q    Okay.  He says yes, sir.

2   A    Yes.

3   Q    How much time has elapsed from the beginning of that

4        tape recording to that spot right there?

5   A    I don't know, sir.

6   Q    Seconds?

7   A    I don't know.  I'd have to time it.

8   Q    Okay.  You listened to the tape.

9   A    At some point, yeah.  I don't remember listening to

10       this tape recently.

11  Q    And the tape you had is not voice activated?

12  A    They can be if they're switched on the VOR.  Sometimes

13       that happens inadvertently.  I don't know in this

14       situation if it was flipped on VOR, or sending or not.

15  Q    Okay.

16            MR. FLOERCHINGER:  Can I just ask a question?

17  Could you tell by listening to the tape if it's on VOR?

18  A    Sometimes you can tell.  There's a little pause.

19  Q    Comes out at the first of the word?

20  A    Yeah.  It just kind of kii-kii a little bit.  Unless

21       there's continuous background noise that will keep it,

22       you know, going all the time even if it's on the VOR

23       setting.

24  Q    Okay.

25            MR. FLOERCHINGER:  Just curiosity.

Exhibit  A
Page 78  of 220

1  A    Close in that context meant nothing.  It was just a

2       stutter.

3  Q    Okay.

4  A    I'd made plenty other clear commands.  I was convinced

5       he was still very understanding of what I was asking

6       him to do.

7  Q    So Whittom says we've got him stopped.....

8  A    I guess.

9  Q    .....to the dispatch?  You don't know?

10 A    He -- he might have said this.  It's on there.

11 Q    Okay.  Now you yelled to Whittom to get the taser out?

12 A    Yes, sir.

13 Q    How far is Trooper Whittom from you and this car at

14      that point?

15 A    Well, let's see.  I'm standing at the position I

16      described earlier, behind the door post of the driver's

17      -- suspect's vehicle.

18 Q    Um-hum.

19 A    And Trooper Whittom is behind his door.  Whatever that

20      measurement is.  He's -- I don't know.  I'm going to

21      say probably 20, 25 feet away, I'm guessing.

22 Q    All right.

23 A    That's a guess though.

24 Q    So you yelled at him to get the taser out.  The idea

25      being you're going to try to frighten this guy into

Exhibit _A_

Page _80_ of _220_

1       compliance?

2  A   No, sir.  I didn't want to frighten anyone.

3  Q   So why did you want him to get the taser out?

4  A   At that point I was trying to think of any other tools

5       we could utilize to gain compliance.  I was just using

6       my head to kind of figure out how we could safely

7       complete this task.

8  Q   Okay.  In other words, you couldn't lower the tone of

9       voice or take it -- notch it down?

10  A   That wasn't -- that wasn't warranted at this time.  I

11       didn't feel that that was necessary.  And I actually

12       did at one point lower my voice.

13  Q   You said open the door.  The word close, you say, is a

14       term that you used, it was a stutter.  You were under a

15       lot of stress.  So essentially in the first 30 seconds

16       you're under a tremendous amount of stress in this

17       scenario, is that what you're saying?

18  A   I wouldn't call it a tremendous amount of stress.

19  Q   Okay.  But you were stressed?

20  A   His actions were stress inducing certainly.

21  Q   Okay.  His actions were -- he wasn't doing what you

22       wanted him to do fast enough?

23  A   No, sir, that's not correct.

24  Q   Well, with 30 seconds into the time he brings his car

25       apparently to a stop?

Exhibit A
Page 81 of 220

82

1  A     I understand the time frame.

2  Q     And in that time frame and that 30 second period of

3        time he hasn't complied and now you're trying to find

4        other physical means to force him into compliance?

5  A     No, sir.  That -- that statement -- answering that

6        question makes an assumption that the only things

7        involved here was his lack of compliance when indeed

8        there are many other factors involved that I based my

9        actions upon.

10  Q    Okay.  He asked what's wrong, sir, I was just parked?

11  A    That's his statement.

12  Q    Okay.  When he makes that statement, do you see that at

13       the bottom of that third group -- or fourth group, CP,

14       what's wrong, sir, I was just parked?

15  A    Can you let me find it here, please?  Is it on the

16       first page?

17  Q    Um-hum.

18           MR. FLOERCHINGER:  Right there.

19  A    I see it, sir.

20  Q    How much time do you think has lapsed to this point

21       now?

22  A    Once again, there's no way I can calculate the seconds

23       in any of this.  I don't know.

24  Q    Okay.  You have a tape recorder though, we could play

25       the tape recorded time then?

