1  Q    .....feel that it's important that we get through all

2        this today.....

3  A    Okay.

4  Q    .....rather than having to hold you guys over.

5  A    I understand.

6                                    **(Exhibit 11 proffered)**

7  Q    I'm going to ask is that your signature.....

8  A    Yes.

9  Q    .....at the top?

10  A    Uh-hum.  (Affirmative)

11  Q    Okay.  Good.  Now I have....

12           MR. FLOERCHINGER:  What were you showing him?

13           MR. OSTERMAN:  I was showing him Exhibit 11.

14           MR. FLOERCHINGER:  Okay.

15                                    **(Exhibit 14 proffered)**

16  Q    (By Mr. Osterman)  And I've got -- that tells me by the

17        way that Exhibit 14 was the diagram that you made for

18        hte officers that day?

19  A    Yeah, it looks like it.

20  Q    Okay.  Now did you ever get a chance to review any part

21        of the investigation that occurred in this particular

22        case?

23  A    Jus- -- just looking at the report.  This -- this looks

24        kind of weird.  It's been photocopied.

25  Q    Sure.  Probably a dozen times before I got it.

Exhibit ___A

Page 166 of 200

167

| | | |
|---|---|---|
| 1 | A | Yeah.  Okay.  I just wanted to let you know that it's |
| 2 | | not hte original. |
| 3 | Q | Oh, I know it's not hte original. |
| 4 | A | Okay. |
| 5 | Q | Nothing I'm showing you is an original..... |
| 6 | A | Okay. |
| 7 | Q | .....of anything. |
| 8 | A | Okay. |
| 9 | | **(Exhibit 10 proffered)** |
| 10 | Q | Okay.  I'm going to show you Exhibit 10..... |
| 11 | A | Okay. |
| 12 | Q | .....which is not stapled and I apologize for that..... |
| 13 | A | Okay. |
| 14 | Q | .....it'a s four part exhibit. |
| 15 | A | Okay.  I'm looking at it.  Okay. |
| 16 | Q | Can you ascertain what this exhibit is about? |
| 17 | A | It looks like it's of -- of the scene. |
| 18 | Q | Okay.  And there's a drawing displaying the track of |
| 19 | | this particular vehicle? |
| 20 | A | Yeah, something that represents the track.  I don't |
| 21 | | know how accurate it is. |
| 22 | Q | And the track I beleive of your car, at least in this |
| 23 | | -- in the..... |
| 24 | A | No, no tracks of my car. |
| 25 | Q | Just where it started out at, right..... |

Exhibit ___A___
Page 167 of 220

168

1  A    Just where -- no, just where it stopped.

2  Q    And there's no tracks in the Whittom vehicle?

3  A    Not that I can see, unh-unh.

4  Q    And if you'll turn to the other pages.....

5  A    Okay.

6  Q    .....following that you'll see that each one of these

7       markers that's laying out there, can you find those

8       particular markers that deal with your brass?

9  A    Sure.  Casing 24.

10 Q    I can't read from my right hand unfortunately.  Thank

11      you.

12 A    Casing 25, casing 26, casing 27, casing 28.

13                                 **(Exhibit 49 proffered)**

14 Q    Okay.  And I'll leave it to you whether you can see --

15      there we go, looking at 49, if you can identify any of

16      those markers as being your brass?

17 A    Okay.  It's right here.  It looks that's a pretty clear

18      27.  That one right there I'm indicating.....

19 Q    Okay.

20 A    .....on Exhibit 49.  Looks like -- I can't make out a

21      clear 28, I don't see it in there.  Let's look for 26.

22      That might be 26, but it's really fuzzy so I can't

23      tell.....

24 Q    Okay.

25 A    .....for sure.  Twenty......

Exhibit _A_
Page _168_ of _220_

169

1  Q    But you fired all your shots in a row so the brass

2       should be all close together?

3  A    You -- you'd think so.  I mean I -- I.....

4  Q    Okay.

5  A    .....wasn't watching them.

6  Q    And if that brass fell approximately two feet to the

7       right of where you fired?

8  A    I don't know if it fell two feet to the right.

9  Q    Do you have an idea of how far your brass would fire on

10      a Glock?

11 A    I've never measured it.....

12 Q    On an average?

13 A    I've never measured it.

14 Q    You've had to go out and pick up your brass and police

15      your brass at ranges how many times now?

16 A    Well, there's usually about a billions pounds of brass

17      from everyone else that's shot out there, so there's

18      really no way to tell what's yours and what's someone

19      else's.

20 Q    You haven't been in a sterile range where you had to go

21      out and police your own brass?

22 A    Not where there wasn't an obstruction, no, sir.

23 Q    You haven't fired in any competitions, Pat Togan's

24      (ph), or anythingn like that?

25 A    Nope.

Exhibit _A_
Page _109_ of _220_

1  Q    Okay.  I'd like to have that exhibit so I can staple

2       it.

3  A    Ah, yes, certainly.

4  Q    I want to put a staple in it.....

5  A    I think it's.....

6  Q    .....so it doesn't get loose and confused.

7  A    I think it's still in order.

8  Q    Okay.  We were at this exhibit was the one that you

9       drew for Dane Gilmore.

10 A    Okay.

11 Q    Is that right?

12 A    I don't know if I drew it for Dane Gilmore.

13 Q    You don't remember darwing anything for him?

14 A    You know I don't recall drawing anything for him.  I

15      mean I could have, but I don't recall it at this point

16      at all.

17                          **(Exhibit 15 proffered)**

18 Q    Okay.  Showing you Exhibit number 15, by teh way, do

19      you recognize that?

20 A    No.

21 Q    It's not your handwriting?

22 A    No.

23 Q    Did you maintain a sheet log?

24 A    No, I.....

25 Q    For your day -- daily event?

Exhibit ___A___

Page _170_ of _220_

1   A   I keep a notebook, this is is in a three ring binder I

2       don't know what that is.

3   Q   Okay.  So you didn't keep a -- this is not your notes?

4   A   No.

5   Q   Do you -- do you have notes from that incident?

6   A   No, I don't believe I did.  I didn't have time to write

7       any notes about it.

8   Q   You didn't have any prior calls that were recorded?

9   A   I probably did, yeah, I don't -- I don't know.

10  Q   Can you turn.....

11          MR. FLOERCHINGER:  Can we go off record for

12  just a second?

13          MR. OSTERMAN:  Sure.

14      (Off record)

15      (On record)

16  Q   (By Mr. Osterman)  Okay.  So.....

17  A   Pardon me.

18  Q   That's okay.  Do you recall talking about Trooper

19      Whittom having his pistol at a guard position?

20  A   I remember seeing that.  I don't remember talking about

21      it specifically but I remember seeing that.

22  Q   Page 16.

23  A   Okay.

24  Q   Where my thumb is, last three lines there.

25  A   Okay.

Exhibit _A_

Page _171_ of _220_

1  Q   Trooper Whittom's door was open like this and Trooper

2      Whittom was standing right behind his door and he was

3      drawn down to guard.  And I believe his arms were

4      extending between the door.

5  A   Yes, sir.

6  Q   And another time later you talked about Trooper Whittom

7      having his pistol in the guard position?

8  A   Okay.

9  Q   And that would be back at page 15.

10 A   Okay.

11 Q   So when you said that you don't remember.....

12 A   What page was that?

13 Q   Fifteen.  And if you go.....

14 A   I do remember that.

15 Q   Okay.  So if you state here and you -- you stated you

16     don't remember what Whittom was doing, but in fact you

17     knew the position of his firearm at the time that this

18     was going down from the beginning of his presence to

19     the time you pulled the trigger of your own gun?

20 A   No, that's not correct, sir.

21 Q   Well.....

22 A   I saw -- I saw Trooper Whittom there with his gun drawn

23     at one point.  I don't -- I didn't watch him the whole

24     time.  I was concentrating on the suspect.

25 Q   Trooper Whittom clearly was in -- his hands came up, he

Exhibit ___A___

Page _172_ of _220_

1           looked at the suspect, said show me your hands, get out

2           of the car, show me your hands.....

3  A    Well.....

4  Q    .....this happened several times.  This is on page 15.

5  A    Okay.

6  Q    I stayed in the guard position.  I believe Trooper

7           Whittom had gotten out of his car and was at the guard

8           with his weapon and I remember calling out Trooper

9           Whittom, or Whittom, get the taser.  So at the time

10          that he arrived, Exhibit Number 1, he talks about the

11          taser.  You knew where Trooper Whittom was.  He was out

12          of his car and he had his pistol in the guard position?

13  A    Yes, sir.

14  Q    Now, this was before we began the tit for tat with the

15          driving or was this after?

16  A    This is after.

17  Q    This is after?

18  A    Yes, sir.

19  Q    Okay.  And he's out of the car at that time with his

20          gun in the guard position.  And now we're going to go

21          through the pepper spraying and finally you're going to

22          shoot and Trooper Whittom has still got his pistol at

23          the guard position?

