Mark D. Osterman, Attorney
Osterman Law Office, P.C.
215 Fidalgo Drive, Suite 106
Kenai, Alaska 99611
907-283-5660

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ARTHUR J. PORTER and CHRISTIE A. PORTER, <br>      Plaintiffs, <br><br> vs. <br><br> ARTHUR J. OSBORN and JOSEPH WHITTOM, individually <br><br>      Defendants | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No. A05-0142 CV (JWS) <br> ) <br> ) |

**RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.    FACTS
### STATEMENT OF FACTS

On January 4, 2003 in the early morning hours, Casey Porter was

parked in a charcoal gray Mazda four-door car in the turnout at the Kenai Keys

intersection.  At approximately 2 a.m., a snow plow driver for the Department of

Transportation claimed he saw a blue car twice during his shift and believed

that he had seen a light come on inside the car.  He called into the State

Troopers and informed the dispatcher who dispatched Trp. Whittom to the

scene.

Trp. Osborn also responded to the call.  Trp. Osborn stated (Ex 1 p 1)

that there had been a report of a suspicious vehicle.  It was also believed (Ex 1

Response To Defendant's Motion For Summary Judgment                    Page 1 of 27
Arthur Porter and Christie Porter v. Arthur Osborn and Joseph Whittom
Case No. A05-0142 CV (JWS)

p 2) that the vehicle that he saw fit the description of the vehicle that had been reported, which was not accurate.

Trp. Osborn admitted (Ex 1, p 3) that he could not see the car upon his immediate approach because of the snow berm, and that he did not know if it was in fact the correct car. (Ex 1, p 9-10). Trp. Osborn believed that since it was the only car the turnout, it must be the "suspicious vehicle" (Ex 1, p12). As he approached the "unknown suspicious vehicle" he thought that it was abandoned. (Ex 1, p 12-14). He repeated that he believed that car was abandoned because it appeared that no one was in it. He admitted that as he approached the car, he turned his headlights into the driver's door and windshield area, and may have had his high intensity lights as well as his bright lights turned on to the vehicle.

The police dispatch log discussed a call from Trp. Osborn suggesting that there had been "failure to yield" called in at approximately the same time that Trp. Osborn arrived at the scene, but it appears to be disputed by Trp. Osborn himself as a possible mistake. (Ex 1, page 12-14).

As Trp. Osborn sat with his headlights shining into the Mazda sedan from his Ford Explorer, and just as he had called in the license plate number of the car, a person inside the car (later identified as a Casey Porter), sat bolt upright and startled Trp. Osborn. (Ex 2, p 1). Trp. Osborn admitted that the lights in his car would have been at about eye level for any person sitting in the Mazda and therefore the person in the Mazda would likely only see the bright

Response To Defendant's Motion For Summary Judgment                Page 2 of 27
Arthur Porter and Christie Porter v. Arthur Osborn and Joseph Whittom
Case No. A05-0142 CV (JWS)

lights of the headlights at approximately 6 feet away. (Ex 2, p 3). While Trp. Osborn argued that some people can see past the bright headlights shining in their face from 6 feet away, he did admit that people frequently pull off into turnout areas for safety issues, including sleep. He stated that it was not uncommon for people to do so. (Ex 2 p 8.)

Trp. Osborn then described that the person began moving the car (apparently the engine was running) and cautiously drove around the police car with his headlights on. As it was getting past the police car, Osborn initiated his overhead lights. (Ex 2, p 10) Osborn moved the patrol SUV to a position to block Porter's leaving. Porter nevertheless drove around the car. Instead of using his car to block the exit, and believing it would be unsafe to use his car to block the vehicle (Ex 2, p 11-13), Osborn got out of the SUV and began chasing after the Porter car on foot yelling for Porter to stop.

Trp. Osborn described that his "contact" with Porter had dissolved and that Porter had showed that he was going to ignore the police commands to stop. (Ex 3, p 1-2). None of the taped transcipts show that Trp Osborn ever identified himself as an officer. Trp. Osborn claimed that Porter refused to answer when ordered to get out of the car, and that he was "eluding police" at that point, even though Trp. Osborn could not describe what crime or suspicion Porter was under at the time (Ex 3, p 3).

Trp. Osborn admitted that Porter was confused (Ex 3, p 4), and that the time between pulling up to the car and the car attempting to leave the area was

Response To Defendant's Motion For Summary Judgment                    Page 3 of 27
Arthur Porter and Christie Porter v. Arthur Osborn and Joseph Whittom
Case No. A05-0142 CV (JWS)

approximately 30 seconds.  (Ex 3, p 4).  Trp. Osborn also admitted that he

remained behind the driver at all times, and never identified himself on his

audiotape as a police officer. (Ex 3 p 6)

Trp. Osborn described the tools necessary to "get compliance" (Ex 3, p

7) which included pepper spray, and the threat of a Taser, and finally being

shot.  Osborn admitted that Porter showed that he was under stress, and

Osborn admitted that he was under great stress.

Trp. Osborn also admitted (Ex 3, p 9) that he had his gun drawn at the

time he was running behind the car and Porter appeared to be leaving the

area, even though the car traveled no faster than a quick walk speed.  When

the car came to a stop, Osborn demanded that Porter get out at which time

Porter responded by asking what was wrong.  Trp. Osborn believed that this

was an inappropriate statement for citizen to make to a yet unidentified police

officer who is chasing him on foot with a pistol in his hand.  (Ex 3, p 11).

