1 A I'd been giving him commands to stop his vehicle.  It

2   looks to me, and I'll speculate, but the first

3   statements made in there, get out of your car.  So I

4   would make the assumption that his vehicle was already

5   come to a stop and I've been giving him commands to

6   stop his vehicle previous to that.

7 Q Okay.  So you're telling him to get out of the car and

8   he asks you what's wrong?

9 A Correct.

10 Q You never responded to him?

11 A That's correct.  Well -- can I look at that again while

12   we're talking here?

13 Q Sure.

14 A Because I -- I did respond to him.

15 Q You did?  What did you say?

16 A I said get out of the car.

17 Q So when he said what's the matter, you said get out of

18   the car?

19 A That's correct, sir.

20 Q So what was the reason for -- you never gave him a

21   reason for why you were stopping him, did you?

22 A I understand your question.  The -- the contact -- and

23   I'm try- -- I'll try not to give you a lengthy

24   explanation for all of this.  But the contact had

25   already dissolved to a point where he had shown me by

R & R  C O U R T  R E P O R T E R S

810 N STREET      1007 WEST THIRD AVENUE
277-0572/Fax 274-8982    272-7515

ANCHORAGE, ALASKA  99501

Exhibit  3
Page  1  of  41

| | | |
|---|---|---|
| 1 | | his actions that he was going to ignore anything but a |
| 2 | | command such as get out of the car. |
| 3 | Q | I want to go back and ask the question. |
| 4 | A | Okay.  I'm sorry.  Maybe I didn't answer your question. |
| 5 | Q | You didn't answer my question so let's go back to it if |
| 6 | | we can. |
| 7 | A | Okay. |
| 8 | Q | He said -- you said get out of the car and he said |
| 9 | | what's wrong, sir? |
| 10 | A | Correct. |
| 11 | Q | And you never answered him, correct? |
| 12 | A | I answered him with a command.  With the..... |
| 13 | Q | To get out of the car? |
| 14 | A | Correct, sir. |
| 15 | Q | You weren't going to tell him why? |
| 16 | A | Not at that point, sir, no. |
| 17 | Q | You didn't know why? |
| 18 | A | Oh, I knew why. |
| 19 | Q | Why? |
| 20 | A | Because he was buying time with that answer. |
| 21 | Q | Well, what crime had he committed, sir? |
| 22 | A | At this point he was eluding a police officer.  I had |
| 23 | | probable cause to contact him, reasonable suspicion, |
| 24 | | responding to the incident. |
| 25 | Q | Okay.  You tell him -- he says okay, no problem, I'll |

R & R  COURT  REPORTERS

810 N STREET                    1007 WEST THIRD AVENUE
277-0572/Fax 274-8982           272-7515

ANCHORAGE, ALASKA  99501

Exhibit  3
Page 2 of 41

1       back up.

2             MR. FLOERCHINGER:  Well, there's some more

3  statements in here.

4             MR. OSTERMAN:  Okay.

5  Q     Well, let's go through the other statements.

6             MR. FLOERCHINGER:  Yeah.

7  Q     You say get out of the car and Trooper Whittom says

8       throw up your hands, get in your vehicle, get out of

9       your vehicle?

10  A    (Inaudible response)

11           COURT REPORTER:  Is that a yes?

12  A    Yes.  I'm sorry.  Once again, yes.

13  Q    Okay.  And he's -- and he says okay, no problem, I'll

14       back up.

15  A    Correct, he said that.

16  Q    Do you think he may be confused by people telling him

17       to get out of the car and people telling him to get in

18       the vehicle?

19  A    No, sir.  It's possible.

20  Q    You don't think that's confusing?

21  A    No, sir.

22  Q    Okay.  You don't -- you say no, get out now?

23  A    Correct.

24  Q    You say do you understand me?

25  A    Correct.

R & R  C O U R T  R E P O R T E R S

810 N STREET                    1007 WEST THIRD AVENUE
277-0572/Fax 274-8982           272-7515

ANCHORAGE, ALASKA  99501

Exhibit  3
Page 3 of 41

1   Q      Okay.  He says yes, sir.

2   A      Yes.

3   Q      How much time has elapsed from the beginning of that

4          tape recording to that spot right there?

5   A      I don't know, sir.

6   Q      Seconds?

7   A      I don't know.  I'd have to time it.

8   Q      Okay.  You listened to the tape.

9   A      At some point, yeah.  I don't remember listening to

10         this tape recently.

11  Q      And the tape you had is not voice activated?

12  A      They can be if they're switched on the VOR.  Sometimes

13         that happens inadvertently.  I don't know in this

14         situation if it was flipped on VOR, or sending or not.

15  Q      Okay.

16              MR. FLOERCHINGER:  Can I just ask a question?

17  Could you tell by listening to the tape if it's on VOR?

18  A      Sometimes you can tell.  There's a little pause.

19  Q      Comes out at the first of the word?

20  A      Yeah.  It just kind of kii-kii a little bit.  Unless

21         there's continuous background noise that will keep it,

22         you know, going all the time even if it's on the VOR

23         setting.

24  Q      Okay.

25              MR. FLOERCHINGER:  Just curiosity.

R & R  COURT  REPORTERS

810 N STREET                    1007 WEST THIRD AVENUE
277-0572/Fax 274-8982          272-7515

ANCHORAGE, ALASKA  99501

Exhibit  3
Page  4 of 41

1    Q      So if I were to tell you that that occurred in less

2           than 30 seconds to that point, would you have any

3           reason to doubt it?

4    A      I guess if you've timed it out, I'd believe you. I

5           have no reason to disbelieve you.

6    Q      Okay. Well, I'm not asking you to believe me. I'm

7           asking you to believe the events.

8    A      Yeah. I.....

9    Q      Would you disagree with me if I said it occurred in

10          less than 30 seconds?

11    A      Sounds like that might be about right.

12    Q      Okay. Now, did you ever tell him you were going to

13          pepper spray him?

14    A      No, sir. We don't tell people we're going to pepper

15          spray them.

16    Q      Because he did not get out of the car within 30 seconds

17          you began to remove and prepare pepper spray?

18    A      No, sir. It had nothing to do with 30 seconds.

19    Q      Well, let's go back. We said that yes, sir, CP. You

20          understand me? He says yes, sir, we're at 30 seconds.

21          Then you say you will get out of the car and show me

22          your hands, open the door, close now.

23    Q      Yeah. I was beginning to be stressed. That's why I

24          said close.

25    Q      What does the word close mean?

R & R  C O U R T  R E P O R T E R S

810 N STREET        1007 WEST THIRD AVENUE
277-0572/Fax 274-8982     272-7515

ANCHORAGE, ALASKA 99501

Exhibit 3
Page 5 of 41

1　A　　Close in that context meant nothing.  It was just a

2　　　　stutter.