Exhibit ___A___
Page ___82___ of ___220___

83

```
 1  A     Yeah, we could do that.

 2  Q     And if we timed that and it goes back to less than a

 3        minute.....

 4  A     Um-hum.  (Affirmative)

 5  Q     .....okay, you're still under a lot of stress at this

 6        point?

 7  A     Once again I wouldn't say I was under a lot of stress.

 8        I was -- I was stressed in the fact that I had given

 9        numerous commands and that his responses were ulterior

10        to -- they're very strange.  They're responses you

11        don't normally get in a circumstance like this.

12  Q     I want to find out, Trooper, your -- at this point do

13        you have a gun drawn?

14  A     Yes.

15  Q     So you have a pistol in your hand?

16  A     Yes, sir.

17  Q     You're beside the door of his car?

18  A     No, sir.

19  Q     Where are you?

20  A     I'm behind the driver's door post standing within

21        touching distance, or right there approximately.

22  Q     Okay.  You're standing behind his door post screaming

23        at him basically to get out of the car.  Is that a fair

24        statement?

25  A     I wouldn't say I'm screaming at him.  I was giving him
```

Exhibit A

Page 83 of 220

84

1           loud verbal commands.  Clear ones.

2    Q      Loud commands?

3    A      Yes, sir.

4    Q      Loud commands under stress?

5    A      I wouldn't call them loud commands under stress.  They

6           were clear concise commands.

7    Q      Let's go back.....

8    A      His activities were inducing stress, certainly.

9    Q      You said when we hit that word close up here.....

10   A      Um-hum.

11   Q      .....that you stuttered and that you were under stress?

12   A      Yes.

13   Q      And are you saying now that when we get down here,

14          three lines or four lines later, that the stress has

15          stopped?

16   A      It did subside somewhat because he began speaking with

17          me.

18   Q      Okay.  So he said what's wrong, sir, I was just parked.

19          Now you're preparing at some point in time to conduct

20          an investigation.....

21   A      Um-hum.

22   Q      .....okay, into some conduct that he has done.  And he

23          has just asked you what that conduct was.  Did you

24          respond to him?

25   A      He didn't ask what the conduct was.  He just asked me

Exhibit A
Page 84 of 220

1       what was wrong.

2  Q    Okay.  So -- but that's a fair statement for anyone to

3       make when a police officer stops him, isn't it?

4  A    Not -- not at this point.

5  Q    Okay.  Why not?  You've engaged your overhead lights,

6       you've drawn a pistol, you're standing behind him,

7       you're shouting at the top of your lungs get out of

8       your car, get out of your car.  Trooper Whittom is

9       yelling at him get out of the car, get into the car.

10      Okay?  You're under stress and you're saying his asking

11      the question what's wrong is improper under the

12      circumstances?

13  A    Yes, sir.

14  Q    What's wrong with that statement?

15  A    That would be -- that would be proper upon initial

16      contact if say he had just -- when I turned on my

17      overheads and if he had complied with the stop in the

18      first place and said what's wrong, sir?  I'd have said,

19      hey, you know, we had just got a call of a suspicious

20      vehicle and were checking things out.

21  Q    So at this point though he's no longer under the bright

22      lights of your vehicle, the ultra lights, if they're

23      on, correct?

24  A    If indeed they were on.

25  Q    That's right.

Exhibit _A_

Page _85_ of _220_

86

1    A      I don't know.

2    Q      He's had a few moments to -- apparently less than two

3           minutes at this point, do you think?

4    A      I -- I don't know.

5    Q      Well, I'm sorry, but you're the only one that's

6           there.....

7    A      I understand.  But I wasn't watching my watch.  I just

8           don't know.

9    Q      Was it five minutes?

10   A      I -- I doubt -- I doubt it was that long.

11   Q      Okay.  So possibly two minutes?

12   A      Possibly.

13   Q      Okay.  So possibly within that two minute period of

14          time he has now fully awakened and may just now realize

15          that you're overhead lights are on because he's moved

16          out from underneath your headlights?

17                 MR. FLOERCHINGER:  Object to form.  Assumes

18   facts not in evidence.

19   A      That would be speculation.  I have no idea if he was

20          asleep or awake or any of that.

21   Q      Okay.  Well.....

22   A      He's obviously.....

23   Q      .....just a few minutes ago he acted in a startled

24          fashion and sat up, which surprised you, as if he might

25          have been sleeping.  And we know that people do pull

Exhibit A
Page 86 of 220

1   over to the side of the road and sleep in these turn

2   outs at night. You said you've done it yourself. Easy

3   assumption to make that's exactly what he's doing.