24  A    I don't know where Trooper Whittom, if he was at the

25          guard position at that point or not.

Exhibit A
Page 173 of 200

174

1  Q    Page 16.

2  A    There's a lot -- there was a lot that happened in

3       between those times.  It didn't go exactly like that.

4  Q    You said on page 16.....

5  A    Okay.

6  Q    .....about -- I pointed it out to you before, Trooper

7       Whittom's door was open like this, he was standing

8       right behind the door, he was drawn down to the guard,

9       his arms were extended, he had his weapon out in the

10      guard position, he was not pointing it at anybody, he's

11      got both of his hands in preparation to use.  Go to

12      page 17, at page 17 you talk about what the academy

13      does and then you say well, I sprayed him with the OC,

14      I pushed the nozzle of the can, because it was only

15      about a four inch opening.  And I pushed the nozzle of

16      the OC almost breaking the plane of his slightly rolled

17      down window.

18 A    Yes, sir.

19 Q    Okay?  So you talk about how close you were to the side

20      of his face with your can.....

21 A    No, I talk about how close I was to the side of the

22      window.

23 Q    Well, this is a Mazda, isn't it?

24 A    I don't know.

25 Q    He's sitting in the driver's seat?

Exhibit __1A__

Page __174__ of __220__

1   A    I didn't know what it was at that time.

2   Q    And he's squarely positioned in that seat as far as you

3        know?

4   A    Not squarely positioned.

5   Q    Oh, he's not?

6   A    No.  He's off.....

7   Q    He's off to one side?

8   A    He goes like this when I spray him.

9   Q    Okay.  So he raises an arm?

10  A    Yes.  He blocks it.

11  Q    Okay.  So we know he's got a couple of inches space

12       between the window.  But that's -- by the way, you

13       never mentioned him raising the arm in this police

14       report.  You didn't mention it here, you didn't mention

15       it with Gilmore, you didn't put it in your police

16       report either, did you?

17  A    I -- and you're right.  We went over that earlier.

18  Q    Okay.  So now you know that Whittom's got his gun out

19       and that Whittom is covering the suspect in the guard

20       position with his pistol.  Okay?

21  A    At some point.

22  Q    Before you asked for the taser.  And you look again and

23       you still -- and he's still in the guard position after

24       the pepper spray.

25  A    No, I didn't look again.

Exhibit A
Page 175 of 220

1   Q     Want to go back through that again?

2   A     Yes, please.

3   Q     Okay.  Let's go back.....

4   A     Because I remember looking again after I pepper sprayed

5         him.

6   Q     I want you to look at page 16.

7   A     Okay.

8   Q     We'll start at the beginning.

9   A     Okay.

10  Q     Okay, okay, by RM.  You, I grabbed.  I grabbed the

11        light in my support hand using the Harry's technique at

12        some point in there.  I'm not exactly sure when it

13        happened.  But I did have the light and I issued the

14        commands to him to open the door, open the door, get

15        out of the door.  When I sprayed him I remembered

16        distinctly I wanted him out of the car.  Of course he

17        still -- he was still and there's no way to get in the

18        car.  I reached down again, grabbed a piece of linkage,

19        pulled hard on the piece of linkage.  He was trying to

20        maneuver in such a way that he might actuate the door.

21        it didn't open -- it didn't happen, open the door?

22  A     He said he was trying to maneuver it in such a way.

23  Q     I'm sorry, I misread that.

24  A     Yeah.  I was trying to maneuver it in such a way that

25        it might actuate the door.

Exhibit _A_

Page _76_ of _220_

1   Q    Okay.  I gave those commands over and over, he was --

2        he was down like this.  He was kind of messing with his

3        face.  I distinctly remember his hands were on his face

4        and they were lit up and I was comforted by them like

5        that because I could see that his hands, and that was

6        good.

7   A    Right.

8   Q    I could see his hands were on his face and he was

9        hunched over like that.  Trooper Whittom's headlights

10       were shining on the car and his headlights were

11       illuminating Trooper Whittom directly.  I remember -- I

12       remember seeing Trooper Whittom out of my peripheral

13       and he was -- he was lit up by the headlights, in

14       uniform.

15  A    Um-hum.

16  Q    Trooper -- and where was he?  Trooper Whittom, as I

17       recall, and his vehicle were positioned like this,

18       drawing on a piece of paper.  Oops, I made that too

19       fat.

20  A    Um-hum.

21  Q    The vehicles were positioned.  This is Trooper

22       Whittom's patrol vehicle, suspect vehicle is back

23       something like that. Now Trooper -- oops, that's --

24       that's a bad triangle.  Trooper Whittom's door was open

25       like this, um, and Trooper Whittom was standing right

Exhibit __A__

Page __177__ of __220__

1    behind his door and he was drawn down to guard.  And I

2    believe his arms were extending between the door, drawn

3    down to guard.  You tell them he had his service

4    revolver out in a guard position.

5  A    Service weapon.

6  Q    Which was elevated but below the point that he's not

7    covering me.  He's not covering the car.  He's not

8    pointing it at anybody but he's got it in both hands in

9    preparation to use it.

10  A    Okay.

11  Q    Okay. Do I need to describe that again?  No, no, that's

12    fine.  You just said at the guard.  I -- that's the

13    position they told us at the academy.  That's what they

14    labeled it.  Basically you have your weapon out, you're

15    not pointing it at anybody, it's pointed in a safe

16    direction but you have it in your hands in case you

17    need it.

18  A    Yes, sir.

19  Q    It's like some kind of next step.  You're coming from

20    the holster but you're not aiming at anybody.  Now, I

21    finished that entire statement to point out that the

22    very end of that you said I'm comforted by the fact

23    that he's got his hands where I can see them.....

24  A    Yes.

25  Q    .....and I looked over and Trooper Whittom is at the

Exhibit A
Page 178 of 200

1       guard position.  Now Trooper Whittom was at the guard

2       position when you called for the taser?

3  A    Yes, sir.

4  Q    Trooper Whittom is in the guard position after the

5       pepper spray.

6  A    Okay.

7  Q    Okay?

8  A    I'm with you on that.

9  Q    So you don't disagree with that?

10 A    No.  I don't have any qualms with that.

11 Q    Okay.  Now.....

12 A    Thanks for taking the time to get me through that

13      because I wasn't recalling it.

14 Q    Okay.  Now, you said here at the bottom of 17, last

15      four lines, the line begins with the word later.  You

16      said I raised my service weapon, I remember shooting.

17      As I instantly recalled after the scene, I think I shot

18      four shots.  It could have been four or five, I don't

19      recall exactly.  I fired four or five to the driver's

20      silhouette as he accelerated towards Trooper Whittom

21      and then -- no, I'm okay, and then I realized the shots

22      had taken effect.  I heard the engine kind of whine

23      down and the vehicle was losing momentum and this was

24      all very condensed.

25 A    Could I clarify something?

Exhibit A

Page 179 of 220

1  Q    Okay.

2  A    It says I fired four or five shots to -- at the

3       driver's silhouette.  I don't know if that's a problem

4       in transcribing the tape or what, but I was -- all

5       those shots were to or towards the driver's silhouette,

6       not.....

7  Q    Well, I'm not concerned about the letter -- the word to

8       there, as much as I'm concerned with the fact that --

9       I'm looking at this exhibit that we have here.....

10  A    Um-hum.

11  Q    .....which is Exhibit 49, I believe, isn't it?

12  A    Yes, it looks like it.

13  Q    And it's showing us that less than five feet behind the

14       rear bumper of this automobile is the brass from your

15       shooting?

16  A    Um-hum.

17  Q    Which means that if you were standing next to this car

18       when you -- at the time that you pulled the trigger to

19       fire this particular weapon to shoot Mr. Porter.....

20  A    Um-hum.

21  Q    .....your brass would not have been able to land in

22       that position.

23  A    I don't know where it would have landed.

24  Q    Well, probably it would have landed on trop of his car

25       because you would have been beside his car at the time

Exhibit A
Page 180 of 220

1         of the shooting.

2    A    I wouldn't say so.

3    Q    You don't think so?

4    A    I -- that'd be speculation.  Who knows where the brass

5         is going to land.  If it bounced off the car, if it --

6         if it, you know, falls straight down.  I don't

7         know.....

8    Q    So you take a .40 caliber Glock, we can go out and

9         pretty well iron out within a fairly decent range where

10        brass is going to land with any Glock.

11   A    Not.....

12   Q    Do you think your Glock is any different than anybody

13        else's Glock?

14   A    Yeah.  It -- you know, brass ejection is going to

15        depend on what kind of ammunition you're shooting.

16        It's probably going to depend on temperature because

17        the extractor mechanism is going to be -- the oil in

18        the extractor mechanism is going to be at different

19        viscosities at different temperatures.  It depends on

20        the angle you're holding the weapon at.....