Trp. Osborn stated (Ex 3, p 22) that based upon the suspicious behavior

of Porter was why shots were fired killing Porter. Trp. Osborn stated that the

fact that there was no door handle was suspicious (Ex 3, p 29).  He also stated

that at the time that he fired his gun at Casey Porter, Porter was 20 feet or less

from Whittom's car and had just started off from a complete stop.  Evidence will

demonstrate (by attached photographs) that Porter's car almost missed Trp.

Whittom's vehicle and likely ran into it because Porter was dead.

Response To Defendant's Motion For Summary Judgment                Page 4 of 27
Arthur Porter and Christie Porter v. Arthur Osborn and Joseph Whittom
Case No. A05-0142 CV (JWS)

Trp. Osborn claims that never spoke with Trp. Whittom about the incident until police investigations occurred (Ex 3, p 41). However, he knew information about a statement that Trp. Whittom would make and would repeat that statement to investigators before Trp. Whittom would make the statement. That statement would be to claim by Trp. Whittom later that he was hit by his patrol car when it slid sideways from the impact of the Porter car.

Trp. Osborn also testified at his Deposition that Trp. Whittom was moving into the area at the time that the Mazda had pulled around Trp. Osborn's SUV. He told investigators and repeated it at the Deposition (Ex 4, p 1-2) that Trp. Whittom was matching Porter's moves "tit for tat". Osborn testified that Whittom was trying to blockade Porter and that Trp. Osborn refused to discuss the length of time between which he made initial contact with Casey Porter and the time that he pulled the trigger on his service weapon, which is believed to be less than three minutes from time he arrived on the scene.

Trp. Osborn denied that the Porter vehicle ever turned toward the left (Ex 4, p 5) and then admitted on page Ex 4 p 6 that Porter's car made a slow left-hand curve toward Trp. Whittom, who as previously described was matching Porter's car tit for tat in an effort to blockade him. At Ex 4, p16, Osborn describes the Porter car moving like a "gentle meandering" and that was his perception of it at the time Porter was moving. (Ex 4, page 17). Trp. Osborn's testimony claims that Porter turned his head, while gripping the

Response To Defendant's Motion For Summary Judgment
Arthur Porter and Christie Porter v. Arthur Osborn and Joseph Whittom
Case No. A05-0142 CV (JWS)

Page 5 of 27

steering wheel with both hands, holding his body up (as his seat was reclined at the time) and looked over his left-hand shoulder approximately 160° to see and make eye contact with Trp. Osborn.  Such an action has not been demonstrated but seems unlikely.

Trp. Osborn claims that Porter saw him, saw him with his service weapon drawn and began to try to roll up the windows on his car when Osborn sprayed him with a can of pepper spray.  (Ex 4, p 18).

Seconds later when Trp. Osborn fired his gun five times into the back of Casey Porter, Osborn did not command Porter to stop.  Nowhere in the transcript of the tape recording from Osborn's tape did Osborn ever identify himself as a State Trooper, and nowhere at the time that he fired did he command Casey Porter to stop just before shooting.  Porter had stopped and had restarted his journey when Osborn fired.

The copy of the photographs (Ex 6 attached) establishes that Trp. Whittom, who is described as being behind his patrol car door at the time of this incident, was substantially near 90° to the left of Porter's car.  One photos shows that Porter's car only slightly made contact with Trp Whittom's car, and was so slight that it did not break glass or damage the filament of the lights.  It is also obvious that Porter's car never threatened Trp. Whittom or Whittom's physical presence as the Porter vehicle nearly missed, and came nowhere near Trp. Whittom who was 20 feet from the front of his car.

Response To Defendant's Motion For Summary Judgment                    Page 6 of 27
Arthur Porter and Christie Porter v. Arthur Osborn and Joseph Whittom
Case No. A05-0142 CV (JWS)

Trp. Whittom reported that when he reported to the scene, Porter was still in his car in front of Osborn and Porter's car had begun moving. (Ex 5, page 6). Trp. Whittom testified that he could not hear what Osborn was saying, that he had had no communications with Osborn prior to entering the area, and yet he informed dispatch that there was a "failure to yield", which meant that Porter was not stopping for Osborn's patrol car, even though there was no pursuit. (Ex 5, p 16).

Trp. Whittom also admits he may have confused Porter (Ex 5, page 19) while yelling at him because the situation called for a "felony stop." Based on Osborn's testimony Osborn was not following a felony stop procedure as described by Whittom. (Ex 5, p 20). Whittom described it as a method of extracting a person 1 foot, and one hand at a time, not just a general "get out of the car".

Trp. Whittom also admitted he did not agree with Osborn's desire to shoot. Whittom stated that he did not feel that he (Whittom) was in danger at the time, as Trp Osborn claimed for justification to shoot. (Ex 5, p 26).

Trp. Whittom's testimony differed from Trp. Osborn's on several important details. For instance, Casey Porter rolled his window down before being pepper-sprayed by Trp. Osborn, said Whittom, while Osborn claimed he was rolling it up, which makes little sense. Casey Porter had engaged in some form of dialogue with Osborn (Ex 5 p 36). Whittom also said that the entire

Response To Defendant's Motion For Summary Judgment                    Page 7 of 27
<u>Arthur Porter and Christie Porter v. Arthur Osborn and Joseph Whittom</u>
Case No. A05-0142 CV (JWS)

incident, up to the time of pepper spraying was less than two minutes.  (Ex 5, p 35).