3　Q　　Okay.

4　A　　I'd made plenty other clear commands.  I was convinced

5　　　　he was still very understanding of what I was asking

6　　　　him to do.

7　Q　　So Whittom says we've got him stopped.....

8　A　　I guess.

9　Q　　.....to the dispatch?  You don't know?

10　A　　He -- he might have said this.  It's on there.

11　Q　　Okay.  Now you yelled to Whittom to get the taser out?

12　A　　Yes, sir.

13　Q　　How far is Trooper Whittom from you and this car at

14　　　　that point?

15　A　　Well, let's see.  I'm standing at the position I

16　　　　described earlier, behind the door post of the driver's

17　　　　-- suspect's vehicle.

18　Q　　Um-hum.

19　A　　And Trooper Whittom is behind his door.  Whatever that

20　　　　measurement is.  He's -- I don't know.  I'm going to

21　　　　say probably 20, 25 feet away, I'm guessing.

22　Q　　All right.

23　A　　That's a guess though.

24　Q　　So you yelled at him to get the taser out.  The idea

25　　　　being you're going to try to frighten this guy into

R & R   COURT   REPORTERS

810 N STREET　　　　　　　　　1007 WEST THIRD AVENUE
277-0572/Fax 274-8982　　　　272-7515

ANCHORAGE, ALASKA  99501

Exhibit　3
Page 6 of 41

1   compliance?

2 A No, sir. I didn't want to frighten anyone.

3 Q So why did you want him to get the taser out?

4 A At that point I was trying to think of any other tools

5   we could utilize to gain compliance. I was just using

6   my head to kind of figure out how we could safely

7   complete this task.

8 Q Okay. In other words, you couldn't lower the tone of

9   voice or take it -- notch it down?

10 A That wasn't -- that wasn't warranted at this time. I

11   didn't feel that that was necessary. And I actually

12   did at one point lower my voice.

13 Q You said open the door. The word close, you say, is a

14   term that you used, it was a stutter. You were under a

15   lot of stress. So essentially in the first 30 seconds

16   you're under a tremendous amount of stress in this

17   scenario, is that what you're saying?

18 A I wouldn't call it a tremendous amount of stress.

19 Q Okay. But you were stressed?

20 A His actions were stress inducing certainly.

21 Q Okay. His actions were -- he wasn't doing what you

22   wanted him to do fast enough?

23 A No, sir, that's not correct.

24 Q Well, with 30 seconds into the time he brings his car

25   apparently to a stop?

R & R  C O U R T  R E P O R T E R S

810 N STREET     1007 WEST THIRD AVENUE
277-0572/Fax 274-8982   272-7515

ANCHORAGE, ALASKA  99501

Exhibit  3
Page 7 of 41

82

1  A    I understand the time frame.

2  Q    And in that time frame and that 30 second period of

3       time he hasn't complied and now you're trying to find

4       other physical means to force him into compliance?

5  A    No, sir.  That -- that statement -- answering that

6       question makes an assumption that the only things

7       involved here was his lack of compliance when indeed

8       there are many other factors involved that I based my

9       actions upon.

10 Q    Okay.  He asked what's wrong, sir, I was just parked?

11 A    That's his statement.

12 Q    Okay.  When he makes that statement, do you see that at

13       the bottom of that third group -- or fourth group, CP,

14       what's wrong, sir, I was just parked?

15 A    Can you let me find it here, please?  Is it on the

16       first page?

17 Q    Um-hum.

18           MR. FLOERCHINGER:  Right there.

19 A    I see it, sir.

20 Q    How much time do you think has lapsed to this point

21       now?

22 A    Once again, there's no way I can calculate the seconds

23       in any of this.  I don't know.

24 Q    Okay.  You have a tape recorder though, we could play

25       the tape recorded time then?

R & R  C O U R T  R E P O R T E R S

810 N STREET                    1007 WEST THIRD AVENUE
277-0572/Fax 274-8982           272-7515

ANCHORAGE, ALASKA  99501

Exhibit  3
Page  8  of  41

83

1    A        Yeah, we could do that.

2    Q        And if we timed that and it goes back to less than a

3             minute.....

4    A        Um-hum.  (Affirmative)

5    Q        .....okay, you're still under a lot of stress at this

6             point?

7    A        Once again I wouldn't say I was under a lot of stress.

8             I was -- I was stressed in the fact that I had given

9             numerous commands and that his responses were ulterior

10            to -- they're very strange.  They're responses you

11            don't normally get in a circumstance like this.

12   Q        I want to find out, Trooper, your -- at this point do

13            you have a gun drawn?

14   A        Yes.

15   Q        So you have a pistol in your hand?

16   A        Yes, sir.

17   Q        You're beside the door of his car?

18   A        No, sir.

19   Q        Where are you?

20   A        I'm behind the driver's door post standing within

21            touching distance, or right there approximately.

22   Q        Okay.  You're standing behind his door post screaming

23            at him basically to get out of the car.  Is that a fair

24            statement?

25   A        I wouldn't say I'm screaming at him.  I was giving him

Exhibit _3_
Page _9_ of _41_

84

```
 1            loud verbal commands.  Clear ones.
 2   Q        Loud commands?
 3   A        Yes, sir.
 4   Q        Loud commands under stress?
 5   A        I wouldn't call them loud commands under stress.  They
 6            were clear concise commands.
 7   Q        Let's go back.....
 8   A        His activities were inducing stress, certainly.
 9   Q        You said when we hit that word close up here.....
10   A        Um-hum.
11   Q        .....that you stuttered and that you were under stress?
12   A        Yes.
13   Q        And are you saying now that when we get down here,
14            three lines or four lines later, that the stress has
15            stopped?
16   A        It did subside somewhat because he began speaking with
17            me.
18   Q        Okay.  So he said what's wrong, sir, I was just parked.
19            Now you're preparing at some point in time to conduct
20            an investigation.....
21   A        Um-hum.
22   Q        .....okay, into some conduct that he has done.  And he
23            has just asked you what that conduct was.  Did you
24            respond to him?
25   A        He didn't ask what the conduct was.  He just asked me
```

R & R   C O U R T   R E P O R T E R S

810 N STREET                    1007 WEST THIRD AVENUE
277-0572/Fax 274-8982           272-7515

ANCHORAGE, ALASKA  99501

Exhibit   3
Page 10 of 41

85

1          what was wrong.

2  Q       Okay.  So -- but that's a fair statement for anyone to

3          make when a police officer stops him, isn't it?

4  A       Not -- not at this point.

5  Q       Okay.  Why not?  You've engaged your overhead lights,

6          you've drawn a pistol, you're standing behind him,

7          you're shouting at the top of your lungs get out of

8          your car, get out of your car.  Trooper Whittom is

9          yelling at him get out of the car, get into the car.

10          Okay?  You're under stress and you're saying his asking

11          the question what's wrong is improper under the

12          circumstances?