4 A I wouldn't say so. It didn't strike me like that, like

5   he was sleeping. People that -- I don't know about

6   you, I'm not a morning person. I -- I don't wake up

7   very fast. I don't wake up like that.

8 Q So if he -- if he didn't wake up very fast and he's two

9   minutes into this, he just realizes you're a police

10   officer for the first time and says what's wrong?

11 A No, I wouldn't say so.

12 Q But he didn't say sir sarcastically, did he?

13 A No, sir.

14 Q He said it respectfully?

15 A He did.

16 Q Okay. You never answered that question, did you?

17 A Which question, sir? I'm lost.

18 Q What's wrong, sir?

19 A No, not at this time.

20 Q Okay. You said okay, open the door and get out?

21 A I said okay, because he said he was just parked. Said

22   okay, open the door now. I still need him to do.....

23 Q But you're still under stress?

24 A Oh, certainly.

25 Q Okay. Now, the next phrase on this transcript is

Exhibit _A_

Page _87_ of _220_

88

1          pepper spray being sprayed?

2  A    Yes, sir.

3  Q    That was immediately following the open the door now?

4  A    No, sir.

5  Q    His window is open?

6  A    I don't know how far it was open.

7  Q    Far enough for you to get your arm in the car?

8  A    I wouldn't put my arm in a car.

9  Q    You sprayed him in the face and you put, according to

10      your statements to investigators, you put the spray

11      bottle right next to his face?

12  A    Right next to the window.  I didn't spray his face.  It

13      never got on his face.

14  Q    So you're saying all these photographs of the bright

15      red side of his head and the bright red beard that he

16      has on his left-hand side wasn't from your pepper

17      spray?

18  A    It may be but I didn't spray him in the face.

19  Q    And you told the investigators you saw it swirling

20      around the inside of his car.....

21  A    I never told the investigators that, sir.

22  Q    Okay.  You never told the investigators that you

23      sprayed that entire remaining half can?

24  A    No, sir.

25                      **(Exhibit 21 proffered)**

Exhibit ___A___

Page __88__ of __220__

89

1  Q     And there was no evidence -- in fact, I'm showing you

2        Exhibit 21.  Can you identify your red pepper spray on

3        the side of that car?

4  A     No.

5                                  (Exhibit 22 proffered)

6  Q     Okay.  I'm showing you Exhibit 22.  Can you identify

7        your red pepper spray on the side of that car?

8  A     I can see some on the suspect's leg.  It might be.  I

9        don't know if that's a bruise or if that's.....

10  Q    Pardon me.

11  A    I don't know if that's a bruise or if that's pepper

12       spray on the thigh.

13  Q    This also could be pepper spray in that -- in his face?

14  A    No, I don't see anything on his face here.

15  Q    You don't see anything in his beard or his hair?

16  A    Maybe near his left ear possibly but I don't see

17       anything on his face at all.

18                                (Exhibit 30 proffered)

19  Q    I'm showing you Exhibit 30.  You may have to turn that

20       one to get the right juxtaposition to the stamp.

21  A    I've got it.

22  Q    Okay.  Find any pepper spray in that photograph?

23  A    I -- I think that that's probably a little bit of a

24       drip on the window.