21   Q    Which means the last bullet fired is going to go

22        further in your analysis?

23   A    That's -- no, that's -- that's speculation.  There's so

24        many variables.  There's no way that I would

25        comfortably base my position based on that brass.

Exhibit A

Page 181 of 200

182

1          Those are moving objects.

2   Q      Okay.  So you're saying then that this vehicle -- this

3          car, Casey Porter's car, moved more than five feet in

4          spite of the location of your brass?

5   A      I don't know what in spite of the location of the brass

6          means.  I'm sure he moved more than five feet.

7   Q      Take a look at the -- at this particular exhibit.

8   A      Okay.

9   Q      The brass there is nearly on top of where this vehicle

10         -- the location of the back of the Porter vehicle, if

11         you look there, isn't it?

12  A      Yes.

13  Q      I mean it's in line with the back end of the car.

14         Taking it in a straight line, it's right off the edge

15         here, isn't it?

16  A      I wouldn't call it lined up.  It's more of a -- it's

17         more of a stray pattern.

18  Q      Less than a car length between the back.  If you take a

19         look at Exhibit 26.

20  A      On those exhibits.....

21  Q      I know, you can't -- but that's Exhibit 26.....

22  A      Okay.

23  Q      .....and this is Exhibit 49.

24  A      Okay.

25  Q      And Exhibit 49 we know for certain that the length of

Exhibit _A_
Page _182_ of _220_

1    the car is -- that the brass is not more than a length

2    of the car behind the car.  In fact, it is

3    substantially less than the length of the car.

4 A  I don't know.  I haven't measured any of that.

5 Q  Well, you can look at it and get the perspective, can't

6    you?

7 A  Not the perspective I was standing.

8 Q  So if we were to take a ruler and just measure the

9    length of the car, it would put it all the way out of

10   the photograph, wouldn't it, for the length of the car?

11   The right bumper is almost at the edge of the

12   photograph now.

13 A  I wouldn't say so.  This is at an angle and it's going

14   to be eschewed distance in length of the vehicle.

15   That'd be improper mathematics.  And once again,

16   there's no -- there's no picture in any of these from

17   my perspective at the time.  So.....

18 Q  So you're going to argue with me over the most common

19   sense view of this particular photograph?

20     MR. FLOERCHINGER:  Objection, form of the

21 question.  Argumentative.

22 A  I would say it's -- it's not common sense because this

23   is a day light area view and it looks far different

24   than what I saw that night.

25 Q  Okay.  But this is -- picture Number 26 -- well, you're

184

1    saying -- so your position is that what I recollect and
2    what physically is there can be two different things
3    and I'm still right?  Is that what your position is?
4  A    You're still right or I'm still right?
5  Q    No, you're still right?
6  A    I don't understand exactly what you're saying.
7  Q    Well, take a look.  We got picture Number 26 which is a
8    different angle and perspective?
9  A    Yes, sir.
10  Q    Okay.  And it gives us a different view of where the
11    brass fell in relationship to this car.  And you're
12    still taking the position that because it's a
13    photograph it could be out of perspective and therefore
14    it could be a mile away?
15  A    No, no, no, that's not what I'm saying.  What I'm
16    saying is is that this photograph doesn't represent --
17    does not represent my perspective at the time of the
18    incident.  That's all I'm stating.
19  Q    I'm asking you what it represents right now.  It
20    signifies this vehicle was less than a car length at
21    the time you pulled the trigger, doesn't it?
22  A    No.  It's close.  Because it depends on where I was
23    standing.
24  Q    Okay.
25  A    I mean you can measure it against the brass.....

Exhibit A

Page 184 of 220

185

1  Q    And you know where you were standing?

2  A    No, I don't.

3  Q    Okay.

4  A    I know my approximate position but I can't put an X on

5       the -- on the photograph.

6  Q    Let's go back to Exhibit 4.

7  A    Okay.  That's where I'm at now.  I think this is 4.

8       It's the big long one?

9  Q    Yeah, the big long one.

10  A    Okay.

11  Q    And you think you gave this particular statement, then

12       went to lunch with the captain?

13  A    I think so, yeah.

14  Q    Okay.  Let's go to page 20.

15  A    Okay.  Nineteen -- there's 20.  Okay.  I'm on page 20.

16  Q    Okay.  Let's go about to the very top paragraph here

17       which is incomplete and you start off with your

18       infamous um, three lines to the bottom of that

19       paragraph.  Um, I left that recorder in my pocket.

20  A    I'm not finding the Um in here.  Hold on.  Oh, there we

21       go.  I left the recorder in my pocket.  Okay.

22  Q    You gave the tape to Sgt. McDonald is what you said

23       here?

24  A    Um-hum.  (Affirmative)

25  Q    I may have done that when I was sitting in the Sgt.'s

186

1            -- it was the 1st Sergeant., Lieutenant Olive

2            Bartolini's (ph) vehicle.

3  A      Okay.

4  Q      Okay.  So who did you give the tape to, do you remember

5            now?

6  A      Um -- um, once again, I'm sorry.  I may have done that

7            as subjective.  I don't know even what I'm referring

8            to.  Without reading the whole paragraph I don't know

9            what that means.  Does that mean when I gave him the

10            tape or does that mean when I dictated what had

11            happened?  I don't know.  The context is not complete

12            for me.

13  Q      So the next paragraph though is describing, you

14            actually walked back into the scene and asked Trooper

15            Whittom if he had a spare tape?

16  A      I don't recall doing that.

17  Q      Take a look at the paragraph, see if you said that.

18  A      Okay.  Is that the next paragraph?

19  Q      It is.

20  A      Okay.  But I gave that tape right to him -- after that,

21            you know, I gave it to Sgt. McDonald before Lt.

22            Bartolini's showed up.  After I put in a new tape I

23            walked over to Trooper Whittom's vehicle, to his

24            driver's side, that was the only time I walked over

25            there.  I said -- I said Trooper Whittom, he was

Exhibit A
Page 86 of 220

1          sitting in there because it was kind of cold out, it

2          was getting colder now.  I asked Trooper Whittom if he

3          had a spare tape because I had used all of mine.  He

4          gave me one of his spare tapes and I put it in my

5          recorder and walked back around and stood out there.

6          Someone gave me a blanket, I put that around me and

7          just kind of dictated my immediate recollection of the

8          entire scene on a separate tape.

9  Q      So where is that tape?

10          MR. FLOERCHINGER:  It was produced.

11  A      Yeah.  Produced.

12          MR. FLOERCHINGER:  It was one of the cassettes.

13  I know specifically that was.

14          MR. OSTERMAN:  I've got all the cassettes with

15  me and I don't -- but nevertheless.  Okay.  I'll look back

16  again to make sure, Dave.

17          MR. FLOERCHINGER:  I'll check and if -- I'll

18  make you a new tape of it if you need it.

19          MR. OSTERMAN:  Okay.

20          MR. FLOERCHINGER:  Just for the record so that

21  we know we're clear, we're not talking about your tape.....

22  A      Of the scene

23          MR. FLOERCHINGER:  .....in your recorder that

24  we talked about earlier.

25  A      Exhibit 1.

Exhibit A
Page 187 of 220

188

1          MR. FLOERCHINGER:  Exhibit 1.  We're talking

2   about a different dictation.

3   A       Right.

4          MR. FLOERCHINGER:  That's -- yeah.

5   A       Yes, yes.  We played them separate.

6          MR. FLOERCHINGER:  I know -- actually know

7   where I can get my hands on that right now.

8          MR. OSTERMAN:  Okay.  And while we're talking

9   about that, is it possible that I can get a cleaner copy, maybe

10  directly off the original or either listen to the original of

11  Exhibit 1?  The copy I have is so many generations old that I

12  cannot distinguish very little on that tape.

13  A       That's understandable.

14         MR. FLOERCHINGER:  Yeah.  Okay.  Let me make

15  some notes here.  So you want the Exhibit 1 tape that you can

16  hear clearly.

17         MR. OSTERMAN:  I can go some place and put a

18  set of head phones on or somebody can -- trusted can read it,

19  Kincaid, who does all the tapes for the PD's office and the

20  District Attorney's office, who can produce a copy or even a CD

21  for us.  I prefer the CD because it won't degrade the quality

22  after it's copied.

23         MR. FLOERCHINGER:  Okay.  So we -- just --

24  okay.  You want the Exhibit 1 tape that you can hear clearly.

25  The tape -- the second -- I'll call it the second tape out

Exhibit ___A___

Page ___188___ of ___220___

189

1  there.  Okay?

2                      MR. OSTERMAN:  Um-hum.

3                      MR. FLOERCHINGER:  Dictation.  All right.  And

4  -- off record for a minute.