Trp. Whittom's testimony also dealt with inconsistencies about the manner in which he drove the car, backed up, and the inconsistency of why the Mazda had been pushed toward the right when it allegedly made contact with the patrol car, which also was pushed to the left.  Trp. Whittom denied ramming the car, but could not fully explain why photographs were taken of uniformed persons standing beside the Mazda, with their feet standing in the tread marks in the snow of the front tire of the Mazda.

Whittom also admitted in the Deposition that the car moved in a straight line and that when he position his car, he had bright light shining toward but not in the face of Casey Porter at the time of the pepper spraying, and at the time the Porter vehicle moved, resulting in Osborn's shooting five times.

These facts depict that there are differences in the stories, and the photographs attached showing the orange investigative markers, the Deposition testimony, the Transcript of the Police Reporter used in the Deposition and other evidence demonstrate there is a genuine issue of material fact concerning the vehicles, concerning the police officers, and finally, the expert report which shows a substantial issue concerning the speed of the Porter car when it struck the police car.

## II. SUMMARY JUDGMENT STANDARD

Response To Defendant's Motion For Summary Judgment                    Page 8 of 27
Arthur Porter and Christie Porter v. Arthur Osborn and Joseph Whittom
Case No. A05-0142 CV (JWS)

Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The function of this Rule is to dispose of factually unsupported claims and defenses. *Celotex Corp. vs. Catrett*, 477 US 317, 325; 106 S. Ct. 2248; 91 L.Ed. 2d 265 (1986).

When considering a motion for summary judgment, the court should examine all of the evidence in the light most favorable to the nonmoving party, in this case the Plaintiff. *United States vs. Diebold, Inc.*, 369 US 654, 655; 82 S. Ct. 983, 993; 8 L.Ed. 2d 176 (1962). Once the moving party meets the requirements of Rule 56 by showing that there is an absence of evidence to support the nonmoving party's case, the burden shifts to the party resisting the motion who must set forth specific facts to show that there is a genuine issue for trial. *Anderson vs. Liberty Lobby, Inc.*, 477 US 242, 256; 106 S. Ct. 2505, 2514; 91 L.Ed. 2d 202 (1986). Genuine issues of material fact, if they exist, "can be resolved only by the finder of fact, because they may reasonably be resolved in favor of either party." *Id.*, 250, 106; S. Ct. at 2511.

When judging the evidence, the Court should not make any credibility determination or weigh conflicting evidence. See *Matsushita Elec. Indus. Co., Ltd. vs. Zenith Radio Corp.*, 475 US 574; 106 S. Ct. 1348 (1986). Speculative testimony in affidavits and moving papers is insufficient to grant genuine issues

Response To Defendant's Motion For Summary Judgment
<u>Arthur Porter and Christie Porter v. Arthur Osborn and Joseph Whittom</u>
Case No. A05-0142 CV (JWS)

of material fact and will defeat summary judgment.  *Falls River Way Realty Co.*

*vs. City of Niagara*, 754 F. 2d 49 (2d Cir., 1985).


## III. ARGUMENT

### A. The claim available to Plaintiffs is a 14th Amendment Due Process and 1st Amendment claim of association and companionship with their adult son.

Mr. and Mrs. Porter lost the association of their son.  Trp Osborn

deprived them of that society and association when he shot Casey Porter in the

back when Casey Porter decided to lawfully leave the place where he had

parked.

The only Constitutional right available to Plaintiffs is found in the 14th

Amendment of the United States Constitution and there is a  1st Amendment

interest also, as seen below.

Mr. and Mrs. Porter believe that the actions by Trp.s Whittom and

Osborn constituted a complete indifference to their liberty interest in continuing

familial relationships with their adult child, Casey Porter, and Defendants

terminated the rights of the Porters to the association of their son by his death.

The right of a consortium claim has been found in multiple cases some

are discussed here: *Baldrige vs. Rangle*, 199 US Dist. Lexis 1414 (N.D.

California, 1999).  The Federal District Court stated that Mr. Baldrige's mother,

who had been deprived of her son by a shooting of a police officer asserted a

claim in deprivation of her liberty interest arising out of familial relationships

Response To Defendant's Motion For Summary Judgment
Arthur Porter and Christie Porter v. Arthur Osborn and Joseph Whittom
Case No. A05-0142 CV (JWS)

Page 10 of 27

with her son.  The Court held that a substantive Due Process claim may be asserted by the parent of a person killed by law enforcement officers.  The Court further cited *Curnow vs. Ridgecrest Police*, 952 F. 2d 321, 325 (9th Cir., 1991), Cert. Denied,  506 US 972; 113S Ct. 460, 121 L.Ed. 2d 369 (1992).

In order for Mr. and Mrs. Porter to prevail in their claim against Defendants Osborn and Whittom, they must show that these officers acted with a deliberate indifference to their rights of maintaining a familial relationship and society with their son by using excessive force against Casey Porter.  In *Byrd v. Guess*, 137 F. 3d 1126, 1133-1134 (9th Cir. 1998), Cert. Denied, 119 S Ct. 405 (1988), it was said "to prove their 14th Amendment claim, the Plaintiffs have to prove that the officers acted with deliberate indifference to the Plaintiffs rights and familiar relationship and society by using excessive force against the Plaintiffs' deceased son."