13  A       Yes, sir.

14  Q       What's wrong with that statement?

15  A       That would be -- that would be proper upon initial

16          contact if say he had just -- when I turned on my

17          overheads and if he had complied with the stop in the

18          first place and said what's wrong, sir?  I'd have said,

19          hey, you know, we had just got a call of a suspicious

20          vehicle and were checking things out.

21  Q       So at this point though he's no longer under the bright

22          lights of your vehicle, the ultra lights, if they're

23          on, correct?

24  A       If indeed they were on.

25  Q       That's right.

R & R  C O U R T  R E P O R T E R S

810 N STREET                    1007 WEST THIRD AVENUE
277-0572/Fax 274-8982           272-7515

ANCHORAGE, ALASKA  99501

Exhibit    3
Page  11  of  41

86

```
 1   A       I don't know.

 2   Q       He's had a few moments to -- apparently less than two

 3           minutes at this point, do you think?

 4   A       I -- I don't know.

 5   Q       Well, I'm sorry, but you're the only one that's

 6           there.....

 7   A       I understand.  But I wasn't watching my watch.  I just

 8           don't know.

 9   Q       Was it five minutes?

10   A       I -- I doubt -- I doubt it was that long.

11   Q       Okay.  So possibly two minutes?

12   A       Possibly.

13   Q       Okay.  So possibly within that two minute period of

14           time he has now fully awakened and may just now realize

15           that you're overhead lights are on because he's moved

16           out from underneath your headlights?

17                   MR. FLOERCHINGER:  Object to form.  Assumes

18   facts not in evidence.

19   A       That would be speculation.  I have no idea if he was

20           asleep or awake or any of that.

21   Q       Okay.  Well.....

22   A       He's obviously.....

23   Q       .....just a few minutes ago he acted in a startled

24           fashion and sat up, which surprised you, as if he might

25           have been sleeping.  And we know that people do pull
```

R & R  COURT  REPORTERS

810 N STREET                    1007 WEST THIRD AVENUE
277-0572/Fax 274-8982           272-7515

ANCHORAGE, ALASKA  99501

Exhibit    3
Page 12 of 41

1       over to the side of the road and sleep in these turn

2       outs at night.  You said you've done it yourself.  Easy

3       assumption to make that's exactly what he's doing.

4  A    I wouldn't say so.  It didn't strike me like that, like

5       he was sleeping.  People that -- I don't know about

6       you, I'm not a morning person.  I -- I don't wake up

7       very fast.  I don't wake up like that.

8  Q    So if he -- if he didn't wake up very fast and he's two

9       minutes into this, he just realizes you're a police

10      officer for the first time and says what's wrong?

11  A    No, I wouldn't say so.

12  Q    But he didn't say sir sarcastically, did he?

13  A    No, sir.

14  Q    He said it respectfully?

15  A    He did.

16  Q    Okay.  You never answered that question, did you?

17  A    Which question, sir?  I'm lost.

18  Q    What's wrong, sir?

19  A    No, not at this time.

20  Q    Okay.  You said okay, open the door and get out?

21  A    I said okay, because he said he was just parked.  Said

22      okay, open the door now.  I still need him to do.....

23  Q    But you're still under stress?

24  A    Oh, certainly.

25  Q    Okay.  Now, the next phrase on this transcript is

R & R   C O U R T   R E P O R T E R S

810 N STREET            1007 WEST THIRD AVENUE
277-0572/Fax 274-8982    272-7515

ANCHORAGE, ALASKA  99501

Exhibit    3
Page 13 of 41

88

1           pepper spray being sprayed?

2  A      Yes, sir.

3  Q      That was immediately following the open the door now?

4  A      No, sir.

5  Q      His window is open?

6  A      I don't know how far it was open.

7  Q      Far enough for you to get your arm in the car?

8  A      I wouldn't put my arm in a car.

9  Q      You sprayed him in the face and you put, according to

10         your statements to investigators, you put the spray

11         bottle right next to his face?

12  A      Right next to the window.  I didn't spray his face.  It

13         never got on his face.

14  Q      So you're saying all these photographs of the bright

15         red side of his head and the bright red beard that he

16         has on his left-hand side wasn't from your pepper

17         spray?

18  A      It may be but I didn't spray him in the face.

19  Q      And you told the investigators you saw it swirling

20         around the inside of his car.....

21  A      I never told the investigators that, sir.

22  Q      Okay.  You never told the investigators that you

23         sprayed that entire remaining half can?

24  A      No, sir.

25                      **(Exhibit 21 proffered)**

R & R  COURT  REPORTERS

810 N STREET               1007 WEST THIRD AVENUE
277-0572/Fax 274-8982      272-7515

ANCHORAGE, ALASKA  99501

Exhibit  3
Page 14 of 41

89

1   Q      And there was no evidence -- in fact, I'm showing you

2          Exhibit 21.  Can you identify your red pepper spray on

3          the side of that car?

4   A      No.

5                        (Exhibit 22 proffered)

6   Q      Okay.  I'm showing you Exhibit 22.  Can you identify

7          your red pepper spray on the side of that car?

8   A      I can see some on the suspect's leg.  It might be.  I

9          don't know if that's a bruise or if that's.....

10  Q      Pardon me.

11  A      I don't know if that's a bruise or if that's pepper

12         spray on the thigh.

13  Q      This also could be pepper spray in that -- in his face?

14  A      No, I don't see anything on his face here.

15  Q      You don't see anything in his beard or his hair?

16  A      Maybe near his left ear possibly but I don't see

17         anything on his face at all.

18                    (Exhibit 30 proffered)

19  Q      I'm showing you Exhibit 30.  You may have to turn that

20         one to get the right juxtaposition to the stamp.

21  A      I've got it.

22  Q      Okay.  Find any pepper spray in that photograph?

23  A      I -- I think that that's probably a little bit of a

24         drip on the window.

25  Q      But you don't know?

R & R  C O U R T  R E P O R T E R S

810 N STREET                          1007 WEST THIRD AVENUE
277-0572/Fax 274-8982                 272-7515

ANCHORAGE, ALASKA  99501

Exhibit ___3___
Page _15_ of _41_

| 1 | A | I don't know. |
| 2 | Q | You're speculating? |
| 3 | A | Yeah. |
| 4 | Q | Okay. |
| 5 | A | It looks orange. |
| 6 | Q | Here's 32, see any pepper spray on that? |
| 7 | A | No.  That's the door handle. |
| 8 | Q | Here is 39. |
| 9 | A | Okay. |
| 10 | Q | See any pepper spray on that? |
| 11 | A | No, sir. |
| 12 | Q | 41, any pepper spray on that one? |
| 13 | A | No.  It looks about like the same picture. |
| 14 | Q | Okay.  Here's 47, any pepper spray on that photo? |
| 15 | A | That's the passenger left rear door..... |
| 16 | Q | Okay. |
| 17 | A | .....and quarter panel. |
| 18 | Q | But you didn't stick your hand on the inside? |
| 19 | A | No, I wouldn't do that. |
| 20 | Q | Okay. |
| 21 | A | That's dangerous. |
| 22 | Q | And there's 54? |
| 23 | A | Okay. |
| 24 | Q | No pepper spray there either? |
| 25 | A | That's a view from the air it looks like.  I don't see |