25  Q    But you don't know?

Exhibit A
Page 89 of 220

1  A    I don't know.

2  Q    You're speculating?

3  A    Yeah.

4  Q    Okay.

5  A    It looks orange.

6  Q    Here's 32, see any pepper spray on that?

7  A    No.  That's the door handle.

8  Q    Here is 39.

9  A    Okay.

10  Q    See any pepper spray on that?

11  A    No, sir.

12  Q    41, any pepper spray on that one?

13  A    No.  It looks about like the same picture.

14  Q    Okay.  Here's 47, any pepper spray on that photo?

15  A    That's the passenger left rear door.....

16  Q    Okay.

17  A    .....and quarter panel.

18  Q    But you didn't stick your hand on the inside?

19  A    No, I wouldn't do that.

20  Q    Okay.

21  A    That's dangerous.

22  Q    And there's 54?

23  A    Okay.

24  Q    No pepper spray there either?

25  A    That's a view from the air it looks like.  I don't see

91

```
 1        any pepper spray.  It's just two cars in snow.
 2  Q     Okay.  So you -- did you see a reaction as a result of
 3        the pepper spray?
 4  A     Yes, sir.
 5  Q     What was the reaction?
 6  A     Reaction to pepper spray going inside the vehicle was
 7        that he -- the first reaction was that he saw what I
 8        was doing and blocked my attempt to spray pepper spray
 9        by lifting his left arm up like this.  Like I'm
10        demonstrating.
11  Q     Okay.
12  A     Left arm covering the face area.
13  Q     So let's talk for a moment about what you know about
14        Mr. Porter.  You know that he was crippled as a result
15        of an accident?
16  A     No, I didn't know who I was talking to.
17  Q     Well, I know you didn't know.  But you know it now,
18        don't you?
19  A     I -- I know that he was involved in some sort of an
20        accident.  I -- I don't know that he was crippled.
21  Q     And you found a cane in his car?
22  A     The investigators found a cane in the car.  I don't --
23        during the incident I didn't see or hear of any cane of
24        any sort, no.  No, I didn't know who I was talking to.
25  Q     Okay.  But after this particular accident you
```

Exhibit __A__
Page __91__ of __220__

92

1    discovered that he needed that cane to depress the

2    clutch?

3  A  That'd be speculation.  I don't know that he needed the

4    cane for anything.

5  Q  Let me show you 38.  Is that the -- have you ever seen

6    that before?

7  A  That's a cane similar to the one in the vehicle.

8  Q  Okay.  And you don't know whether that was the cane

9    that was recovered from that vehicle or not?

10  A  No, I don't.  It looks like it's an exhibit so it

11    probably is.  But I don't know.

12  Q  Okay.  You took photographs at the scene?

13  A  No, sir.

14  Q  Trooper Whittom took photographs of the scene?

15  A  You'll have to ask Trooper Whittom.  I believe he did.

16    I remember him going around with his camera.

17  Q  I'm showing you photograph 30.  Do you see a cane in

18    that particular photograph?

19  A  Yes, sir.

20  Q  In the photograph the cane is shown to be on the left

21    side of the vehicle, isn't that correct?

22  A  Yes.  It -- it appears that the suspect is no longer in

23    the vehicle at this point and.....

24  Q  Okay.

25  A  .....that cane certainly wasn't visible to me during

Exhibit  A

Page 92 of 220

93

1        the contact.

2   Q    Okay.

3   A    Here's your exhibit, sir.

4   Q    You subsequently learned that Mr. Porter used that cane

5        to depress the clutch?

6   A    No, sir.

7   Q    You didn't read anything about that in the newspapers?

8   A    Yes, sir.  But I certainly wouldn't call that learning.

9        It was a rumor.

10  Q    Okay.  It was a rumor.  And the fact is that -- did

11       anybody ever tell you that a cane was recovered from

12       the vehicle?

13  A    Yes.

14  Q    And the cane was recovered on the clutch petal?

15  A    No, sir.

16  Q    Has anybody asked you about whether or not he was using

17       that left hand to depress the clutch?

18  A    I don't know that I was ever asked that specific

19       question but I know that that wasn't the case.

20  Q    Okay.  You know it wasn't the case because when he

21       raised his hands, right?

22  A    No, sir.

23  Q    Okay.

24  A    I know it wasn't the case because when he attempted to

25       drive over Trooper Whittom he put both his hands on the

Exhibit  A
Page 93  of 220

94

1  wheel and squeezed the wheel in a manner where all of

2  his knuckles had turned white and he was gripping the

3  wheel and doing what appeared to be angling the wheel

4  as he heavily accelerated the vehicle and drove towards

5  Trooper Whittom.

6 Q But you didn't -- you don't know to this day whether it

7  was an automatic or a manual except based upon the

8  assumptions you heard about?

9 A Yeah, that's correct.  It -- I didn't have it in my

10  mind whether it was a manual or an automatic at the

11  time.

12 Q So he didn't raise his hands -- you say he raised his

13  left hand at the time he was pepper sprayed.  Is that

14  approximately simultaneous to the fact that the vehicle

15  lurched forward?

16 A No, sir.  No, not at all.

17 Q Well, the next thing in the transcript it says ah, I

18  didn't do nothing.

19    MR. FLOERCHINGER:  For the record we're on

20 Exhibit 1 now?

21    MR. OSTERMAN:  Right.  Go back on Exhibit 1.

22 A Okay.  I've got to go back.....

23 Q Pepper spray being sprayed and ah, I didn't do nothing.

24 A Correct.

25 Q And then you're attributed to saying tell him he's been

Exhibit _A_

Page _94_ of _200_

95

1          sprayed.....

2     A    Yeah.

3     Q    .....then you said get out.

4     A    I believe that's it.  For clarification, I believe

5          that's a typo.  I said tell him he's been sprayed and I

6          was hollering at Trooper Whittom asking him to tell

7          dispatch that the suspect had been sprayed.