5          (Off record)

6          (On record)

7  Q      You've relied upon your recollection of events here

8          today, not only the statements that you made to other

9          people but your own specific recollection, particularly

10         dealing with the location of Trooper Whittom and other

11         matters, correct?

12 A      What do you mean by statements made to other people?

13 Q      Well, you made statements to.....

14 A      Interviews, you're saying?

15 Q      .....in interviews, right?

16 A      I did, sir.

17 Q      Okay.  And those were contemporaneous statements?

18 A      Well, they were contemporaneous.  What's that mean?

19 Q      Well, real close to the time the event occurred?

20 A      Yes, sir.

21 Q      Okay.  In fact, when you met with Trooper Gilmore was a

22         matter of hours?

23 A      Yeah.  It was right away.

24 Q      Okay.  And when you met with the investigators the

25         following day, I believe, you still had not slept?

Exhibit ___A___

Page __189__ of __220__

190

1   A      I'd slept but not very well and not very much.

2   Q      Okay.  Would you believe that your recollection of

3          events at that -- at the time that you made those

4          statements is more accurate than your recollection of

5          events now?

6   A      I wouldn't judge them against one another.  But that

7          was the most fresh in my memory.  Although, you know,

8          some times new memories come up later.  That's normal.

9   Q      Okay.

10              MR. OSTERMAN:  I have no other questions.

11              MR. FLOERCHINGER:  I just have a few and I'll

12  try to get through these as quickly as possible.

13  A      Okay.

14                      **CROSS EXAMINATION**

15  BY MR. FLOERCHINGER:

16  Q      There was some discussion early on in the deposition of

17         when you turned on your overhead lights.

18  A      Yes, sir.

19  Q      When you turn on your overhead lights does that do

20         anything else?

21  A      On that particular vehicle when you turn on the

22         overhead lights and move that light bar over it -- the

23         light bar, meaning the control switch on the console,

24         it also turns on the -- the videotape recorder in the

25         vehicle.

Exhibit A

Page 190 of 220

1  Q    And that's a videotape recorder facing right out in

2       front of your vehicle?

3  A    Yeah.  You can actually aim it, if you want to.  You'd

4       have to manually turn it and, you know, wherever I had

5       it set at the time.

6  Q    Okay.

7  A    I believe it was set straight forward which is

8       standard.

9  Q    Okay.  So as you hit the lights the video comes on?

10  A    Video comes on when you hit the lights.

11  Q    Okay.  Going to Exhibit Number 1, we'll go through

12       that.

13  A    Okay.

14  Q    You see in there that you're giving him numerous

15       commands.

16  A    Yes, sir.

17  Q    And at some point you ask him if he understands?

18  A    Yes, sir.

19  Q    And what's his response?

20  A    His response is yes, sir.

21  Q    And what was going through your mind at that time?

22  A    What was going through my mind at that time is that he

23       understood what I was saying and had been understanding

24       of what I was saying as we communicated.

25  Q    Okay.  What happened then?

Exhibit A
Page 191 of 220

192

1   A   Well, he -- he said yes, sir, which was good because we

2       were starting to dialogue.  Then I told him again to

3       get into -- to get out of the car.  And during the

4       contact, it's difficult to pin it down.....

5   Q   Before you get into that.....

6   A   Certainly.

7   Q   .....you mentioned earlier about your stress level.

8       When he says yes, sir, did that effect your stress

9       level in any.....

10  A   No.  His statements didn't.  It -- because actually any

11      time we spoke I was relieved because we were speaking

12      and I knew we had communication.  But the statements he

13      made were not fitting for the situation.  And, you

14      know, of course that always send up red flags.

15  Q   What do you mean not fitting for the situation?

16  A   Well, under normal circumstance, or a contact with a

17      person, when you give them a clear instruction, or just

18      a request or just a contact, they immediately respond

19      appropriately.  Just like if you're -- if you're

20      walking down the street and you say hello to someone

21      and they say hello back, that's an appropriate response

22      in any sort of conversation.  When you tell someone to

23      get out of the car and they say okay, I'll back up,

24      that tells me as a police officer that this person is

25      buying time with a meaningless conversation and it

Exhibit  A

Page  192  of  220

1      doesn't make sense.  And this is my speculation, but my

2      understanding from training and contacts, it doesn't

3      make sense because their mind is not on the

4      conversation, although they understand what's happening

5      their mind is on doing something else.  And this

6      conversation is buying time continuing and a

7      distraction technique basically.

8  Q    Okay.  Back to Exhibit Number 1.....

9  A    Okay.

10  Q    .....you indicated that you said do you understand?

11      His response was yes, sir.

12  A    Yes, sir.

13  Q    What happened next?

14  A    I told him to show me his hands and get out of the car.

15      And he -- he continually kept concealing his hands.  I

16      don't know what he was doing.  But I was concerned

17      about what he was doing with his hands because it was

18      obvious to me that when I said show me your hands he

19      would comply with the order which meant that I knew he

20      understood me, and he put his hands up just like I'm

21      demonstrating, showing the fingers and hands.  And his

22      face and hands lit up by Trooper Whittom's headlights.

23      And then he would quickly put them down and direct his

24      attention away from me and conceal his hands somewhere

25      down below in the darkness of the vehicle.  I was

Exhibit ___A___
Page __193__ of __220__

194

1       concerned that he was reaching for a weapon or trying

2       to find something to hurt me.  And you'll see that

3       reflected later on when I'm still looking at his

4       hands.....

5   Q   Well, let's just stay where we are on this portion.

6   A   Okay.

7   Q   Okay.  So he says yes, sir, you say you get out of that

8       car, show me your hands?

9   A   Right.

10  Q   And it looks like Officer Whittom is now on a radio, is

11      that right?

12  A   Yeah, I don't recall hearing him, but it -- you know,

13      it's Soldotna 1820, we've got him stopped.

14  Q   Okay.  So his car is stopped at this point?

15  A   Oh, yes.

16  Q   Okay.

17  A   Yeah, absolutely.

18  Q   All right.  Well, what's going through your mind when

19      he car is stopped?

20  A   Relief that the car was stopped, number one.  And

21      concern that we needed to get him out of the car and

22      find out what he was trying to do with his hands

23      concealing them from me while he refused orders.

24  Q   Okay.  What was your -- well, what happened then --

25      next?

Exhibit A

Page 194 of 200

195

1   A       He continues with his conversation as I've described

2           and he says what's wrong, sir, I was just parked.  This

3           is the most significant dialogue we've had and I

4           lowered my tone and said okay, open the door now.  At

5           that time he reached over -- and this is something that

6           I recalled later on and I didn't recall when I did my

7           interviews, but he grabbed the door handle, the -- the

8           window crank and very quickly started rolling up the

9           window.  I knew because I couldn't open the door

10          because the door handle was broken and there was

11          linkage sticking out and that was suspicious.  And I'd

12          also tried the rear passenger door on that side and

13          that car -- door was locked.  I knew that it was my

14          last chance to try to get him out of the stopped

15          vehicle was by getting some pepper spray inside the

16          vehicle.  That's when I placed the pepper spray up to

17          the window and sprayed in there.  And at that point I

18          was -- I was relieved because I felt like the only

19          opportunity that we had to safely remove him from the

20          vehicle we'd successfully at least gotten the pepper

21          spray in the vehicle -- or I had successfully gotten

22          the pepper spray in the vehicle.

23  Q       All right.  So then there's a few seconds I assume?

24  A       Yeah, there's a few moments where, you know, he goes

25          down like this and -- and goes like this and that's

Exhibit __A__
Page 195 of 220

196

1      just before when -- when his head snaps up.....

2  Q   Well.....

3  A   Oh, I'm sorry.

4  Q   .....I'm trying to stay on -- on.....

5  A   I'm sorry.

6  Q   .....Exhibit number 1.  It looks to me like he goes

7      ah.....

8  A   Right.  Yeah.  He -- he yells.....

9  Q   .....and explains.....

10 A   .....makes a noise.

11 Q   All right.

12 A   Right.  He -- and that was right after being sprayed.

13     He says ah, he yells, and then he yells I didn't do

14     nothing and then I told Trooper Whittom, I said tell

15     them, that's that typo, tell them he's been sprayed, I

16     was hoping he could relay it to dispatch.

17 Q   So.....

18 A   Then I said get out.

19 Q   .....what we have here is above Trooper Whittom has

20     been on the radio it appears to tell them -- tell

21     dispatch that he was stopped?

22 A   That's true.

23 Q   And then you tell Trooper Whittom to tell dispatch he's

24     now been sprayed?

25 A   Correct.  I was asking him.....

Exhibit *A*
Page 196 of 220

1    Q      Is that a correct understanding of that?

2    A      Yes, I was asking him to relay that traffic to dispatch

3         because I was busy dealing with -- with the suspect.

4    Q      Okay.  Suspect then goes ah, why don't you walk me

5         through the rest of what happened?