Thus, under the circumstances, there exists a right of consortium in the parents of the adult deceased under a Constitutional deprivation of rights.


**B.  Trp.s Whittom and Osborn do not have qualified immunity.**

The Defendants argue that there is a two-step process.  First, the Court must consider in its initial step whether the facts taken the light most favorable to the Plaintiffs establish the Trp.s conduct violated a Constitutional right.

Response To Defendant's Motion For Summary Judgment          Page 11 of 27
Arthur Porter and Christie Porter v. Arthur Osborn and Joseph Whittom
Case No. A05-0142 CV (JWS)

(*Defendants' Brief*, page 11). However, the United States Supreme Court's methods in deciding the 2 step process requires some caution.[1]

There can be no doubt that constitutionally recognized rights were violated. Casey Porter's rights to be free from seizure, while it may not give any vicarious liability in Mr., and Mrs. Porter, it is the beginning point of rights violations. Trp. Osborn and Whittom knew then and now that death terminates familial relations.

First, the Defendants argue that the standard in this case is the "objective reasonableness" standard found in *County of Sacramento v. Lewis*, 523 US 833 (1998), which is mistaken. The *Lewis* case and *Moreland*, 159 F3d 635 (9th Cir 1998) are about deaths caused in high speed crashes and the resulting 14th Amendment issues. But this is not necessarily the standard in qualified immunity in a shooting case. Defendants want the shocks-judicial-conscience standard, and that is not the correct standard.

> 'Government officials performing discretionary functions, generally are shielded from liability for civil damages [in a section 1983 action] insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982).
>
> This "clearly established law" test requires more than an alleged "violation of extremely abstract rights." Anderson v. Creighton, 483 U.S. 635, 639, 97 L. Ed. 2d 523, 107 S. Ct. 3034 (1987). Rather, "the contours of the right must be sufficiently clear that a

---

[1] Defendants argue that under *Saucier v. Katz*, 533 US 194 (2001) the Court should consider the 2 step approach of first looking to the constitutional violation before deciding to go to the second step, but in *County of Sacramento v. Lewis*, 523 US 833 (1998) at footnote 5, the Court cautions lower courts not to assume a constitutional violation.

Response To Defendant's Motion For Summary Judgment                    Page 12 of 27
Arthur Porter and Christie Porter v. Arthur Osborn and Joseph Whittom
Case No. A05-0142 CV (JWS)

reasonable official would understand that what he is doing violates that right." Id. at 640. In other words, "in the light of preexisting law the unlawfulness must be apparent." Id." *Curnow v. Ridgecrest Police*, 952 F.2d 321, 324 (9th Cir. 1991).

First, the allegation in this case is that Trp.s Whittom and Osborn deprived Casey Porter of his right to life and the right of his parents to his association in violation of substantive Due Process and that under the circumstances described, Osborn and Whittom's actions in causing Porter's death were an abuse of the executive power and was so clearly unjustified by any legitimate objective of law enforcement as to be barred by the 14th Amendment. [2]

In *Lewis, supra* the Supreme Court explained:

"[W]e have emphasized time and again that 'the touchstone of Due Process is protection of the individual against arbitrary action of government.' **Wolf vs. McDonald**, 418 US 539, 558 41 L.Ed. 2D 935 (1974), whether the fault lies in a denial of fundamental procedural fairness, See e.g., **Fuentes vs. Shevin**, 407 US 67, 82; 92 S. Ct. 1983 (1972) (the procedural due process guarantee protects against 'arbitrary takings'), or in the exercise of power without any reasonable justification in the service of legitimate governmental objective, see, e.g., **Daniels vs. Williams**, 474 US at 331 (the substantive Due Process guarantee protects against government power arbitrarily and oppressively exercised)."

In note 9, the Court held "[I]t was not the ultimate purpose of the government actors in harm to the plaintiff, but they apparently acted with a full

---

[2] See *Collins vs. Harker Heights*, 503 US 115, 126; 111 L.Ed. 2d 261 (1992) noting that the Due Process Clause was intended to prevent government officials from "abusing [their] power or employing it as an instrument of oppression" (quoting *Duchene vs. Winnebago County Department of Social Services*, 49 US 29 196; 103 L.Ed. 2d 249 (1999).

Response To Defendant's Motion For Summary Judgment                    Page 13 of 27
Arthur Porter and Christie Porter v. Arthur Osborn and Joseph Whittom
Case No. A05-0142 CV (JWS)

appreciation of what the Court described as brutality of their acts.  [Describing

its analysis in *Rochin vs. California*, 342 US 165, 72 S. Ct. 205 96 L.Ed. 183

(1952).] The Court here also held (note 10) "we have also employed deliberate

indifference as the standard of culpability sufficient to identify a dereliction as

reflective of municipal policy and to sustain a claim of municipal liability for

failure to train an employee who causes harm by unconstitutional conduct for

which he would be individually liable."  But these discussions focus on

"arbitrary" acts and not deliberate conduct of shooting a citizen in the back.