R & R  C O U R T  R E P O R T E R S

810 N STREET                    1007 WEST THIRD AVENUE
277-0572/Fax 274-8982           272-7515

Exhibit ___3___
Page _16_ of _41_

ANCHORAGE, ALASKA  99501

91

```
 1              any pepper spray.  It's just two cars in snow.
 2   Q   Okay.  So you -- did you see a reaction as a result of
 3              the pepper spray?
 4   A   Yes, sir.
 5   Q   What was the reaction?
 6   A   Reaction to pepper spray going inside the vehicle was
 7              that he -- the first reaction was that he saw what I
 8              was doing and blocked my attempt to spray pepper spray
 9              by lifting his left arm up like this.  Like I'm
10              demonstrating.
11   Q   Okay.
12   A   Left arm covering the face area.
13   Q   So let's talk for a moment about what you know about
14              Mr. Porter.  You know that he was crippled as a result
15              of an accident?
16   A   No, I didn't know who I was talking to.
17   Q   Well, I know you didn't know.  But you know it now,
18              don't you?
19   A   I -- I know that he was involved in some sort of an
20              accident.  I -- I don't know that he was crippled.
21   Q   And you found a cane in his car?
22   A   The investigators found a cane in the car.  I don't --
23              during the incident I didn't see or hear of any cane of
24              any sort, no.  No, I didn't know who I was talking to.
25   Q   Okay.  But after this particular accident you
```

R & R  C O U R T  R E P O R T E R S

810 N STREET                    1007 WEST THIRD AVENUE
277-0572/Fax 274-8982           272-7515

ANCHORAGE, ALASKA  99501

Exhibit  3
Page 17 of 41

92

1          discovered that he needed that cane to depress the

2          clutch?

3    A     That'd be speculation.  I don't know that he needed the

4          cane for anything.

5    Q     Let me show you 38.  Is that the -- have you ever seen

6          that before?

7    A     That's a cane similar to the one in the vehicle.

8    Q     Okay.  And you don't know whether that was the cane

9          that was recovered from that vehicle or not?

10   A     No, I don't.  It looks like it's an exhibit so it

11         probably is.  But I don't know.

12   Q     Okay.  You took photographs at the scene?

13   A     No, sir.

14   Q     Trooper Whittom took photographs of the scene?

15   A     You'll have to ask Trooper Whittom.  I believe he did.

16         I remember him going around with his camera.

17   Q     I'm showing you photograph 30.  Do you see a cane in

18         that particular photograph?

19   A     Yes, sir.

20   Q     In the photograph the cane is shown to be on the left

21         side of the vehicle, isn't that correct?

22   A     Yes.  It -- it appears that the suspect is no longer in

23         the vehicle at this point and.....

24   Q     Okay.

25   A     .....that cane certainly wasn't visible to me during

R & R  C O U R T  R E P O R T E R S

810 N STREET                          1007 WEST THIRD AVENUE
277-0572/Fax 274-8982                 272-7515

ANCHORAGE, ALASKA  99501

Exhibit    3

Page 18 of 41

93

1          the contact.

2    Q     Okay.

3    A     Here's your exhibit, sir.

4    Q     You subsequently learned that Mr. Porter used that cane

5          to depress the clutch?

6    A     No, sir.

7    Q     You didn't read anything about that in the newspapers?

8    A     Yes, sir.  But I certainly wouldn't call that learning.

9          It was a rumor.

10   Q     Okay.  It was a rumor.  And the fact is that -- did

11         anybody ever tell you that a cane was recovered from

12         the vehicle?

13   A     Yes.

14   Q     And the cane was recovered on the clutch petal?

15   A     No, sir.

16   Q     Has anybody asked you about whether or not he was using

17         that left hand to depress the clutch?

18   A     I don't know that I was ever asked that specific

19         question but I know that that wasn't the case.

20   Q     Okay.  You know it wasn't the case because when he

21         raised his hands, right?

22   A     No, sir.

23   Q     Okay.

24   A     I know it wasn't the case because when he attempted to

25         drive over Trooper Whittom he put both his hands on the

R & R  C O U R T  R E P O R T E R S

810 N STREET                    1007 WEST THIRD AVENUE
277-0572/Fax 274-8982           272-7515

ANCHORAGE, ALASKA  99501

Exhibit   3
Page 19 of 41

94

1    wheel and squeezed the wheel in a manner where all of

2    his knuckles had turned white and he was gripping the

3    wheel and doing what appeared to be angling the wheel

4    as he heavily accelerated the vehicle and drove towards

5    Trooper Whittom.

6  Q    But you didn't -- you don't know to this day whether it

7        was an automatic or a manual except based upon the

8        assumptions you heard about?

9  A    Yeah, that's correct.  It -- I didn't have it in my

10       mind whether it was a manual or an automatic at the

11       time.

12 Q    So he didn't raise his hands -- you say he raised his

13       left hand at the time he was pepper sprayed.  Is that

14       approximately simultaneous to the fact that the vehicle

15       lurched forward?

16 A    No, sir.  No, not at all.

17 Q    Well, the next thing in the transcript it says ah, I

18       didn't do nothing.

19             MR. FLOERCHINGER:  For the record we're on

20 Exhibit 1 now?

21             MR. OSTERMAN:  Right.  Go back on Exhibit 1.

22 A    Okay.  I've got to go back.....

23 Q    Pepper spray being sprayed and ah, I didn't do nothing.

24 A    Correct.

25 Q    And then you're attributed to saying tell him he's been

R & R  C O U R T   R E P O R T E R S

810 N STREET                1007 WEST THIRD AVENUE
277-0572/Fax 274-8982       272-7515

ANCHORAGE, ALASKA  99501

Exhibit    3
Page 20 of 41

95

| | | |
|---|---|---|
| 1 | | sprayed..... |
| 2 | A | Yeah. |
| 3 | Q | .....then you said get out. |
| 4 | A | I believe that's it.  For clarification, I believe |
| 5 | | that's a typo.  I said tell him he's been sprayed and I |
| 6 | | was hollering at Trooper Whittom asking him to tell |
| 7 | | dispatch that the suspect had been sprayed. |
| 8 | Q | Okay. |
| 9 | A | So that -- and it's an understandable typo for..... |
| 10 | Q | Sure. |
| 11 | A | .....you know, tell him, sounds like tell him. |
| 12 | Q | Right. |
| 13 | A | Please continue after that point. |
| 14 | Q | Then you said get out? |
| 15 | A | To the suspect, yes.  At some point. |
| 16 | Q | Okay.  And then five shots are fired? |
| 17 | A | Correct, sir. |
| 18 | Q | Now, tell him -- you tell him he's been sprayed -- tell |
| 19 | | them he's been sprayed..... |
| 20 | A | Right. |
| 21 | Q | .....get out.  How much time has lapsed? |
| 22 | A | I don't know.  I was watching his activities after the |
| 23 | | spray went into the car. |
| 24 | Q | You never went back and listened to your tape to |
| 25 | | determine how long it was? |

96

1  A    I never timed it, no.

2  Q    Okay.  If you were to hear the tape would it help you?

3  A    It -- it would probably help as far as we could time

4       it.  But the shooting action, of course, the time frame

5       doesn't have anything to do with the -- the reason the

6       shots were fired.  It was based on suspect's behavior

7       is why.