8     Q    Okay.

9     A    So that -- and it's an understandable typo for.....

10    Q    Sure.

11    A    .....you know, tell him, sounds like tell him.

12    Q    Right.

13    A    Please continue after that point.

14    Q    Then you said get out?

15    A    To the suspect, yes.  At some point.

16    Q    Okay.  And then five shots are fired?

17    A    Correct, sir.

18    Q    Now, tell him -- you tell him he's been sprayed -- tell

19         them he's been sprayed.....

20    A    Right.

21    Q    .....get out.  How much time has lapsed?

22    A    I don't know.  I was watching his activities after the

23         spray went into the car.

24    Q    You never went back and listened to your tape to

25         determine how long it was?

Exhibit A
Page 95 of 220

96

1    A    I never timed it, no.

2    Q    Okay.  If you were to hear the tape would it help you?

3    A    It -- it would probably help as far as we could time

4         it.  But the shooting action, of course, the time frame

5         doesn't have anything to do with the -- the reason the

6         shots were fired.  It was based on suspect's behavior

7         is why.

8    Q    I'm understanding that.  But I'm trying to get down to

9         the time frame, sir.

10   A    Okay.  Yeah, we'd have to replay it.

11   Q    Your contention is that you gave him time for

12        compliance?

13   A    Yes, sir.

14   Q    And if we're at less than two minutes at the time five

15        shots gets fired, have you given him time for

16        compliance?

17   A    Absolutely.

18   Q    Okay.  At that point then you announce that shots are

19        fired, shots are fired?

20   A    I don't know if I said it twice.  Yeah.  Yeah, in my

21        statement here, shots -- shots fired.

22   Q    Okay.

23   A    Soldotna 1-E-16, shots fired.

24   Q    Okay.  You provided statements to investigators?

25   A    Yes, sir.  I was interviewed twice, I believe.

Exhibit _A_
Page _96_ of _220_

97

1  Q    Okay.  Once by Dane Gilmore?

2  A    Yes, sir.

3  Q    And once by two other officers from the Anchorage area,

4       I believe?

5  A    Correct.  From the CIB, or whatever the acronym was at

6       that point.

7  Q    Okay.  And I'm going to ask you to look at -- I want to

8       make sure I've got the right one and it's complete

9       before I hand it to you.

10  A   Okay.  Do you want Exhibit 1 back here?

11  Q   Yes, I do because I.....

12  A   Okay.

13  Q   That may be his copy.  And if it's his copy he keeps

14      it.  Yeah.

15            MR. FLOERCHINGER:  That's my copy.

16  A   Okay.

17                               **(Exhibit 2 proffered)**

18  Q   This is Exhibit 2.

19  A   Okay.

20  Q   I believe this is a transcript of your recorded

21      statement with Trooper Gilmore?

22  A   Trooper Gilmore, yes, sir.

23  Q   Is there any -- have you had a chance to review this?

24  A   No, I haven't.  That's a lengthy document.

25  Q   It is seven pages.

Exhibit A
Page 97 of 220

98

1  A       Yeah.

2  Q       But understanding that, okay, do you know if anything

3          that you told Investigator Gilmore was inaccurate?

4  A       No, sir.  That was my best recollection at the time.

5          Of course this was right after the accident.

6  Q       Okay.  May I have that back for just a moment?

7  A       Sure.

8  Q       Do you remember making the statement that Trooper

9          Whittom said that he'd been struck by the vehicle?

10  A      At some point I made that statement and I don't recall

11         if it was that interview or what.

12  Q      Okay.

13              MR. FLOERCHINGER:  Just for clarity, can

14  we.....

15              MR. OSTERMAN:  We will.

16              MR. FLOERCHINGER:  Trooper Whittom stuck by the

17  vehicle, a vehicle?

18              MR. OSTERMAN:  Struck by his vehicle.

19              MR. FLOERCHINGER:  Oh, his vehicle.

20              MR. OSTERMAN:  His own vehicle.

21              MR. FLOERCHINGER:  Oh, his own vehicle.

22              MR. OSTERMAN:  Yes.

23  Q       Now, I'm going to refer to Exhibit 2, page seven -- I'm

24          sorry, page four of seven.  And we are going to begin

25          at the line that says before I fired in order to hit

Exhibit  A
Page  98  of 220

1         the passenger window.  This looks like about the 20th

2         one down.  Three-quarter mark.

3              MR. FLOERCHINGER:  Let me get there.

4              MR. OSTERMAN:  It starts with before I fired in

5    order to hit.....