6    A      Okay.  Up until what point?

7    Q      Up until his vehicle stops.

8    A      Okay.  He yells ah and says -- it's muffled, but he

9         goes I didn't do nothing and he's down here like this

10        and I'm describing, you know, he has his hands down

11        here, has them put on his face and he -- he -- I don't

12        know -- you, sir, probably have prior law enforcement

13        experience.  I don't know if -- if you ever observed

14        this, but there's a -- I -- I guess I'd call it the

15        calm before the storm and you'll see this in people's

16        body language and it can't be described on an audio

17        tape at all.  And this is where a person has stopped

18        and I'm actually relieved at this point and he's

19        absolutely still.  Then his head snaps up, straight up

20        and his face is looking straight forward, both of his

21        hands actually reach up and grab the wheel like -- like

22        you would grab a steering wheel if you wanted to tear

23        it off of the steering column.  I mean grabbed it.  I

24        mean remember seeing his white knuckles and skin

25        stretched, both hands on the wheel, right and left, lit

Exhibit _A_

Page 197 of 200

1       up in Trooper Whittom's headlights.  Then I -- and he

2       looked stone cold straight forward.  Obviously had

3       ignored every command up to that point, you know, he --

4       he was not obeying any commands.  And then instantly

5       engine revved what sounded to me like full throttle and

6       the tires were spinning and his lights were lighting up

7       Trooper Whittom's uniform from his last known position

8       knowing he's behind the door, I remember seeing blue in

9       the lights.  And I fired my weapon until the -- I heard

10      the engine down rev and the vehicle was obviously

11      stopped.  It -- it -- you know, whether I stopped

12      firing before he hit the vehicle or after or what, a

13      collision occurred.  Things came to a rest.  I stopped

14      firing.  Then -- well, that's when the vehicle came to

15      a stop.  I can tell you what happened after that if you

16      like.

17  Q   What -- what was going through your mind when he came

18      up and both hands grabbed the wheel?

19  A    So he's aiming for Trooper Whittom.  He's going to run

20      him right over.  I -- I felt that that -- that grabbing

21      of the wheel and that stone cold looking straight

22      forward with the engine revving full throttle when he'd

23      already demonstrated to me that he could steer around a

24      vehicle slowly because he'd done it with mine, that

25      that was intent to run over Trooper Whittom.

Exhibit __A__
Page _198_ of _220_

199

1  Q    When you -- strike that.  Now throughout this period of

2       time did you know who was in the car?

3  A    No clue.

4  Q    Did you know whether that individual had any

5       outstanding warrants?

6  A    No.

7  Q    Did you know what the individual had been doing in that

8       car?

9  A    No.

10 Q    You had no personal thoughts towards this individual at

11      all?

12 A    No clue who he was.

13 Q    Okay.

14 A    No -- no thoughts of any sort.

15 Q    And I just want to go back.  I think it's been cleared

16      up in Mr. Osterman's questioning, but we were talking

17      about this -- what was referred to as a tit for tat.

18 A    Yes.

19 Q    And that occurred prior to the time he stopped?

20 A    Yes, that was on the initial -- Trooper Whittom's

21      initial advance into the scene.  And that was well

22      before both vehicles came to a stop.

23 Q    That was before the point where you pepper sprayed him?

24 A    Yes, sir.

25 Q    That was before the point that you fired your weapon?

Exhibit A

Page 199 of 220

1  A    Yes, sir.

2  Q    That -- was that before the point where he was actually

3       speaking to you?

4  A    Yes, sir.

5  Q    When you said do you understand me?

6  A    Yes, that -- that all occurred when the vehicle -- when

7       both Trooper Whittom's vehicle and his were stopped.

8  Q    Okay.  There was some discussion with who you talked

9       to.  Were you ever instructed to not talk about the

10      shooting with other officers?

11 A    Yes.

12 Q    And who instructed you to do that?

13 A    Investigating officer, I believe Trooper Gilmore.

14 Q    Okay.  And I think regarding the handcuffing of Mr.

15      Porter after you broke out the window, you said that

16      was procedure?

17 A    Yes, taught at the Department of Public Safety Training

18      Academy.

19 Q    Why did they teach you to do that, do you -- is that --

20      from what you understand?

21 A    Certainly. That's -- now Sergeant Kathy Peterson taught

22      that portion I remember distinctly.  And they teach you

23      to do that because there are instances in where people

24      think that a suspect has been shot and they weren't

25      actually shot or they hadn't actually died.  In fact,

Exhibit _A_

Page _200_ of _200_

1      there have been reports of methamphetamine -- heavy

2      methamphetamine users actually being shot through the

3      head and continuing to fight and kill police officers

4      until they had no more blood left in them to make their

5      body actually run anymore.  They're overridden by

6      chemicals.  And there have been instances where people

7      -- troopers or officers have thought that the suspect

8      was dead and left them laying there next to the weapon

9      and then were actually shot by that suspect who is

10     either pretending to be dead or had, you know, came to

11     after becoming unconscious for whatever reason.  Those

12     are all officer safety reports and bulletins that we go

13     over so it's always just safest to go ahead and secure

14     them in handcuffs and that way you're absolutely sure

15     especially since in this situation where he had been

16     reaching for something, I didn't know what was in the

17     car.  I didn't dig through it, but I felt it

18     appropriate to handcuff the suspect in this situation.

19          MR. FLOERCHINGER:  That's all the questions I

20  have.

21                    **REDIRECT EXAMINATION**

22  BY MR. OSTERMAN:

23  Q      A couple of follow ups.  I refer you to Exhibit 20.

24                              **(Exhibit 20 proffered)**

25  A      Yes, sir.

Exhibit ___A___
Page 201 of 220

202

1   Q   Do you see those little orange dots?

2   A   On the left-hand side of the picture?

3   Q   Yeah.

4   A   Yes, sir.

5   Q   Do you know what they represent?

6   A   No, not exactly.

7   Q   If I were to show you that exhibit that had the

8       sketched diagram by the investigative team.....

9   A   Uh-hum.

10                              **(Exhibit 10 proffered)**

11  Q   .....Exhibit 10.....

12  A   Right, I remember looking at that.  It looks similar to

13      the vehicle tracks.  I can't say for sure because these

14      are different.....

15  Q   Okay. Is that....

16  A   .....areas.....

17  Q   .....approximately the track of the vehicle around

18      yours?

19  A   I -- I didn't take the measurement.  That's.....

20  Q   No, I'm not asking you if you did.  Is that

21      approximately the same track that the person took to

22      avoid you?

23  A   It looks about right.

24                              **(Exhibit 45 proffered)**

25  Q   Okay.  So then if we take a look here at Exhibit number

Exhibit _A_
Page 202 of 220

1           45.....

2    A      Uh-hum.

3    Q      .....can you tell me, does it appear to you that the

4           front wheel of that Mazda is turned slightly to the

5           right?

6    A      No, it doesn't.

7    Q      Okay.  Let's go.....

8    A      It doesn't look.....

9    Q      ......back for a second.  You talked about how you

10          lowered your tone and increased your tone.....

11   A      Uh-hum.

12   Q      .....during Exhibit 1.  Have you listened to the tape

13          of Exhibit 1 recently?

14   A      Oh, I -- I think I did a couple of years ago.  I

15          remember feeling more calm at that point though.

16   Q      Okay.  You said do you understand and he said yes, and

17          you said that's an avoidance response.  Who.....

18   A      No, I didn't say that was an avoidance response.

19   Q      Well, you said he's trying to ask for more time?

20   A      No.  That's not an avoidance response.  The -- when he

21          says okay, I'll back up and those other statements are

22          avoidance responses.

23   Q      Now let's talk about avoidance responses for a second.

24   A      Yes, sir.

25   Q      How did you learn about avoidance responses?

Exhibit ___A
Page 203 of 220

204

1   A   Just experience dealing with people.

2   Q   Okay.  So you don't -- you put a title on it.  Somebody

3       gave you that title?

4   A   Actually you said avoidance response.  I didn't

5       actually title it.  It's just something.....

6   Q   Well, I actually --.....

7   A   .....I've learned.

8   Q   .....I actually wrote it down here from your testimony

9       with.....

10  A   Okay.

11  Q   .....your attorney?

12  A   Yeah.  That's my best way to describe it.  I wouldn't

13      call it a title.

14  Q   Have you ever had any classes in neuro-linguistics?

15  A   No.

16  Q   Are you a card carrying member of the Read (ph) method?

17  A   Yes.

18  Q   Oh, so you have been to the Read method?

19  A   Yeah, but I haven't -- I had briefly at the academy and

20      I've had more Read training since then.

21  Q   Okay.  Well, let's talk about neuro-linguistics for a

22      second.  You ascribe to the theories established by

23      neuro-linguistics that certain people's eye movements

24      and statements can oftentimes lead to their planned and

25      plotted courses of actions?