"Reasonable justification" would seem to be standard expressed by the *Lewis*

Court and not entirely different than the standard set in *Garner*, infra.

The Supreme Court also summarized the issue of negligent use of the

automobile.  In note 13, the Court states "where the citizen suffers physical

injury due to a police officer's *negligent use* of his vehicle, no section 1983

claim is stated.  It is a different story when a citizen suffers or is seriously

threatened with physical injury due to a police officer's *intentional misuse* of his

vehicle. *Checki vs. Webb*, 705 F.  2d 534, 538 (CA5, 1986) requoted at 522 US

at 854."  Under this analysis, Trp Whittom used his car to contain Mr. Porter

allowing Trp Osborn to shoot him, and was thus an intentional act.

Thus, the analysis of the Supreme Court is not on whether or not

someone died negligently, but whether they died by the deliberate act of a

government agent.  When Trp. Osborn removed his side-arm, released the

safety device and fired 5 times, he intended to "stop" Casey Porter by the

Response To Defendant's Motion For Summary Judgment                                          Page 14 of 27
Arthur Porter and Christie Porter v. Arthur Osborn and Joseph Whittom
Case No. A05-0142 CV (JWS)

ultimate seizure--death.  Trp. Osborn denied Mr. and Mrs. Porter of their

fundamental liberty interest to serve as parents and companions to their son.

The concept that a parent has a fundamental liberty interest in the

companionship and society of his or her child and that the  interference with

that liberty interest without due process of law is remedial under 42 USC

§1983.  *Kelson vs. City of Springfield*, 767 F. 2d 651, 654-55 (9th Cir., 1985)

(citing *Santosky vs. Kramer*, 455 US 745, 753; 102 S. Ct. 1388 (1982).

In *Board of Directories vs. Rotary Club*, 481 US 537, 545; 107 S. Ct.

1940 (1987), the Supreme Court held that the First Amendment protects those

relationships, including family relationships, that presuppose 'deep attachments

and commitments to the necessary few other individuals with whom one shares

not only a special community of thoughts, experiences, and beliefs but also

distinctly personal aspects of one's life.'  These concepts are not part of an

"estate" but arise from the creation of the association.  No one can express the

doubt that Christina and Art Porter loved their son, wished to remain

'connected' and associated with him and as the attached Affidavit shows, had

an even stronger connection to Casey through his daughter.

The recognition of fundamental elementary liberty protected by the Bill

of Rights has not been limited by the United States Supreme Court.

> "The Court has recognized that the freedom to enter into and
> carry on certain intimate or private relationships is a fundamental
> element of liberty protected by the Bill of Rights. Such
> relationships may take various forms, including the most intimate.
> See *Moore v. East Cleveland*, 431 U.S. 494, 503-504 (1977)

Response To Defendant's Motion For Summary Judgment                    Page 15 of 27
Arthur Porter and Christie Porter v. Arthur Osborn and Joseph Whittom
Case No. A05-0142 CV (JWS)

(plurality opinion). We have not attempted to mark the precise boundaries of this type of constitutional protection. The intimate relationships to which we have accorded constitutional protection include marriage, *Zablocki v. Redhail*, 434 U.S. 374, 383-386 (1978); the begetting and bearing of children, *Carey v. Population Services International*, 431 U.S. 678, 684-686 (1977); child rearing and education, *Pierce v. Society of Sisters*, 268 U.S. 510, 534-535 (1925); and cohabitation with relatives, *Moore v. East Cleveland*, supra, at 503-504. Of course, we have not held that constitutional protection is restricted to relationships among family members. We have emphasized that the First Amendment protects those relationships, including family relationships, that presuppose "deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life." *Roberts v. United States Jaycees*, supra, at 619-620. But in *Roberts* we observed that "determining the limits of state authority over an individual's freedom to enter into a particular association . . . unavoidably entails a careful assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments." 468 U.S., at 620 (citing *Runyon v. McCrary*, 427 U.S. 160, 187-189 (1976) (POWELL, J., concurring)). In determining whether a particular association is sufficiently personal or private to warrant constitutional protection, we consider factors such as size, purpose, selectivity, and whether others are excluded from critical aspects of the relationship. 468 U.S., at 620." *Board of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 546 (U.S. 1987)

The Defendants argue that the "shocks judicial conscience" standard is the standard to be applied in this particular case. However, in *Mahach-Watkins vs. Depee*, ___ F. 3d ___, No. C05-1143 (ND, CA October 24, 2006) that Federal District Court found that the shocks-judicial-conscience standard of the United States Supreme Court in dealing with issues of immunity does not apply in a case involving a deliberate shooting. That Court argued that the Lewis

Response To Defendant's Motion For Summary Judgment                    Page 16 of 27
<u>Arthur Porter and Christie Porter v. Arthur Osborn and Joseph Whittom</u>
Case No. A05-0142 CV (JWS)

decision was limited to the facts of a negligent death and this seems supported by the 9th Circuit's ruling in Moreland which focuses on the "unintentional killing of an individual by law enforcement officers."[3]

The 9th Circuit Court found that the *Moreland vs. Las Vegas Metropolitan Police Department* case, 159 F. 3d at 365 (9th Cir., 1998) was a situation of an accidental death. Similarly, in the *Lewis*[4] case, supra, the United States Supreme Court was dealing with the death of a person caused by an automobile accident involving a high-speed chase.