8  Q    I'm understanding that.  But I'm trying to get down to

9       the time frame, sir.

10 A    Okay.  Yeah, we'd have to replay it.

11 Q    Your contention is that you gave him time for

12      compliance?

13 A    Yes, sir.

14 Q    And if we're at less than two minutes at the time five

15      shots gets fired, have you given him time for

16      compliance?

17 A    Absolutely.

18 Q    Okay.  At that point then you announce that shots are

19      fired, shots are fired?

20 A    I don't know if I said it twice.  Yeah.  Yeah, in my

21      statement here, shots -- shots fired.

22 Q    Okay.

23 A    Soldotna 1-E-16, shots fired.

24 Q    Okay.  You provided statements to investigators?

25 A    Yes, sir.  I was interviewed twice, I believe.

R & R  C O U R T  R E P O R T E R S

810 N STREET                    1007 WEST THIRD AVENUE
277-0572/Fax 274-8982           272-7515

ANCHORAGE, ALASKA  99501

Exhibit ___3___
Page 22 of 41

97

1   Q     Okay.  Once by Dane Gilmore?

2   A     Yes, sir.

3   Q     And once by two other officers from the Anchorage area,

4        I believe?

5   A     Correct.  From the CIB, or whatever the acronym was at

6        that point.

7   Q     Okay.  And I'm going to ask you to look at -- I want to

8        make sure I've got the right one and it's complete

9        before I hand it to you.

10  A     Okay.  Do you want Exhibit 1 back here?

11  Q     Yes, I do because I.....

12  A     Okay.

13  Q     That may be his copy.  And if it's his copy he keeps

14        it.  Yeah.

15            MR. FLOERCHINGER:  That's my copy.

16  A     Okay.

17                            **(Exhibit 2 proffered)**

18  Q     This is Exhibit 2.

19  A     Okay.

20  Q     I believe this is a transcript of your recorded

21        statement with Trooper Gilmore?

22  A     Trooper Gilmore, yes, sir.

23  Q     Is there any -- have you had a chance to review this?

24  A     No, I haven't.  That's a lengthy document.

25  Q     It is seven pages.

98

```
 1   A      Yeah.

 2   Q      But understanding that, okay, do you know if anything

 3          that you told Investigator Gilmore was inaccurate?

 4   A      No, sir.  That was my best recollection at the time.

 5          Of course this was right after the accident.

 6   Q      Okay.  May I have that back for just a moment?

 7   A      Sure.

 8   Q      Do you remember making the statement that Trooper

 9          Whittom said that he'd been struck by the vehicle?

10   A      At some point I made that statement and I don't recall

11          if it was that interview or what.

12   Q      Okay.

13                 MR. FLOERCHINGER:  Just for clarity, can

14   we.....

15                 MR. OSTERMAN:  We will.

16                 MR. FLOERCHINGER:  Trooper Whittom stuck by the

17   vehicle, a vehicle?

18                 MR. OSTERMAN:  Struck by his vehicle.

19                 MR. FLOERCHINGER:  Oh, his vehicle.

20                 MR. OSTERMAN:  His own vehicle.

21                 MR. FLOERCHINGER:  Oh, his own vehicle.

22                 MR. OSTERMAN:  Yes.

23   Q      Now, I'm going to refer to Exhibit 2, page seven -- I'm

24          sorry, page four of seven.  And we are going to begin

25          at the line that says before I fired in order to hit
```

R & R  COURT  REPORTERS

810 N STREET                1007 WEST THIRD AVENUE
277-0572/Fax 274-8982        272-7515

ANCHORAGE, ALASKA  99501

Exhibit 3
Page 24 of 41

99

```
1              the passenger window.  This looks like about the 20th

2              one down.  Three-quarter mark.

3                      MR. FLOERCHINGER:  Let me get there.

4                      MR. OSTERMAN:  It starts with before I fired in

5     order to hit.....

6                      MR. FLOERCHINGER:  Okay.  I'm with you.

7   Q    Okay.  I'm going to go to the first complete sentence

8        there to point out to you what I'm looking for.

9   A    Okay.

10  Q    And it begins with um, right there.  Okay?

11  A    Okay.

12  Q    So if you'll read there for about three sentences.

13  A    Um, the.....

14  Q    No, go ahead and read it to yourself.

15  A    Oh, sorry.  How many sentences you said?

16  Q    About three sentences complete.

17  A    Okay.  I ended at, but that he was okay.

18  Q    Okay.

19  A    You want me to read further?

20  Q    No.  That's fine.  I'm going to show you Exhibit 1.

21  A    Okay.

22  Q    Turn to page two.  I want you to find in there anywhere

23       that Trooper Whittom told you that he was hit by his

24       car.

25  A    And this Exhibit 1 is my audio recording on my --.....
```

R & R  C O U R T  R E P O R T E R S

810 N STREET              1007 WEST THIRD AVENUE
277-0572/Fax 274-8982     272-7515

ANCHORAGE, ALASKA  99501

Exhibit  3
Page 25 of 41

100

| | | |
|---|---|---|
| 1 | Q | It is. |
| 2 | A | .....on my belt? |
| 3 | Q | It is. |
| 4 | A | I'll have to start at the beginning.  I see one |
| 5 | | reference to that but I don't see him straight out |
| 6 | | telling me that in -- in this particular recording, no. |
| 7 | Q | Okay.  Now you go on to state in your statement that |
| 8 | | Trooper Whittom came around and I asked him if he was |
| 9 | | okay and he said yes.  He said the car hit him -- his |
| 10 | | patrol vehicle hit him because of the impact, but that |
| 11 | | he was okay.  He didn't get knocked down or anything. |
| 12 | | I believe I did speed load, is your next statement. |
| 13 | A | Correct. |
| 14 | Q | Okay? |
| 15 | A | Okay. |
| 16 | Q | So no where on your tape recorder does Trooper Whittom |
| 17 | | say he was hit by his own patrol car? |
| 18 | A | No.  He might have told me that later.  It's not -- |
| 19 | | it's not in this recording. |
| 20 | Q | Trooper Whittom, when he pulled in and stopped his |
| 21 | | vehicle, did he move it after he pulled in and stopped? |
| 22 | A | I don't know.  I was concentrating on the driver. |
| 23 | Q | But you knew he was there? |
| 24 | A | Yeah.  I could see -- you know, I could see him down |
| 25 | | there but I don't know his exact actions. |