6              MR. FLOERCHINGER:  Okay.  I'm with you.

7  Q     Okay.  I'm going to go to the first complete sentence

8         there to point out to you what I'm looking for.

9  A     Okay.

10  Q     And it begins with um, right there.  Okay?

11  A     Okay.

12  Q     So if you'll read there for about three sentences.

13  A     Um, the.....

14  Q     No, go ahead and read it to yourself.

15  A     Oh, sorry.  How many sentences you said?

16  Q     About three sentences complete.

17  A     Okay.  I ended at, but that he was okay.

18  Q     Okay.

19  A     You want me to read further?

20  Q     No.  That's fine.  I'm going to show you Exhibit 1.

21  A     Okay.

22  Q     Turn to page two.  I want you to find in there anywhere

23         that Trooper Whittom told you that he was hit by his

24         car.

25  A     And this Exhibit 1 is my audio recording on my .....

Exhibit A
Page 99 of 220

100

1  Q    It is.

2  A    .....on my belt?

3  Q    It is.

4  A    I'll have to start at the beginning.  I see one

5       reference to that but I don't see him straight out

6       telling me that in -- in this particular recording, no.

7  Q    Okay.  Now you go on to state in your statement that

8       Trooper Whittom came around and I asked him if he was

9       okay and he said yes.  He said the car hit him -- his

10      patrol vehicle hit him because of the impact, but that

11      he was okay.  He didn't get knocked down or anything.

12      I believe I did speed load, is your next statement.

13 A    Correct.

14 Q    Okay?

15 A    Okay.

16 Q    So no where on your tape recorder does Trooper Whittom

17      say he was hit by his own patrol car?

18 A    No.  He might have told me that later.  It's not --

19      it's not in this recording.

20 Q    Trooper Whittom, when he pulled in and stopped his

21      vehicle, did he move it after he pulled in and stopped?

22 A    I don't know.  I was concentrating on the driver.

23 Q    But you knew he was there?

24 A    Yeah.  I could see -- you know, I could see him down

25      there but I don't know his exact actions.

Exhibit ___A___

Page _100_ of _220_

1  Q    The car rolled that a way, was about 20 feet away from

2       him and you looked over at him and yelled once about

3       getting the taser?

4  A    Um-hum.

5  Q    Right.

6  A    Yes, sir.  I'm sorry, I said um-hum.

7  Q    Okay.  That's fine.  So you don't know whether he was

8       in his vehicle at the time it had impact with it?

9              MR. FLOERCHINGER:  At the time that it.....

10 Q    At the time that the Porter car hit his car?

11 A    I -- I'd like to restructure that question and I think

12      I can give you the answer.  As I was keeping an eye on

13      Trooper Whittom, and I'll just do my best to describe

14      this so maybe you can understand.  As I was keeping my

15      eye on Trooper Whittom, continuously during the contact

16      Trooper Whittom's uniform, his person, outside his

17      vehicle and behind his door, was lit up by the

18      suspect's headlights.  And that's really the only focus

19      I maintained.  I wasn't concerned about Trooper

20      Whittom's vehicle, I was looking at his body and

21      headlights being on his body.

22 Q    And his vehi- -- he was obviously only illuminated from

23      the waist line up, that part of the car up?

24 A    Yes.  Say the waist line up.

25 Q    Well, actually was he -- you said he was behind his

Exhibit _A_

Page _101_ of _220_

102

1      door so he was past the top of hid car?

2  A   No, I wouldn't say so because the -- the door frame is

3      angled.  And when the door is  completely open, it

4      opens up a V of visibility all the way down to about

5      the waist line on the Crown Victoria.

6  Q   Okay.

7  A   Which I know well because that's an area we're trying

8      to stay out of in certain circumstances.

9  Q   Why is that?

10 A   Well, you know, if someone was shooting at your or

11     something like that, you wouldn't want to be exposed.

12 Q   Right.  But I don't think any police cars are

13     especially armored to withstand.....

14 A   None of ours are, no.

15 Q   .....bullets.

16 A   It's still better -- something is better than nothing

17     though.

18 Q   True.  Let's talk for a moment about the shooting.

19 A   Okay.

20                            **(Exhibit 30 proffered)**

21 Q   I'm showing you Exhibit 30.

22 A   Okay.

23 Q   You fired five times?

24 A   That's what the report says.  I think I recall four at

25     the time.

Exhibit ___A___

Page __123__ of __220__

1    Q    They recovered five casings?

2    A    I believe that's what the report reflects.

3    Q    And you don't dispute that the casings were similar to

4         the ones you -- the other four you were using?