Exhibit ___A___

Page _204_ of _220_

205

1  A    No.

2  Q    You've attended these things?

3  A    Yes, but that's not anywhere in the same.....

4  Q    You used avoidance response as a term which is one of

5       their terms of art?

6  A    No, that's -- that's not accurate.  It -- it seemed to

7       be deceptive behavior is all I'm saying.

8  Q    Okay.  Deceptive behavior is one of the other nice

9       terms they like to use as well.

10 A    Okay.

11 Q    Because to deceive means that he's trying to hide

12      something from you?

13 A    Okay, I understand.

14 Q    Okay.  It may not -- and so your -- your statement is,

15      is that he's giving you these statements and not

16      complying with you because he's planning to do some

17      harm to you?

18 A    It's a possibility.

19 Q    But if you've just awakened him from a sound sleep?

20 A    That's speculation.  I don't know that he was sleeping.

21      That was not my -- my feeling on it and upon.....

22 Q    Do you think he was sitting there waiting for you to

23      show up?

24 A    I have no idea what he was doing.

25 Q    Okay.  But you believe that he was probably waiting for

Exhibit A

Page 205 of 220

1          you there?

2    A     No.

3    Q     Then you think he might have been sleeping?

4    A     I have no clue what he was doing.

5    Q     Okay.  And you have no clue what he was doing and

6          you're not even going to slightly even consider

7          anything about it?

8    A     I -- I -- I wouldn't speculate at this point.  We could

9          have talked about it then, but he chose not to.

10   Q     Okay.  You said you tried the rear passenger door?

11   A     Yes, sir.

12   Q     You never told anybody before today that you tried the

13         rear passenger door?

14   A     I thought for sure I did.  Maybe I didn't.

15   Q     Okay.

16   A     I remember doing it.  I mean I'm sorry if I didn't.  I

17         tried to recall everything.....

18   Q     And you talked about that there's -- you can see that

19         there's something wrong with somebody, that the storm

20         is brewing, I think is what you said or the.....

21   A     No, that's not what I said.  I said the -- the calm

22         before the storm is the best way to describe it because

23         he was very still and very calm and then had an

24         instant, his head snapped up and he grabbed the wheel

25         very aggressively.  It was a drastic change from his

Exhibit _A_
Page 206 of 220

1      previous behavior.

2  Q    And you never seen -- and by the way, have you ever

3      served as a chemical officer and provided testing for

4      people with.....

5  A    No, sir.

6  Q    .....spray?  Have you ever studied the statistics of

7      the OC spray and what it does?

8  A    I think in training we studied statistics.  I don't

9      remember them exactly.

10  Q    And so you've never taken to heart any of -- the use of

11      OC spray on people?

12  A    Oh, yes, I've been sprayed myself.  I don't like it.

13  Q    Well, I realize you don't like it, but the -- there's a

14      generalized response by the general -- by most people

15      who are not on drugs nor on alcohol when they get hit

16      by OC spray?

17  A    I wouldn't even say so.  There were a couple of people

18      in my academy that got sprayed and they just licked

19      their lips and it didn't bother them.

20  Q    Okay.

21  A    It's really person specific.  Yeah, amazing.  But it's

22      pretty person specific.  It's.....

23  Q    Okay.  But at the same time now you have used OC spray

24      on other people?

25  A    Yes, sir.

Exhibit A
Page 207 of 220

1   Q       And in fact, you resorted to physical violence with

2           other people in the past?

3   A       No, not physical violence, sir.

4   Q       There was an incident, I believe, involving you and a

5           gentleman from Korea?

6   A       Yes, sir.

7   Q       And I believe that you beat him?

8   A       No, sir.

9   Q       Would that be a fair statement?

10  A       No, that'd be an unfair statement.

11  Q       Okay.  You confiscated his passport and upset him and

12          he could not speak English to you?

13  A       No, sir, that's not an accurate description of the

14          incident.

15  Q       So you did not.....

16              MR. FLOERCHINGER:  Counsel, just before we go

17  any further in this I'll enter this for the record.  You can go

18  ahead and go through this.  Other -- other acts would be

19  violative of 404(b) of the Evidence Rules, I'm just going to

20  make that statement for the record and I object to this line of

21  questioning, but you can go ahead and ask.....

22              MR. OSTERMAN:  Well, I think it's a part of his

23  history and I think even under 404 it might have some ability

24  to -- to apply it.  I only put that on the record for the

25  benefit of any record as well.

Exhibit _A_

Page _208_ of _220_

1          MR. FLOERCHINGER:  Well, you understand my

2     objection.

3          MR. OSTERMAN:  I do.

4          MR. FLOERCHINGER:  All right.

5   Q    (By Mr. Osterman)  But there have been other reports by

6          -- against you of violent behavior by you?

7   A    There were reports in the newspaper.  No official

8          reports of any sort.

9   Q    Okay.  And the statements in the newspaper there have

10         never been any complaints made against you with AST?

11  A    How do you mean by -- by who, sir?  By?

12  Q    By -- by pedestrians -- or by citizens who have been

13         allegedly harmed by you?

14  A    No, we've never had -- that I know of no one's

15         officially complained to the troopers or anything at

16         all.  There was just rumor in the paper.

17  Q    Okay.  I'm going to ask you, sir, would you give me a

18         release to allow me to view your training records?

19  A    No.

20  Q    Okay.  Why not?

21  A    There's no reason to.  They have nothing to do with the

22         incident in my opinion.

23  Q    Okay.

24         MR. FLOERCHINGER:  Just for the record, are you

25     talking the training records at the academy?          Exhibit _A_

                                                              Page _209_ - _220_

1              MR. OSTERMAN:  I'm talking training records

2    that he -- through the academy to the present day.  I want to

3    know every aspect of training he's received.

4              MR. FLOERCHINGER:  Oh, training.

5              MR. OSTERMAN:  Training.

6              MR. FLOERCHINGER:  I'll discuss it with him.

7    We'll get back to you on that.

8              MR. OSTERMAN:  Okay.

9    A    Yeah, I just -- I say no 'cause I don't see any reason

10        for it especially to present day has nothing to do with

11        the incident.  It was four years ago.....

12   Q    Well.....

13   A    .....almost.

14   Q    Nevertheless, there is an issue and your attorney will

15        be more than happy to discuss it with you.

16   A    Certainly.

17             MR. OSTERMAN:  I have no other questions.

18   Q    (By Mr. Osterman)  And by the way, I would indicate for

19        the record that we have marked -- I'm going to ask you,

20        sir, to sign these.....

21   A    Yeah, I have.....

22   Q    .....and put a little thing on the bottom down here

23        that this is Exhibit 56 and this was the first diagram

24        that he created.

25   A    Certainly.  Can I borrow your pen, sir?  It's on that

Exhibit _A_
Page 210 of 220

211

1       yellow paper.

2   Q   Yeah, I've got to get more.....

3   A   Where would you.....

4   Q   If you would just sign.....

5   A   .....like to me to sign that.....

6   Q   ..... over where I've got Ex 56?

7   A   Certainly.

8   Q   Now we've taken these out of order.  I didn't realize I

9       had done that, so I apologize 'cause.....

10  A   That's okay.

11                      **(Exhibits 55 and 56 marked)**

12              MR. FLOERCHINGER:  While he's doing that you're

13  talking from Sitka to the present or through the incident?

14              MR. OSTERMAN:  I want Sitka to today.

15              MR. FLOERCHINGER:  Okay.  We'll get back to you

16  on that.

17  A   What is it, the 29th?

18              MR. OSTERMAN:  Today is the 29th.

19  A   29th.  Thank you.

20              MR. OSTERMAN:  Pardon?  I'm sorry.

21              MR. FLOERCHINGER:  I'll get back to you on

22  that.

23              MR. OSTERMAN:  Okay.  At least I want through

24  this incident,  minimum.

25              MR. FLOERCHINGER:  Minimum through the

Exhibit _A_
Page _211_ of _220_

212

1    incident?

2                    MR. OSTERMAN:  Right.

3    Q       And if you'll sign -- and this is Exhibit 55, it's in

4            the corner down there.

5    A       Okay.

6    Q       And this is the second one that I had you draw showing

7            the relationship of Trooper Whittom's car prior to the

8            collision.

9    A       Should we label these so it's clear?

10   Q       I think you probably should.  If you could put Porter

11           is one of the cars and Whittom is the other.

12   A       I'd prefer not to put Porter 'cause I didn't know who

13           it was.

14   Q       Well, I realize.....

15   A       Can I -- can I use the same.....

16   Q       .....you didn't know who it was.  But we all know who

17           it was.  And he is definitely a plaintiff in this case.

18           Okay.

19   A       He was A on this one, can we put an A here?

20   Q       As I say why don't you put the word Porter there, just

21           solve the problem.  Mr. Floerchinger knows who it is

22           and I know who it is by putting the word Porter.  And

23           we're only doing it for the methodology.....