In the Mahach-*Watkins* case, that District Court proposed that the "reckless, intentional, deliberate acts and omissions of defendants" standard is necessary. See *Lee vs. City of Los Angeles*, 250 F. 3d 668 (9th Cir. 2001).

Pursuant to *Tennessee vs. Garner*, 471 US 1; 105 S. Ct. 1694 (1985):

> "[W]henever an officer restrains the freedom of a person to walk away, then he has seized that person.  *United States vs. Brignoni-Ponce*, 422 US 873, 878 (1975).  While it is not always clear just when minimal police interference becomes a seizure there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirements of the Fourth Amendment."

## (1) Focused Law and Facts

The testimony of Mr. Osborn reveals that from the cab of the Ford Explorer, he could not get a full view of the car "blue" (but really dark gray) car until he entered the turn out, which means the snow plow truck likely could not

---

[3] Requoting *Moreland*, 159 F3d at 372.
[4] *County of Sacramento v. Lewis* 523 US 833 (1998).

Response To Defendant's Motion For Summary Judgment                    Page 17 of 27
Arthur Porter and Christie Porter v. Arthur Osborn and Joseph Whittom
Case No. A05-0142 CV (JWS)

have seen it.  When Mr. Osborn arrived, the car was parked and all was quiet.

Mr. Osborn had no idea whether the car he was investigating was the one

called in by the plow operator.  (Ex 1 p 9)

Mr. Osborn described it as the  "suspicious vehicle" (Ex 1 p11) because

it was dark or the time of night (Ex 1 p 10).  One wonders if the shape of the

headlights gave it a sinister effect or perhaps it was some slightly tinted

windows that gave off an aura of suspicion.  But in all actuality, it was just a

dark gray Mazda that was ordinary in every respect and Mr. Osborn felt it may

be abandoned (Ex 1 p 12) suggesting that there was no "suspicion" to justify

even a *Terry* stop.

We also know from the facts of the case (Ex 2 p3) that Osborn had

bright lights shining into the front of this car.  There were no red lights (patrol

over-head lights) activated initially and because of the extreme brightness, it is

unlikely that Casey Porter could see anything more than images in silhouette

form.  Casey Porter started to drive away and to leave the area and when

Porter began moving Osborn activated overhead lights.  No one alleged that

Porter had committed a crime and no police officer can find that there was a

reason to stop him except that there was some duty to investigate.

The rest of Mr. Porter's life is explained by the attached Ex 7, a partial

transcript of Mr. Osborn's tape of the incident.  This tape is less than 3 minutes.

As the facts have already established, there was no probable cause to

believe that a crime had been committed.  When Casey Porter began leaving

Response To Defendant's Motion For Summary Judgment
Arthur Porter and Christie Porter v. Arthur Osborn and Joseph Whittom
Case No. A05-0142 CV (JWS)

Page 18 of 27

the area, there still had been no probable cause to believe that a crime had been committed. This is worthy of repeating.

There was no reasonable articulable suspicion that would cause a *Terry*[5] stop.  Even the description of the car did not match that given by the DOT driver.

From this point on, and according to the facts, Casey Porter never sees the person behind him yelling at him.  At no time did Trp. Jesse Osborn move to the front of the car where Porter could see him.  On the contrary, Osborn gets him to stop and demands that he exit the vehicle.  Porter responded with words such as "what's wrong" and Osborn demanded "you will get out of the car now.  Do you understand me?"  Pepper spray follows in seconds.

At no time has there been any crime committed except the disobedience of a police officer's unlawful command in a situation where no probable cause exists to stop the citizen.  Within seconds, Jesse Osborn has emptied an entire can of pepper spray in the face of Casey Porter.  Pepper spray tends to cause confusion.  People cannot see, they cannot breathe, and they cannot function. The function of pepper spray is to disorient.  When Porter acts disoriented, Osborn shoots him.

In the meantime, Trp. Whittom used his automobile in an effort to block Casey Porter from leaving.  Trp. Whittom does not know why Casey Porter should not leave, or why any crime has been committed, or what the probable

---

[5] *Terry v. Ohio,* 392 U.S. 1; 88 S. Ct. 1868; 20 L. Ed. 2d 889 (1968)

Response To Defendant's Motion For Summary Judgment
Arthur Porter and Christie Porter v. Arthur Osborn and Joseph Whittom
Case No. A05-0142 CV (JWS)

cause of any crime would happen to be, except that Mr. Porter is n the wrong place.

The factual dispute about whether the vehicle revved its motor and spun its tires is left to be seen according to the testimony of the Trp.s present; however, there is some dispute about the speed of the vehicle that collided with Officer Whittom's vehicle, and its cause.  Plaintiff's expert report is attached, and by reference establishes that the car of Mr. Porter was traveling at a substantially reduced speed than the Defendants contend.

From this standpoint, genuine issues of material fact exist on several levels.  First, Mr. Porter had been pepper-sprayed and people were yelling at him to do things.  Mr. Osborn was yelling about getting a Taser gun (Trp. Osborn).  It is believed that Mr. Porter's condition caused him to allow the car to roll forward and when he did so, Jesse Osborn maliciously and without regard for human life opened fire on Casey Porter in an effort to stop him and to justify his own misconduct.