Exhibit 3
Page 26 of 41

101

| | | |
|---|---|---|
| 1 | Q | The car rolled that a way, was about 20 feet away from |
| 2 | | him and you looked over at him and yelled once about |
| 3 | | getting the taser? |
| 4 | A | Um-hum. |
| 5 | Q | Right. |
| 6 | A | Yes, sir.  I'm sorry, I said um-hum. |
| 7 | Q | Okay.  That's fine.  So you don't know whether he was |
| 8 | | in his vehicle at the time it had impact with it? |
| 9 | | MR. FLOERCHINGER:  At the time that it..... |
| 10 | Q | At the time that the Porter car hit his car? |
| 11 | A | I -- I'd like to restructure that question and I think |
| 12 | | I can give you the answer.  As I was keeping an eye on |
| 13 | | Trooper Whittom, and I'll just do my best to describe |
| 14 | | this so maybe you can understand.  As I was keeping my |
| 15 | | eye on Trooper Whittom, continuously during the contact |
| 16 | | Trooper Whittom's uniform, his person, outside his |
| 17 | | vehicle and behind his door, was lit up by the |
| 18 | | suspect's headlights.  And that's really the only focus |
| 19 | | I maintained.  I wasn't concerned about Trooper |
| 20 | | Whittom's vehicle, I was looking at his body and |
| 21 | | headlights being on his body. |
| 22 | Q | And his vehi- -- he was obviously only illuminated from |
| 23 | | the waist line up, that part of the car up? |
| 24 | A | Yes.  Say the waist line up. |
| 25 | Q | Well, actually was he -- you said he was behind his |

R & R  C O U R T  R E P O R T E R S

810 N STREET                    1007 WEST THIRD AVENUE
277-0572/Fax 274-8982           272-7515

ANCHORAGE, ALASKA  99501

Exhibit  3
Page 27 of 41

1          door so he was past the top of hid car?

2  A     No, I wouldn't say so because the -- the door frame is

3          angled.  And when the door is  completely open, it

4          opens up a V of visibility all the way down to about

5          the waist line on the Crown Victoria.

6  Q     Okay.

7  A     Which I know well because that's an area we're trying

8          to stay out of in certain circumstances.

9  Q     Why is that?

10  A     Well, you know, if someone was shooting at your or

11         something like that, you wouldn't want to be exposed.

12  Q     Right.  But I don't think any police cars are

13         especially armored to withstand.....

14  A     None of ours are, no.

15  Q     .....bullets.

16  A     It's still better -- something is better than nothing

17         though.

18  Q     True.  Let's talk for a moment about the shooting.

19  A     Okay.

20                                  **(Exhibit 30 proffered)**

21  Q     I'm showing you Exhibit 30.

22  A     Okay.

23  Q     You fired five times?

24  A     That's what the report says.  I think I recall four at

25         the time.

R & R  C O U R T  R E P O R T E R S

810 N STREET                 1007 WEST THIRD AVENUE
277-0572/Fax 274-8982       272-7515

ANCHORAGE, ALASKA  99501

Exhibit  3
Page 28 of 41

103

```
 1  Q        They recovered five casings?

 2  A        I believe that's what the report reflects.

 3  Q        And you don't dispute that the casings were similar to

 4           the ones you -- the other four you were using?

 5  A        I don't dispute that they were all mine.

 6  Q        There were three bullets found?

 7  A        No, I believe all five were found.

 8  Q        Okay.  Looking at this particular exhibit, what does

 9           that exhibit tell you, or show you?

10                    MR. FLOERCHINGER:  And for the record we're at

11  Exhibit 30?

12                    MR. OSTERMAN:  Exhibit 30, 1 of 1.

13  A        It shows me, based on what I know about the case, that

14           I believe that this indentation at the top of the door

15           pillar, the driver's door pillar.....

16  Q        Um-hum.

17  A        .....is a bullet round.  And it was embedded in that

18           rubber molding.  And it shows me that the door handle

19           to the car is missing.  That there's a piece of linkage

20           sticking out.....

21  Q        Okay.

22  A        .....that I found suspicious at the time.  And that

23           there's duct tape around that.

24  Q        Okay.

25  A        And it shows me that the left rear passenger window is
```

R & R  COURT  REPORTERS

810 N STREET                      1007 WEST THIRD AVENUE
277-0572/Fax 274-8982             272-7515

ANCHORAGE, ALASKA  99501

Exhibit    3
Page 29 of 41

104

1        not there and that the right front window is rolled

2        down approximately a third of the way.

3               MR. FLOERCHINGER:  I think you said left front.

4  A   I'm sorry.  The driver's door window is rolled down

5        about a third of the way.

6  Q   Okay.  So at the time that you pulled the trigger, how

7        far were you from the back of Mr. Porter?

8  A   I don't know, sir.

9  Q   The vehicle you said had started out and was about 25

10       feet away from Whittom's car.

11  A   Yeah.  That's a guestimation.  You know, a car length

12      between the two, I'd say.  Something like that.

13  Q   Okay.  A car length between the two.  The motor was

14      revving up.  Then all of sudden the car took off like a

15      bat out of hell?

16  A   I don't remember using those terms, but yeah, it -- it

17      was going.....

18  Q   Okay.

19  A   .....full throttle.

20  Q   Okay.  You had your weapon drawn?

21  A   I already had my weapon drawn previously.

22  Q   You had your safety off?

23  A   There's no safety on a Glock.

24  Q   On a Glock.

25  Q   There's three types of safeties that are integrated

R & R  C O U R T  R E P O R T E R S

810 N STREET          1007 WEST THIRD AVENUE
277-0572/Fax 274-8982    272-7515

ANCHORAGE, ALASKA  99501

Exhibit 3
Page 30 of 41

105

| | | |
|---|---|---|
| 1 | | within the firing arm. |
| 2 | Q | Okay. |
| 3 | A | Firearm.  I'm sorry. |
| 4 | Q | So because you had your hand on it the way you did the |
| 5 | | safeties were all in the off position and the weapon |
| 6 | | was ready to fire? |
| 7 | A | No, sir. |
| 8 | Q | So did you have any safety to remove before you could |
| 9 | | pull the trigger? |
| 10 | A | Yes.  I had the trigger safety which is integrated into |
| 11 | | the trigger must be defeated before the safety can |
| 12 | | fall. |
| 13 | Q | Okay.  So how can you defeat the finger safety? |
| 14 | A | By placing my finger on the very front of the trigger |
| 15 | | which first contact is actually made with the trigger |
| 16 | | safety.  Once that safety is pulled then the trigger |
| 17 | | may --..... |
| 18 | Q | So in other words you put your..... |
| 19 | A | .....may be pulled. |
| 20 | Q | .....finger inside the trigger ring and you disabled |
| 21 | | that safety? |
| 22 | A | Correct. |
| 23 | Q | Did you do that immediately before you fired or did you |
| 24 | | do that when you were still beside the vehicle with the |
| 25 | | weapon in your hand? |

R & R  COURT  REPORTERS

810 N STREET                    1007 WEST THIRD AVENUE
277-0572/Fax 274-8982           272-7515

ANCHORAGE, ALASKA  99501

Exhibit___3___
Page 31 of 41

106

1    A    I did that -- I don't know -- once again, I don't know

2         my exact placement.  I don't remember if I was moving,

3         like running along with the car or not.  All I remember

4         is responding to the suspect's action.