5    A    I don't dispute that they were all mine.

6    Q    There were three bullets found?

7    A    No, I believe all five were found.

8    Q    Okay.  Looking at this particular exhibit, what does

9         that exhibit tell you, or show you?

10             MR. FLOERCHINGER:  And for the record we're at

11   Exhibit 30?

12             MR. OSTERMAN:  Exhibit 30, 1 of 1.

13   A    It shows me, based on what I know about the case, that

14        I believe that this indentation at the top of the door

15        pillar, the driver's door pillar.....

16   Q    Um-hum.

17   A    .....is a bullet round.  And it was embedded in that

18        rubber molding.  And it shows me that the door handle

19        to the car is missing.  That there's a piece of linkage

20        sticking out.....

21   Q    Okay.

22   A    .....that I found suspicious at the time.  And that

23        there's duct tape around that.

24   Q    Okay.

25   A    And it shows me that the left rear passenger window is

Exhibit _A_
Page _103_ of _220_

104

1      not there and that the right front window is rolled

2      down approximately a third of the way.

3              MR. FLOERCHINGER:  I think you said left front.

4  A   I'm sorry.  The driver's door window is rolled down

5      about a third of the way.

6  Q   Okay.  So at the time that you pulled the trigger, how

7      far were you from the back of Mr. Porter?

8  A   I don't know, sir.

9  Q   The vehicle you said had started out and was about 25

10     feet away from Whittom's car.

11 A   Yeah.  That's a guestimation.  You know, a car length

12     between the two, I'd say.  Something like that.

13 Q   Okay.  A car length between the two.  The motor was

14     revving up.  Then all of sudden the car took off like a

15     bat out of hell?

16 A   I don't remember using those terms, but yeah, it -- it

17     was going.....

18 Q   Okay.

19 A   .....full throttle.

20 Q   Okay.  You had your weapon drawn?

21 A   I already had my weapon drawn previously.

22 Q   You had your safety off?

23 A   There's no safety on a Glock.

24 Q   On a Glock.

25 Q   There's three types of safeties that are integrated

Exhibit __A__

Page _104_ of _220_

105

1       within the firing arm.

2  Q    Okay.

3  A    Firearm.  I'm sorry.

4  Q    So because you had your hand on it the way you did the

5       safeties were all in the off position and the weapon

6       was ready to fire?

7  A    No, sir.

8  Q    So did you have any safety to remove before you could

9       pull the trigger?

10  A    Yes.  I had the trigger safety which is integrated into

11       the trigger must be defeated before the safety can

12       fall.

13  Q    Okay.  So how can you defeat the finger safety?

14  A    By placing my finger on the very front of the trigger

15       which first contact is actually made with the trigger

16       safety.  Once that safety is pulled then the trigger

17       may --.....

18  Q    So in other words you put your.....

19  A    .....may be pulled.

20  Q    .....finger inside the trigger ring and you disabled

21       that safety?

22  A    Correct.

23  Q    Did you do that immediately before you fired or did you

24       do that when you were still beside the vehicle with the

25       weapon in your hand?

Exhibit ___A___
Page _105_ of _200_

106

1  A    I did that -- I don't know -- once again, I don't know

2       my exact placement.  I don't remember if I was moving,

3       like running along with the car or not.  All I remember

4       is responding to the suspect's action.

5  Q    Okay.  Do you recall any part of the investigation into

6       where your bullets went?

7  A    Yes.  But I didn't know at the time.  Based on what I

8       know about the report I do.

9  Q    So based upon what you know about the report where did

10      your bullets go?

11  A   One of them was -- I believe what this mark is in the

12     door pillar behind the driver's position.  Another one

13     I believe entered through the -- the upper shoulder on

14     his left side.....

15  Q   Okay.

16  A   .....re-exited through the top of the latch.....

17  Q   Don't worry about where it exited.  Just where it

18     entered.  Go to the next bullet.

19  A   Yeah.  It re-entered, that's what I was trying to say.

20     And I believe there were three in the left back

21     somewhere.

22  Q   Okay.  Did any of your bullets go through the seat?

23  A   No, I don't believe so.  Not that the report reflected

24     and not that I have any knowledge of.

25  Q   Okay.  So we have this extremely narrow area because

Exhibit _A_

Page _106_ of _200_

107

1        your bullets went between this door post and the side

2        of this seat to strike his body?

3  A     Oh, no, sir.  The seat was down.

4  Q     Sure, the seat was down, but none of the bullets that

5        you fired struck that seat?