24                   MR. FLOERCHINGER:  And I don't think there's

25   any issue  that he didn't know who it was.

213

1    COURT REPORTER:  And actually I think the date

2  is the 30th.....

3  (Simultaneous conversation)

4  A    Okay.  I just put later learned Porter's vehicle.  And

5    then I'll put Trooper Whittom's vehicle.

6    MR. OSTERMAN:  You may be right.

7    COURT REPORTER:  Friday is the 30th.

8    MR. OSTERMAN:  Yeah, it is the 30th by the way.

9  I apologize.....

10  A    I'm sorry.

11    MR. OSTERMAN:  No, my fault too.  You could

12  have said it was April and I would have agreed.

13  A    It's that whole time perception thing, you know.

14    MR. OSTERMAN:  Yeah.

15  A    All right.  30.

16  (Off record comments)

17    MR. FLOERCHINGER:  I think you've got some of

18  my exhibits.

19    MR. OSTERMAN:  If I do I intend to go through

20  them very quickly.  And piece them out, but if I do I'll be

21  happy to give them back to you.

22    MR. FLOERCHINGER:  All right.

23  A    All right.  So there you are.

24    MR. OSTERMAN:  Okay.  So let's hand those into

25  the court reporter.  Now, Madam Court Reporter, the exhibits

Exhibit ___A___
Page 213 of 220

214

1    we've used in this dep we're going to use in the next dep.

2                    COURT REPORTER:  Okay.

3                    MR. OSTERMAN:  Is that going to be a problem

4    for you?

5                    COURT REPORTER:  Nope.

6         (Off record comments)

7                    MR. FLOERCHINGER:  And then we'll stipulate

8    that all of the exhibits will be attached to.....

9                    MR. OSTERMAN:  To all of the.....

10                   MR. FLOERCHINGER:  .....the Osborn deposition.

11                   MR. OSTERMAN:  Uh-hum.

12                   MR. FLOERCHINGER:  But they will be used in

13   both depositions.

14                   MR. OSTERMAN:  Right.  And that way we don't

15   have to multiply reproduce them.

16                   COURT REPORTER:  Shall we go off record?

17                   MR. OSTERMAN:  Yes.

18        (Off record)

19                        (END OF PROCEEDINGS)

20

21

22

23

24

25

Exhibit ___A___
Page 214 of 220



Case No.
03-800

# STATE OF ALASKA
## DEPT. OF PUBLIC SAFETY
### TRANSCRIPTION OF RECORDING

RLM 1
2-10-03

| | |
|---|---|
| **Transcription Of:** | **Shooting Incident involving CASEY PORTER** |
| **Date:** | 1/4/03 |
| **Time:** | Approximately 0207 Hours |
| **Location:** | Kenai Keys Road near the intersection of the Sterling Highway |
| **Present:** | TRP. JESSE OSBORN (JO) |
| | CASEY PORTER (CP) |
| | TRP. JOE WHITTOM (JW) |
| **Transcribed By:** | Vickie Miller |

JO:  ...get out of the car!  Get out of the car, now!  Get out of the car.
CP:  What's wrong, sir?


JW:  (indiscernible)
JO:  Get out of the car.
JW:  Throw up your hands, get in your veh...get out of your vehicle!
CP:  Okay.  No, no problem...I'll back up.

JO:  No, you won't back up, you will get out of the car now.
JW:  No!  Get out, now!
JO:  Do you understand me?
JW:  (indiscernible)
CP:  Yes, sir.

JO:  You will get out of that car, show me your hands.  Open the door, close, now.
JW:  (To AST Dispatch) Sodotna, 1-E-20, we got him stopped.
JO:  (To Trp. WHITTOM) Get that tazer out.  (To CASEY PORTER) Open the door now.
JW:  Turn off your vehicle!
CP:  What's wrong, sir?  I was just parked.

JO:  Okay, open the door now.

**(pepper spray being sprayed)**

CP:  Ahhh.....I didn't do nothing!

JO:  Tell him he's been sprayed.  Get out.

**(Five shots fired)**

JO:  Shots....shots fired.  Soldotna, 1-E-16, shots fired.  We're 10-60.  Get medics 10-19.  You okay, WHITTOM?
JW:  Yeah.

EXHIBIT___ 1 pg 1 of
CASE NO. *Porter Dep*
DATE:_____

PAGE    AST 0043

NOV-28-2006 11:04 AM

P.02



**STATE OF ALASKA**
**DEPT. OF PUBLIC SAFETY**
**TRANSCRIPTION OF RECORDING**

Case No.
03-800

---

**Shooting Incident Involving CASEY PORTER**

**(radio traffic in background)**

JO:    He was headed straight for ya'.
JW:    (To AST Dispatch) Soldotna, 1-E-20,....

JO:    10-4, suspect. It's the Kenai Keys pull-out. I can see his hands. I believe he's 79...I can't see his...I can see his right hand. Are you okay, did your car hit you?
JW:    No, he hit my car.

JO:    God, I thought he was gonna' kill you....he doesn't...he's not wearing any pants.
JW:    Yeah.

JO:    Looks like there's a marijuana pipe in the front. Okay. It doesn't look like he has any weapons, let's get him out of there. I couldn't open the door, I tried. Okay....I'm gonna' holster my weapon, keep him covered. You sure you're okay?
JW:    Yeah, I'm okay. It's...

JO:    God, I saw him hit that car....
JW:    (indiscernible) the vehicle bumped me a little bit and kinda'....

JO:    I saw him hit the gas and he was headed straight for you aiming with his steering wheel. I'm gonna' check pulse. I'm gonna' handcuff him first, he was still clenching his fists a second ago. Alright...that glove's not working.

**(radio traffic in background)**

JO:    Just cover him. He's still moving, I think that's just a....reaction however. I'm gonna' get in the passenger's side, cuff him. It's locked. I'm gonna' break it out with my baton. (Sound of baton breaking passenger side front window) 10-4, we're 10-60, I believe the subject's 10-79. 10-4 and we are 10-60. Just cover him from the rear. Okay. Time is 0216, suspect isn't wearing any pants. No me....no vehicles have been moved since point of impact when Trooper WHITTOM's vehicle was struck. Trooper WHITTOM was on the other side of his vehicle, the side that had moved towards instruct the suspect to stop and not move his vehicle. He immediately hit the gas, grasping the steering wheel with both hands, aiming for Trooper WHITTOM with his headlights on. I fired on the suspect, he's believed to be deceased at this point. He's been restrained. We don't see any weapons right in the vehicle immediately. Looks like some pornographic material um....suspect's not wearing any shoes....looks like he's got a cane. I..I believe I know who this is. Um....he was a suspect ...I..I believe he's 10-99....I'm gonna' make a phone call, be off record.

**End of taped incident.**

---

Vick
01/07/03-Page #2

EXHIBIT _( pg 7 of_
CASE NO. _Porter Dep_
DATE:

AST 0044
PAGE

Exhibit _A_
Page _216_ of _220_



**STATE OF ALASKA**
**DEPT. OF PUBLIC SAFETY**
**TRANSCRIPTION OF RECORDING**

Case No.
**03-800**

| | |
|---|---|
| **Transcription Of:** | **JOE WHITTOM** |
| **Date:** | 1/4/03 |
| **Time:** | 0643 hours |
| **Location:** | Soldotna AST Post |
| **Present:** | Inv. Dane Gilmore (DG) |
| | Trp. Joe Whittom (JW) |
| **Transcribed By:** | Vickie Miller |

**DG:** This is Investigator GILMORE, the date is 1/4/2003. We're at AST Soldotna Post. The time is approximately 0643 hours, I'm in my office with Trooper JOE WHITTOM to conduct an interview. I'm gonna' read you a section out of the OPM here. Do you understand that you are not in custody and are free to discontinue this interview at any time?