Evidence will establish that the car, after Osborn fired his service gun into the back of Casey Porter, the car swerved slightly to the left and barely connected with the police car of Officer Whittom.  It is believed that evidence will establish that had shots not been fired, the automobile on its track would have missed Trp. Whittom entirely.  It is this "near miss" that defies Trp. Osborn's testimony because the Mazda would have required a critically hard left turn to be aimed at Whittom, whom Osborn claims he was protecting when

Response To Defendant's Motion For Summary Judgment    Page 20 of 27
Arthur Porter and Christie Porter v. Arthur Osborn and Joseph Whittom
Case No. A05-0142 CV (JWS)

he fired.  When the Mazda hits the front of the patrol car, it is 8 feet and a near 90 degree angle to Whittom, and never posed a threat to Whittom.

Trp. Osborn's absolute indifference to human life is characterized by his actions: he seized Porter, refused to let him go, tortured him with pepper spray and threats of a tazer and then shot and killed him.

Defendants argue that the two-step basis for determining whether or not there is qualified immunity is "whether the facts taken in a light most favorable to the non-moving party establish that the officers' conduct violated a constitutional right.  Then and only then does the Court move to the second question of whether the right was clearly establishes a matter of law." (*Defendants' Brief*, page 11).

The Constitution of the United States makes it clear, and case law also makes it clear that in a deprivation such as this, there is a right to seek protection under the Constitution.  Thus, we should proceed to the second test because there was a seizure and a violation of rights.

Trp.s Osborn and Whittom argues that under *Graves vs. Thomas*, 450 F. 3d 1215 (10th Cir., 2006) that the shocks-judicial-conscience standard has once again been reiterated.  Graves' son was driving a friend's car with a friend following in the second car.  The son was driving with his lights off at night when a police officer pulled around the second car and behind the son with his lights off also.  When police engaged his overhead lights, the son took off in the

Response To Defendant's Motion For Summary Judgment            Page 21 of 27
Arthur Porter and Christie Porter v. Arthur Osborn and Joseph Whittom
Case No. A05-0142 CV (JWS)

car and police pursued him.  He approached an intersection with his lights off at speeds of over 100 mph.  Swerving to avoid striking a truck, his car lost control, went airborne, flipped over and rolled into a field causing his death.

Once again, this is a traffic-accident-factual-basis where no police car was intentionally used.

In *Garner*, the court held

"[T]he intrusiveness of seizure by means of deadly force is unmatched.  The suspect's fundamental interest in his own life need not be elaborated upon.  The use of deadly force also frustrates the interest of individual, and of society, in judicial determination of guilt and punishment.  Against these interests are ranged governmental interest and effective law enforcement. It is argued that overall violence will be reduced by encouraging the peaceful submission of suspects who know that they may be shot if they flee.  Effectiveness in making arrests requires the resort to deadly force or at least the meaningful threat thereof." ***Garner***, at 8.

The standard used in *Garner* (*Garner*, at 21) whether the facts, as found, did not justify the use of deadly force.  The court held that Officer Hyman, who shot young Master Garner in the back of the head while fleeing from a possible burglary, could not have reasonably believed that Garner posed any threat.  While the court found that the police officer in *Garner* had probable cause to believe that Garner had committed a night-time burglary, the court did not agree that it was so dangerous to automatically justify the use of deadly force.

Response To Defendant's Motion For Summary Judgment                    Page 22 of 27
Arthur Porter and Christie Porter v. Arthur Osborn and Joseph Whittom
Case No. A05-0142 CV (JWS)

but the issue is one of "reasonableness" and this is an issue for the jury

after issues of qualified immunity have been resolved . *White v. Pierce County*,

797 F.2d 812, 816 (9th Cir. 1986).

### C.  The Porters have no state law claims.

### 1.  Claims for loss of consortium or emotional distress

The Defendants argue that because *Gillespie vs. Beta Construction Co.*,

842 P. 2d 1272 (Alaska, 1992) focuses on the wrongful death statute that a

parent can bring no action independently of the estate.

The court stated

"The result we reach today comports with our earlier case law. We have
already held that a wife has the right to sue for loss of "care, comfort,
companionship and solace" resulting from an injury to her husband,
**Schreiner**, 519 P.2d at 466, and that a child is entitled to loss of
consortium damages when his parent is tortiously injured. *Hibpshman v.
Prudhoe Bay Supply, Inc.*, 734 P.2d 991 (Alaska 1987). To now hold that
a parent is not entitled to recover loss of society for the death of his or her
child would run counter to this line of precedent. Without question, the
death of one's own child is the greatest loss a parent may suffer. It is far
more than pecuniary; whatever monetary disadvantage a child's death
may present to its parents pales in comparison to the immense mental
anguish, grief and sense of loss that this event would inevitably cause. AS
09.15.010 is the appropriate vehicle for recognizing this loss." *Gillispie v.
Beta Constr. Co.*, 842 P.2d 1272, 1274 (Alaska 1992)

The decision reached in *Gillespie* would suggest that the court no longer

wishes to follow the common-law parental consortium issue.  Second, the court

does not seem to distinguish between a minor child and an adult child.