5    Q    Okay.  Do you recall any part of the investigation into

6         where your bullets went?

7    A    Yes.  But I didn't know at the time.  Based on what I

8         know about the report I do.

9    Q    So based upon what you know about the report where did

10        your bullets go?

11   A    One of them was -- I believe what this mark is in the

12        door pillar behind the driver's position.  Another one

13        I believe entered through the -- the upper shoulder on

14        his left side.....

15   Q    Okay.

16   A    .....re-exited through the top of the latch.....

17   Q    Don't worry about where it exited.  Just where it

18        entered.  Go to the next bullet.

19   A    Yeah.  It re-entered, that's what I was trying to say.

20        And I believe there were three in the left back

21        somewhere.

22   Q    Okay.  Did any of your bullets go through the seat?

23   A    No, I don't believe so.  Not that the report reflected

24        and not that I have any knowledge of.

25   Q    Okay.  So we have this extremely narrow area because

107

```
 1              your bullets went between this door post and the side

 2              of this seat to strike his body?

 3    A         Oh, no, sir.  The seat was down.

 4    Q         Sure, the seat was down, but none of the bullets that

 5              you fired struck that seat?

 6    A         Right.  Because the seat was not obstructing his

 7              silhouette.

 8    Q         Okay.

 9    A         It was laid down flat.  Which I didn't know of course

10              at the time either.  I hadn't even observed that yet.

11              But that was the -- the outcome.  So I'm.....

12                      MR. FLOERCHINGER:  When you say seat back, do

13    you mean reclined?

14    A         Yeah.  The seat back was in a fully reclined position

15              so I learned later.

16    Q         Okay.  So when you fired those rounds were you less

17              than 20 feet from the vehicle?

18    A         That's probably a fair -- fair estimate, yes, sir.

19    Q         Because the vehicle took off and it had only about 20

20              feet to go, right?

21    A         Yeah, something like that.

22    Q         Now you seen the markings that the police have put out

23              that demonstrate the path of the vehicle?

24    A         Yes, sir.

25    Q         And you noticed the vehicle took a sharp turn at the
```

Exhibit  3
Page 33 of 41

 1          last toward Whittom's patrol car?

 2     A    No, sir.

 3     Q    I'm going to have you identify, is that your Glock?

 4     A    I don't know.  I thought mine was.....

 5                                        (Exhibit 37 proffered)

 6              MR. FLOERCHINGER:  Excuse me.  For the record

 7     you're looking at Exhibit 37?

 8     A    This says EYU657.  I can't recall if mine was EYU,

 9          Echo, Uniform, or Yankee Uniform, or 67.  I'd have to

10          look at armory's records.  I can't remember what my

11          serial number was.

12     Q    We're looking at 35 -- 36, I'm sorry.

13     A    Okay.  I'm looking at 36.

14     Q    Okay.  Do you know whether that's your Glock and your

15          magazines?

16     A    No, sir.  They all look the same.  But these magazines

17          all look full from the picture if it's accurate and

18          there's one round left, but the round would be in the

19          chamber with the full magazine.  So it's possible that

20          this weapon in this photograph is Trooper Whittom's.

21     Q    I'm going to show you what's been marked as 26.

22     A    Yes, sir.

23     Q    Do you see the little yellow tags there?

24     A    Yeah.  There are lots of them.

25     Q    Okay.  If I were to tell you that most of the little

R & R  COURT  REPORTERS

810 N STREET                    1007 WEST THIRD AVENUE
277-0572/Fax 274-8982           272-7515
                    ANCHORAGE  ALASKA  99501

Exhibit____3____
Page_34_ of _41_

109

1        yellow tags that are grouped together by the back of

2        the vehicle.....

3  A    Um-hum.

4  Q    .....that those little yellow tags represent the

5        falling of your brass.

6  A    Okay.

7  Q    Now, how does the brass fall on a Glock?

8  A    It ejects to the right and upward usually.  But, you

9        know, sometimes there are anomalies and they can jam or

10       sometimes they just fall.....

11  Q   Sir, I'm not asking you what the anomalies are.  I'm

12      asking if you knew.  And since you did know.....

13  A   Yes.

14  Q   .....how far out does it spit them?  Or do you have any

15      problem with them coming down in your shirt while

16      you're shooting?

17  A   I've never had that problem.

18  Q   Okay.  So how far out does it throw the brass?

19  A   I don't know.  I've never measured it.  I know that if

20      someone on a range is shooting to the left of you

21      sometimes their brass comes out on your shirt.  Which,

22      you know, it's hot.

23  Q   Yeah.

24  A   So it'll probably -- any where from six inches or

25      falling straight to a couple of feet.

R & R  C O U R T  R E P O R T E R S

810 N STREET             1007 WEST THIRD AVENUE
277-0572/Fax 274-8982     272-7515

ANCHORAGE, ALASKA  99501

Exhibit ___3___
Page 35 of 41

110

1   Q    Okay.  If you fired your shots as soon as this car took

2        off, then you were closer than 20 feet at the time that

3        you shot according to the lay of your brass, weren't

4        you?

5   A    I don't know.  Maybe I was moving.  I don't know if I

6        was moving at the time I shot.  I can't remember that

7        detail.

8   Q    Okay.

9   A    I've tried to.  I just can't remember.

10   Q    And you shot five times in rapid succession?

11   A    Yeah.  Yeah, I shot five times.

12   Q    And I believe -- I may be mistaken, but I believe that

13        most of your brass is in this area which would be

14        directly behind the vehicle?

15   A    I don't know.  I didn't do this investigation.  And if

16        -- if these tags numbered 24, 27, what appears to be 25

17        and 26, these ones in the lower center portion of the

18        picture, if those do represent the brass placement I --

19        I have no reason to dispute that they are.

20   Q    Okay.  Now, I want to go -- if -- do you have.....

21            MR. FLOERCHINGER:  Could we take a quick break?

22            MR. OSTERMAN:  Pardon?

23            MR. FLOERCHINGER:  Could we take a quick break?

24            MR. OSTERMAN:  We sure can.  Not a problem.

25  We'll take a break and I can form that question.

Exhibit 3
Page 36 of 41

111

1              MR. FLOERCHINGER:  Okay.

2         (Off record)

3         (On record)

4    A    You want these exhibits back, sir, before we continue?

5    Q    No.  We'll collect them all before you leave anyway.

6    A    Yeah.  They're all mixed up.

7    Q    They're all out of order.  We'll have to put them all

8         back in order before we give them to the court reporter

9         or.....