6  A     Right.  Because the seat was not obstructing his

7        silhouette.

8  Q     Okay.

9  A     It was laid down flat.  Which I didn't know of course

10       at the time either.  I hadn't even observed that yet.

11       But that was the -- the outcome.  So I'm.....

12           MR. FLOERCHINGER:  When you say seat back, do

13 you mean reclined?

14  A    Yeah.  The seat back was in a fully reclined position

15       so I learned later.

16  Q    Okay.  So when you fired those rounds were you less

17       than 20 feet from the vehicle?

18  A    That's probably a fair -- fair estimate, yes, sir.

19  Q    Because the vehicle took off and it had only about 20

20       feet to go, right?

21  A    Yeah, something like that.

22  Q    Now you seen the markings that the police have put out

23       that demonstrate the path of the vehicle?

24  A    Yes, sir.

25  Q    And you noticed the vehicle took a sharp turn at the

Exhibit ___A___
Page _107_ of _220_

108

1       last toward Whittom's patrol car?

2   A   No, sir.

3   Q   I'm going to have you identify, is that your Glock?

4   A   I don't know.  I thought mine was.....

5                               (Exhibit 37 proffered)

6           MR. FLOERCHINGER:  Excuse me.  For the record

7   you're looking at Exhibit 37?

8   A   This says EYU657.  I can't recall if mine was EYU,

9       Echo, Uniform, or Yankee Uniform, or 67.  I'd have to

10      look at armory's records.  I can't remember what my

11      serial number was.

12  Q   We're looking at 35 -- 36, I'm sorry.

13  A   Okay.  I'm looking at 36.

14  Q   Okay.  Do you know whether that's your Glock and your

15      magazines?

16  A   No, sir.  They all look the same.  But these magazines

17      all look full from the picture if it's accurate and

18      there's one round left, but the round would be in the

19      chamber with the full magazine.  So it's possible that

20      this weapon in this photograph is Trooper Whittom's.

21  Q   I'm going to show you what's been marked as 26.

22  A   Yes, sir.

23  Q   Do you see the little yellow tags there?

24  A   Yeah.  There are lots of them.

25  Q   Okay.  If I were to tell you that most of the little

Exhibit ___A___

Page _108_ of _220_

1   yellow tags that are grouped together by the back of

2   the vehicle.....

3 A Um-hum.

4 Q .....that those little yellow tags represent the

5   falling of your brass.

6 A Okay.

7 Q Now, how does the brass fall on a Glock?

8 A It ejects to the right and upward usually.  But, you

9   know, sometimes there are anomalies and they can jam or

10   sometimes they just fall.....

11 Q Sir, I'm not asking you what the anomalies are.  I'm

12   asking if you knew.  And since you did know.....

13 A Yes.

14 Q .....how far out does it spit them?  Or do you have any

15   problem with them coming down in your shirt while

16   you're shooting?

17 A I've never had that problem.

18 Q Okay.  So how far out does it throw the brass?

19 A I don't know.  I've never measured it.  I know that if

20   someone on a range is shooting to the left of you

21   sometimes their brass comes out on your shirt.  Which,

22   you know, it's hot.

23 Q Yeah.

24 A So it'll probably -- any where from six inches or

25   falling straight to a couple of feet.

Exhibit ___A___

Page _109_ of _290_

110

1  Q    Okay.  If you fired your shots as soon as this car took

2         off, then you were closer than 20 feet at the time that

3         you shot according to the lay of your brass, weren't

4         you?

5  A    I don't know.  Maybe I was moving.  I don't know if I

6         was moving at the time I shot.  I can't remember that

7         detail.

8  Q    Okay.

9  A    I've tried to.  I just can't remember.

10  Q    And you shot five times in rapid succession?

11  A    Yeah.  Yeah, I shot five times.

12  Q    And I believe -- I may be mistaken, but I believe that

13         most of your brass is in this area which would be

14         directly behind the vehicle?

15  A    I don't know.  I didn't do this investigation.  And if

16         -- if these tags numbered 24, 27, what appears to be 25

17         and 26, these ones in the lower center portion of the

18         picture, if those do represent the brass placement I --

19         I have no reason to dispute that they are.

20  Q    Okay.  Now, I want to go -- if -- do you have.....

21             MR. FLOERCHINGER:  Could we take a quick break?

22             MR. OSTERMAN:  Pardon?

23             MR. FLOERCHINGER:  Could we take a quick break?

24             MR. OSTERMAN:  We sure can.  Not a problem.

25  We'll take a break and I can form that question.

Exhibit A
Page 110