**JW:** Yes, I do.

**DG:** Do you understand that you are not obligated to talk to me?

**JW:** Yes, I do.

**DG:** Okay. Having that in mind, why don't you just uh...start from the beginning about what happened tonight.

**JW:** M'kay. At approximately 0157 hours, I was dispatched to a traffic complaint off of Kenai Keys out in Sterling. The complainant was a DOT driver who stated that every time the ve...he stated a vehicle, a blue four-door sedan, had been out there for the last couple of hours. Uh....he said that every time he drove by, the sedan would flash his lights at him. Um...I cleared from a traffic stop that I was on and proceeded to head out there. Trooper OSBORN uh...was ahead of me by half a mile. He also was responding to the vehicle. As we got closer to Kenai Keys, which is at seventy-nine mile Sterling, I was approximately three hundred miles behind, uh...Trooper OSBORN. I'm using my spotlight, looked in either side of the ditch uh...to see if I could locate a vehicle, uh...did a quick shine with the brights, didn't see a vehicle in the Kenai Keys pull-out area. As you turn onto Kenai Keys, there's a big open area that's, it's like a big parking lot. You can...uh...park there or..or um....just a big open area, and uh...didn't notice any vehicles.......noticed Trooper OSBORN say he was 10-23...he was 10-6 with the vehicle. He ran the vehicle license plate number, he stated that it was occupied with at least one person in it. As I turned onto Kenai Keys, noticed that Trooper OSBORN had activated his emergency lights. Shortly after Trooper OSBORN activated his emergency lights, the vehicle then proceeded to leave the area. As the vehicle was starting to leave the area, I flipped on my emergency lights and notified Dispatch that we had a Fail to Yield situation, at which point, before I could finish what I was uh...going to tell Dispatch in which direction he was going, uh...vehicle description....the vehicle stopped. As soon as the vehicle stopped, threw the...the my patrol vehicle in park, got out of the vehicle, drew my weapon, was at the guard position, yelled verbal commands for the uh...the driver to show his hands and to step out of the vehicle. I remember seeing the driver um... look directly at me, look back at Trooper OSBORN, he looked back at me... kind of had a confused look on his face, um....brought his hands up...and then would bring his hands back below sight....uh...to where we couldn't see

EXHIBIT ____ no 3 of ____

CASE NO. _Porter Dep._

DATE: _____

PAGE ___ AST 0045

P.04

NOV-20-2006 11:05 AM

Exhibit **A**
Page 217 of 220



**STATE OF ALASKA**
**DEPT. OF PUBLIC SAFETY**
**TRANSCRIPTION OF RECORDING**

Case No.
03-800

12-384 (REV 406)

**JOE WHITTOM**

them. Down in front uh.....of the steering wheel... like he was reaching down towards the floor....and then we'd yell at him to show us your hand...his hands again. He'd come back up. He did this approximately two or three times and then he rolled down his window, uh...during which point he mumbled something that I didn't understand. Uh...we kept giving him verbal commands to keep his hands up, keep his hands up, step out of the vehicle. He then proceeded to roll up his window at what point Trooper OSBORN uh...used uh....OC spray and sprayed inside the vehicle. I remember seeing the spray actually hit the driver at least on the left back han....back of his head area and the mist swirl around inside...inside the car. Uh...the driver gave out a...a short, uh...moan or scream when the OC was into the vehicle. He immediately went down towards his lap, hands went out of sight again. He came back up, he went back down, uh, at which point Dispatch was on the ....on the radio...asking for directions at which way this vehicle is failing to yield which...which direction of ...of travel he's left. I re-holstered my weapon real quick, leaned inside, uh...with one of my hands on the seat....reached for the...the mic....as I'm doing this...I'm watching the...the vehicle....Trooper OSBORN. The...the driver sits up, has his eyes open, he grabs a hold of the wheel with both ....both hands and I could hear the....the cars' engine rev up and the tires spinning on the...on the ice. Uh..quickly stand back up...re-draw my ...my weapon, come back to the um...guard position and as I'm getting out of the vehicle, Trooper OSBORN's already firing into the weapon...or firing into the vehicle. Um....the vehicle rolls approximately five feet...before it comes to a stop...hitting my vehicle. Um....it wasn't until afterwards that I noticed that my vehicle had been moved at least a foot and a half, two feet. Uh....

DG: From the impact?
JW: From the impact.

DG: Okay.
JW: Um....

DG: When uh....you were in the vehicle, you're trying to use the radio....something uh...made you come out to re-draw your pistol, what were you seeing and thinking when that was going on?
JW: Um....like I say I..I was watching the vehicle, heard...heard the engine rev, and that's what made me uh...step back out of the vehicle. As I'm...I'm not fully stood up still I'm kind of in a half stance, half in the car, half out, still on the way out I hear shots, um....and seeing Trooper OSBORN shoot into the back of the... through the back window into the driver. Um...my initial thought was uh....the shock...I couldn't...couldn't believe that shots were fired in...in a situation like this. Um....I..I....right at that point I just was uh...was kind of numb, didn't....didn't really feel anything. Um....I noticed I...the adrenaline....I ended up talking kind of quick on the radio...I remember that. Reaching back in after...uh...the suspect was stopped, reach back in and getting on the radio. Um...before I got on the radio, Troo...I hear...I remember hearing Trooper OSBORN on the radio saying that shots were fired and that we needed medics. Uh...I then asked for the on-call uh...person...uh to be called and for medics to respond that shots were fired. Um....just uh...just disbelief that...that what had just happened had happened. Um....uh...it just all happened so quick.

Vick-9160
01/21/03-Page #2

EXHIBIT____ pg 4 of ___
CASE NO. Porter Dep
DATE:_____

AST 0046
PAGE ____

P.05    NOV-20-2006 11:05 AM

Exhibit A
Page 218 of 220



# STATE OF ALASKA
## DEPT. OF PUBLIC SAFETY
### TRANSCRIPTION OF RECORDING

03-800

### JOE WHITTOM

**DG:** Um....at the time that this happened, approximately how many uh...hours had you been working at that point?
**JW:** I had just come on at ten o'clock that night, so...ten...eleven, twelve...so about three, four hours.

**DG:** Okay. And did you sleep before your shift?
**JW:** Yes.

**DG:** Okay. About how many hours of sleep...
**JW:** Uh...

**DG:** ....before your shift?
**JW:** Today I got quite a bit....at least eight or nine...

**DG:** Okay.
**JW:** ..if not a little bit more.

**DG:** Okay. Uh...were you on any medications at this time?
**JW:** Negative.

**DG:** Any alcohol?
**JW:** Negative.

**DG:** Okay, when's the last time that you had a drink of alcohol?
**JW:** It's been well over a year.

**DG:** Okay.
**JW:** Almost two years probably.

**DG:** Uh....okay. Uh....were you injured out of the car hitting yours?
**JW:** No.

**DG:** Okay. About what speed do you think the vehicle was going when it hit yours?
**JW:** Probably five or ten miles an hour? On the ice it didn't get much traction, so....

**DG:** Okay.
**JW:** ...about five or ten miles an hour.

**DG:** When he started to accelerate toward your car, how far away was he?
**JW:** Oh, approximately hmm....from the front of his vehicle to the front of my vehicle, I'd say about ten feet.

**DG:** Okay. Alright. And he'd already been sprayed with pepper spray at that point?
**JW:** Right, he'd already been sprayed.

EXHIBIT ___ pg 5 of
CASE NO. Porter Dep
DATE:___

Vick-9160
01/21/03-Page #3

AST 0047
PAGE ___



# STATE OF ALASKA
## DEPT. OF PUBLIC SAFETY
## TRANSCRIPTION OF RECORDING

Case No.
03-800

---

### JOE WHITTOM

**DG:** Okay. Uh....any...you say that you were shocked ...with...with uh...that shots were fired, it...in what way?

**JW:** Um...you know...I guess from my...my perspective, I didn't see uh...that shots were warranted in this situation. Um...I didn't feel any danger to myself when the sus....when the driver of the...or the suspect vehicle decided to um...gun it. Um....you know he'd already been sprayed and uh....and with the conditions that were...were there um....I don't think that uh...you know it was...was good use of force.

**DG:** I see.

**JW:** In..in..in my own...

**DG:** Mm hmm.

**JW:** ...uh perspective. And...and that's why I didn't return fire or...or shoot when...um...when I saw the vehicle coming towards me.

**DG:** Okay.

**JW:** Because I was shielded by my vehicle.

**DG:** Okay. Alright. Is there anything else that I haven't asked or we haven't covered that you think I should be aware of?

**JW:** Um...just afterwards we covered the suspect. Trooper OSBORN checked to see if uh...uh...he was still alive....uh...he had some uh...movement of his neck and it was...had a few last gasps like he was trying to breathe and uh....Trooper OSBORN went around the other side and broke the uh....front passenger window to gain access to the vehicle that way, uh... because it was...the vehicle was all locked up. The driver's side door didn't have a handle so you could open it from the outside. Uh...went in through the dri...passenger side uh...did a quick pulse on his uh...on his wrist closest to him and then uh...placed him in handcuffs and uh..as soon as the suspect was secured I went right straight into photographing the area and...

**DG:** At any time during this did you see the person who was shot with a gun?

**JW:** At no time did I see him with a gun.

**DG:** Okay. Did you see anybody else in the car or in the area?

**JW:** At no time did I ever see anybody else in the area or in the car.

**DG:** Okay. Alright. I don't think that I have anything else. Okay. Uh...we'll be ending the interview, the time's approximately 0655 hours.

## END OF TAPED INTERVIEW.

EXHIBIT \_\_\_\_ pg \_\_\_\_ of \_\_\_\_
CASE NO. _____
DATE: _____

Vick-9160
01/21/03-Page #4

AST 0048
PAGE _____

NOV-20-2006  11:06 AM

P.07

Exhibit \_\_\_A\_\_\_
Page 220 of 220