Response To Defendant's Motion For Summary Judgment                    Page 23 of 27
Arthur Porter and Christie Porter v. Arthur Osborn and Joseph Whittom
Case No. A05-0142 CV (JWS)

Alaska's approach to statutory construction, oftentimes described as a "sliding scale"[6] looks to strong legislative history to support different meanings. Alaska does not follow the plain meaning rule and plain language of statutory provisions does not itself end the inquiry. *Wold*, at 161. For this reason, while Alaska law may not recognize an adult child consortium-type claim, nothing in the statutory law or in the decisions of the court quoted above would suggest to the contrary. In other words, merely because the Alaska state courts have not ruled does not automatically preclude the right to the companionship of an adult child beyond the confines of a wrongful death action. The analysis of the statutes, the common law and expressions of the issues in *Gillespie* suggest a position contrary to the one painted by Defendants.

## 2.  The Alaska Supreme Court has never allowed a *Bivens*-type action to proceed against anyone in violation of Alaska's Constitution.

To some extent, issues concerning the Alaska Constitution are without merit here. The Defendants removed this matter to the federal court leaving the issues of state court behind. Yet we are confronted with State Court issues.

The argument presupposes that there is no *Bivens* claim in federal court. As no *Bivens* claim has been made, and since the balance of the claims being made here deal with the 14th Amendment and perhaps First

---

[6] ***Wold vs. Progressive Preferred Insurance Co***., 52 P. 3d 155 (Alaska, 2002)

Response To Defendant's Motion For Summary Judgment          Page 24 of 27
Arthur Porter and Christie Porter v. Arthur Osborn and Joseph Whittom
Case No. A05-0142 CV (JWS)

Amendment issues, then discussion of what the Alaska State Court will provide in federal question issues does not appear to be relevant.

## V. CONCLUSION

There are genuine issues of material fact. These genuine issues of fact are seen in the depositions, photographs, and information establishing that Trp. Jesse Osborn, with the assistance of Trp. Whittom, trapped Casey Porter into a parking area and killed him. There is no information that establishes that Jesse Osborn had any probable cause to stop the vehicle. There is no evidence to establish that Casey Porter had done anything wrong. There is nothing to indicate that the car the plow driver saw was the car occupied by Casey Porter. When Casey Porter was startled, he tried to leave, was pepper-sprayed, and shot in the back. All of this was because Trp. Osborn and Trp. Whittom felt that they had to prevent his leaving to conduct some kind of unknown investigation about a car that no one could identify and that did not, of itself appear suspicious.

As the attached Affidavit establishes, Christie Porter lost her son. He was an only child. While all of this was happening, Christie Porter was doing all she could for Casey's child. Her love for her son had extended to the child. As the attached Affidavit establishes, the child has been with Ms. Porter for a substantial period of time and since the Estate was open. The Estate did not dispose of her claims, nor the claims that Arthur Porter has.

Response To Defendant's Motion For Summary Judgment
Arthur Porter and Christie Porter v. Arthur Osborn and Joseph Whittom
Case No. A05-0142 CV (JWS)

Page 25 of 27

Art Porter misses his son.  They had a chance on many occasions to be together, to associate with each other, to be in each other's company, to tell the stories, catch up on the news and be a part of the society between them. They shared a common bond and had affection for each other.

Jesse Osborn and Joseph Whittom ended all of that with five bullets.

Respectfully submitted:

The recognition of the First Amendment right providing such coverage is a right beyond the right of the estate, but falls directly to those in direct association with Casey Porter, including his family.

The Defendants tried to distinguish *Moreland vs. Las Vegas Metropolitan Police Department* to the present facts.  Unfortunately, they cannot be reconciled because in the *Moreland* case, a police officer shot and killed Moreland accidentally as he was returning fire.  The court focused on the number of people trapped in the parking lot, the ongoing gunfire and determined that the officers acted reasonably under the circumstances.

The genuine issue of material fact exists as to whether or not Casey Porter turned the wheel at the time he was shot causing the collision with Trp.

Response To Defendant's Motion For Summary Judgment                    Page 26 of 27
Arthur Porter and Christie Porter v. Arthur Osborn and Joseph Whittom
Case No. A05-0142 CV (JWS)

Whittom.  Trp. Whittom's own testimony at the time of his deposition displayed that he was concerned about whether or not it was necessary to employ deadly force against Casey Porter.  At the time of the shooting, he did not believe it was necessary.  He was standing on the backside of the patrol car and was protected.  There was no threat of imminent harm to the police officer.  The harm came to the police officer after Osborn drew his weapon and fired, killing Casey Porter and causing the wheel to turn to strike the patrol car.

When Casey Porter died, Trp. Osborn along with the assistance of Trp. Whittom terminated any connection between himself and his mother and father.  His First Amendment rights of association with them were terminated. His ability to be a part of the family and hear about the daily events, associate with others within the family, and be a part of the community was terminated. Those rights were terminated individually in Art Porter and in Christine Porter.

Date:  February 1, 2006

Respectfully submitted:

/s_____
Mark D. Osterman
Alaska Bar No. 0211064
Attorney for Plaintiffs

I certify that the above-described Response to Motion for Summary Judgment was served on the David D. Floerchinger, Dave_floerchinger@law.state.ak.us electronically.

/s
Mark D. Osterman 2/1/07

Response To Defendant's Motion For Summary Judgment                    Page 27 of 27
Arthur Porter and Christie Porter v. Arthur Osborn and Joseph Whittom
Case No. A05-0142 CV (JWS)