10   A    Okay.

11   Q    .....she'll be upset with us.  You say this vehicle --

12        I hate to use the word vehicle.  People get in and out

13        of vehicles but I drive a car.  This little Mazda car

14        you say rev'ed its engine and began accelerating.  How

15        fast was it going when it struck Trooper Whittom's car?

16   A    No idea.

17   Q    Was it going faster than three miles per hour?

18   A    No idea.  It was going as fast as I believed it could

19        go.

20   Q    Okay.

21   A    But that's speculation.

22   Q    So if I were to tell you that an expert with a degree

23        in engineering believes the vehicle was going less than

24        three miles per hour at the time of the strike, do you

25        have any reason to believe that would be inaccurate?

R & R  C O U R T  R E P O R T E R S

810 N STREET                1007 WEST THIRD AVENUE
277-0572/Fax 274-8982       272-7515

ANCHORAGE, ALASKA  99501

Exhibit    3
Page 37 of 41

112

1   A       I -- I don't think that's accurate.  I think he'd have

2           to be going faster than that to move to the Whittom's

3           vehicle the way it moved.

4   Q       If Trooper Whittom were to excessively accelerate his

5           car, would you have heard it?

6   A       I don't know.

7   Q       So you were not paying any attention at all?

8               MR. FLOERCHINGER:  Did you say if Trooper

9   Whittom excessively.....

10              MR. OSTERMAN:  Yes.

11              MR. FLOERCHINGER:  I see.

12  A       I wasn't near Trooper Whittom's vehicle.  I was paying

13          attention to what I was paying attention to.  I have no

14          idea.

15  Q       Did you see Trooper Whittom ram this Mazda?

16  A       No, sir.

17  Q       Do you believe that he did?

18  A       No, sir.

19                                  (Exhibit 53 proffered)

20  Q       I hate to take a moment to reshuffle all of these but

21          I'm going to have to for a second.  I'm showing you

22          Exhibit 53.....

23  A       Okay.

24  Q       .....that mark there, what does that look like to you?

25  A       Well, I didn't do the investigation.  I'm not an

R & R   C O U R T   R E P O R T E R S

810 N STREET                    1007 WEST THIRD AVENUE
277-0572/Fax 274-8982           272-7515

ANCHORAGE, ALASKA  99501

Exhibit    3
Page  38 of 41

113

```
1              accident reconstruction expert.  But it looks to me
2              like Trooper Whittom's vehicle was pushed sideways.
3    Q    I'd ask you to look at the foot of that trooper
4              standing there.
5    A    I don't know if that's a trooper standing there.
6    Q    Or emergency person.  Certainly not the victim and it's
7              not you.
8    A    I don't believe it's a trooper because we wear uniform
9              boots and those are tennis shoes.  So.....
10   Q    Okay.  Probably an EMS personnel?
11   A    Could be.
12   Q    Okay.  Can you tell me why it is that that person is
13             nearly stepping in the track of that Mazda?
14   A    I don't know.  He put his foot there.
15   Q    Yeah.  That track should be underneath the vehicle,
16             shouldn't it?
17   A    I don't know.  I mean looking at one angle of the
18             photograph I can't even see for sure if his foot is in
19             it.  I don't understand why it should be.  Can you
20             clarify?
21   Q    Well, you pointed out that Trooper Whittom's vehicle
22             moved sideways
23   A    It looks like it did, yeah.
24   Q    And if that track mark is where that person is standing
25             then that Mazda has moved sideways, hasn't it?
```

R & R  C O U R T  R E P O R T E R S

810 N STREET                           1007 WEST THIRD AVENUE
277-0572/Fax 274-8982                  272-7515

ANCHORAGE, ALASKA  99501

Exhibit    3
Page 39 of 41

114

| | | |
|---|---|---|
| 1 | A | I don't know.  I can't see it clear enough and I |
| 2 | | haven't done the investigation on the impact. |
| 3 | Q | I'm showing you 52. |
| 4 | A | Okay. |
| 5 | Q | Do you know what that is? |
| 6 | A | It's a patrol car. |
| 7 | | **(Exhibit 48 proffered)** |
| 8 | Q | If I were to tell you that is Trooper Whittom's patrol |
| 9 | | car at the scene, then I'll show you Exhibit 48. |
| 10 | A | Okay. |
| 11 | Q | Okay.  Looking underneath the vehicle by the back tire |
| 12 | | can you describe for me why those shining marks are |
| 13 | | there exhibiting high acceleration backwards? |
| 14 | A | I'd certainly say they're not -- based on my training |
| 15 | | and experience that picture does not represent a |
| 16 | | reverse acceleration at all. |
| 17 | Q | Okay.  That's a rear wheel drive vehicle, isn't it? |
| 18 | A | I don't know.  They are, aren't they?  Yes. |
| 19 | Q | I'll show you that one showing you that foot mark |
| 20 | | standing in that tire track. |
| 21 | A | The same picture as before? |
| 22 | Q | Yes.  I think it's a different angle though. |
| 23 | A | I think it's smaller. |
| 24 | Q | Okay. |
| 25 | A | Same picture.  It might be a different angle.  I think |

R & R  COURT  REPORTERS

810 N STREET                    1007 WEST THIRD AVENUE
277-0572/Fax 274-8982           272-7515

ANCHORAGE, ALASKA  99501

Exhibit ___3___
Page_ 40 of 41

115

1           you're correct.  I see the emblem in there.

2  Q     Okay.

3  A     And.....

4  Q     Can you describe that for me?

5  A     Describe the photograph?

6  Q     You can't tell me why it is that he's standing in that

7           tire track of that vehicle because those wheel marks

8           should be underneath the car, right?

9  A     I -- I can't even see -- his foot might be underneath

10          the edge of the car.  I don't know.

11  Q    Okay.

12  A    I -- I can't see from that angle.  I didn't do the -- I

13         didn't mark any of this.  I don't -- I didn't do the

14         investigation.

15  Q    Okay.  You -- at the time of this incident there was a

16         disagreement between you and Trooper Whittom to some

17         degree about the necessity for the shooting?

18  A    No, I never had a disagreement with Trooper Whittom.

19         We never spoke of the incident.

20  Q    The two of you have never talked about this?

21  A    I've spoke with him about it briefly since then but I

22         never had a disagreement with Trooper Whittom.

23  Q    Okay.  At the time of that particular incident did you

24         know that he did not believe immediately following the

25         incident that there should have been a shooting?