1               IN THE FEDERAL DISTRICT COURT

2                 FOR THE DISTRICT OF ALASKA

3   ARTHUR J. PORTER and            )
    CHRISTIE L. PORTER,             )
4                                   )
                    Plaintiffs,     )
5                                   )
       vs.                          )
6                                   )
    ARTHUR J. OSBORN, and           )
7   JOSEPH WHITTOM,                 )
                                    )
8                   Defendants.     )
    _____)
9   Case No. A05-0142 CV (JWS)

10          __DEPOSITION OF JOSEPH WHITTOM__

11
    APPEARANCES:
12
       FOR THE PLAINTIFFS:        MR. MARK D. OSTERMAN
13                                Osterman Law Office, PC
                                  215 Fidalgo
14                                Suite 106
                                  Kenai, Alaska 99611
15                                (907) 283-5660

16     FOR THE DEFENDANTS:        MR. DAVID D. FLOERCHINGER
                                  Attorney General's Office
17                                1031 West Fourth Avenue
                                  Suite 200
18                                Anchorage, Alaska 99501
                                  (907) 269-5190
19
       ALSO PRESENT:             MR. ARTHUR OSBORN
20
                         *  *  *  *  *  *
21

22

23

24

25

Exhibit  5
Page  1  of  54

1    PURSUANT TO NOTICE, the Deposition of **JOSEPH WHITTOM**

2  was taken on behalf of the Plaintiffs, before Meredith Downing,

3  Notary Public in and for the State of Alaska and reporter for R

4  & R Court Reporters, at the offices of R & R Court Reporters,

5  811 G Street, on the 30th day of August, 2006, commencing at

6  the hour of 12:43 o'clock p.m.

7                    * * * * * *

8                  TABLE OF CONTENTS

9  Direct Examination by Mr. Osterman                04
   Cross Examination by Mr. Floerchinger             48
10 Redirect Examination by Mr. Osterman              52

11 EXHIBITS MARKED:

12 57 - Hand drawing by Mr. Whittom

13 EXHIBITS PROFFERED:

14
   56                                                10
15 1                                              15/50
   35                                                22
16 34                                                22
   24                                                23
17 46                                                23
   53                                                24
18 40                                                25
   2                                                 29
19 5                                                 30
   10                                                41
20 20                                                41
   26                                                41
21 45                                             43/47
   48                                                43
22 28                                                44
   24                                                45
23 18                                                45
   17                                                45
24 50                                                45
   3                                                 52
25

R & R  C O U R T  R E P O R T E R S
811 G STREET
(907) 277-0572/Fax 274-8982
ANCHORAGE, ALASKA  99501

Exhibit 5
Page 2 of 54

3

1                    P R O C E E D I N G S

2          (On record)

3              COURT REPORTER:  On record.  My name is

4  Meredith Downing.  I'm a court reporter here on behalf of R & R

5  Court Reporters whose business address is 811 G Street,

6  Anchorage, Alaska.  I'm a Notary Public in and for the State of

7  Alaska.  Today's date is August 30, 2006, the time set for this

8  deposition will be filled in later.  We are at the offices of R

9  & R Court Reporters at 811 G Street, Anchorage, Alaska for the

10  audio tape deposition of Joseph Whittom in the case in the

11  Federal District Court for the District of Alaska, case number

12  A05-0142 CV (JWS), Arthur J. Porter and Christie L. Porter,

13  Plaintiff, versus Arthur J. Osborn and Joseph Whittom,

14  Defendant.  The deposition is being taken on behalf of the

15  Plaintiff.  Off record.

16          (Off record)

17          (On record)

18      COURT REPORTER:  On record.  Counselors, if you'd

19  identify yourselves for the record, please, and your

20  representation?

21              MR. OSTERMAN:  Mark Osterman for the

22  Plaintiffs, the Porters.

23              MR. FLOERCHINGER:  Dave Floerchinger with the

24  Attorney General's office for the Defendants.

25              COURT REPORTER:  Thank you.  Would you raise

R & R   C O U R T   R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit 5
Page 3 of 54

4

 1  your right hand, sir?

 2          (Oath administered)

 3              MR. WHITTOM:  I do.

 4                  **JOSEPH WHITTOM**

 5  having been first duly sworn under Oath, testified as follows

 6  on:

 7                  **DIRECT EXAMINATION**

 8              COURT REPORTER:  Would you state your name for

 9  the record, please, spelling your last name?

10  A      Joseph Whittom.  Last name W-h-i-t-t-o-m.

11              COURT REPORTER:  A mailing address, sir?

12  A      P.O. Box 268, Bethel, B-e-t-h-e-l, Alaska 99559.

13              COURT REPORTER:  And a daytime or message

14  phone?

15  A      It's just be post, 907 543-2294.

16              COURT REPORTER:  Thank you, sir.

17              MR. OSTERMAN:  Thank you.

18  **BY MR. OSTERMAN:**

19  Q      Trooper Whittom, you know who I am by now 'cause you

20          sat through the deposition of.....

21  A      Yes, sir.

22  Q      .....Mr. Osborn.  And you had a chance to hear all the

23          want to take a break, no trick questions, and uh-huh

24          and unh-unhs are not good things.

25  A      Yes, sir.

R & R  C O U R T  R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit 5
Page 4 of 54

1  Q    Okay.  Any questions?

2  A    Not at this time.

3  Q    Okay.  If you have a question don't hesitate to stop

4       us, ask what the question may be.  Slow me down if I

5       get a little ahead. The question gets unclear, ask for

6       clarification.

7  A    Yes, sir.

8  Q    Not a problem.  You are aware of the incident that

9       occurred on the night of, I believe, January the 3rd,

10      2003, or was it the 4th?

11 A    The exact date -- it was either the night of the 3rd or

12      the morning of the 4th.

13 Q    Okay.

14 A    But, yes, I am aware of that.

15 Q    Okay.  And you made out -- or made several statements

16      to investigators?

17 A    That is correct.

18 Q    In fact, you made statements to Investigator Gilmore,

19      is that right?

20 A    Yes.

21 Q    And you made statements to Sergeant Randel McPherron?

22 A    Yes.

23 Q    And you made statements to Randel McPherron in the

24      morning of the 5th of January?

25 A    That sounds about right, yes.

R & R  COURT  REPORTERS

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit  5
Page 5 of 54

6

| | | |
|---|---|---|
| 1 | Q | Okay.  Those statements that you made were tape |
| 2 | | recorded? |
| 3 | A | That is correct. |
| 4 | Q | You were dispatched to Kenai Keys area on the morning |
| 5 | | of the 4th? |
| 6 | A | Yes. |
| 7 | Q | About 2:00 o'clock in the morning? |
| 8 | A | Approximately, yes. |
| 9 | Q | And you were dispatched for a suspicious vehicle? |
| 10 | A | Yes, it was dispatched, yes. |
| 11 | Q | Okay.  When you arrived where was Casey Porter's |
| 12 | | vehicle in relationship to Trooper Osborn's truck? |
| 13 | A | When I arrived the Porter vehicle was still in front of |
| 14 | | Trooper Osborn's vehicle. |
| 15 | Q | So it had not moved yet? |
| 16 | A | It was just starting to move. |
| 17 | Q | Where did you go in relationship to the other cars? |
| 18 | A | I was -- as I pulled in I --I could see that the Porter |
| 19 | | car was just moving around Trooper Osborn's and I kind |
| 20 | | of went up the Kenai Keys Road and headed off the |
| 21 | | vehicle. |
| 22 | Q | So this turn-out had kind of a large bottleneck or |
| 23 | | large opening that opened onto Kenai Keys Road then? |
| 24 | A | I -- I guess I don't understand the bottleneck or |
| 25 | | opening. |

R & R   C O U R T   R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit __5__
Page _6_ of _54_

1   Q    Well.....

2   A    It -- there was a big pullout.

3   Q    Okay.  So -- and the pull-out was mostly on the Kenai

4        Keys and not on the Sterling?

5   A    That is correct.

6   Q    And how wide would you estimate the opening into this

7        turn-out?

8   A    Standard road length.

9   Q    So 16, 20 feet?

10  A    Without getting out and measure it, it's, you know, a

11       standard dirt road.

12  Q    If you pulled your vehicle -- your car -- I'm trying

13       real hard to cut down on what are your words and police

14       words.  If you pulled your car across the opening would

15       it completely block traffic?

16  A    Pretty close to.

17  Q    Okay.  And your.....

18            MR. FLOERCHINGER:  Counsel, I'm not sure you

19  two are communicating right now.

20            MR. OSTERMAN:  I think we are.  Is the

21  opening.....

22            MR. FLOERCHINGER:  And I just want to make sure

23  of that fact.

24            MR. OSTERMAN:  I'll go back and make sure.

25            MR. FLOERCHINGER:  Okay.

R & R  C O U R T  R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit  5
Page  7  of  54

8

1    Q        (By Mr. Osterman)   There's an opening on the Kenai Keys

2             for a turn-out?

3    A        Off the Sterling.

4    Q        Off the Sterling.   Kenai Keys is a road off the

5             Sterling?

6    A        That is correct.

7    Q        There is a turn-out on Kenai Keys?

8    A        Yes, there's -- there's -- there's a big open area off

9             to the -- if you're pulling off the Sterling and

10            turning onto Kenai Keys it'd be off the right-hand

11            side.   There's a big kind of U-shaped.....

12   Q        Okay.

13   A        .....opening.

14   Q        You cannot enter the turn-out from the Sterling?

15   A        No.

16   Q        You have to be on Kenai Keys to enter the opening to

17            the turn-out?

18   A        That is correct.

19   Q        And the opening to the turn-out is about the width of a

20            standard highway?

21   A        I wouldn't say a highway.  A standard dirt road.

22   Q        A standard dirt road.  You said that's about the width

23            of your car?

24   A        Yeah, approximately......

25   Q        Or the length of your car.  I'm sorry?

R & R   C O U R T   R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit   5
Page  8  of  54

9

| | | |
|---|---|---|
| 1 | A | Right.  I -- I-- yeah, I wouldn't say the width |
| 2 | | but..... |
| 3 | Q | Yeah, okay.  And when you pulled in you blocked that -- |
| 4 | | or you tried to bottleneck this car that was exiting? |
| 5 | A | Negative. |
| 6 | Q | What'd you do then? |
| 7 | A | I continued up into the -- the parking lot and the |
| 8 | | vehicle was driving slowly and I moved out in front and |
| 9 | | stopped. |
| 10 | Q | Okay.  Did you ever back up? |
| 11 | A | I did. |
| 12 | Q | When? |
| 13 | A | When it looked like the other vehicle may have -- may |
| 14 | | hit the side of my vehicle. |
| 15 | Q | You backed up? |
| 16 | A | I did. |
| 17 | Q | Okay.  We'll talk about that in a second. |
| 18 | A | Okay. |
| 19 | Q | I want to -- I want to try to get through as many of |
| 20 | | the basic details as possible.  Could you hear Trooper |
| 21 | | Osborn talking? |
| 22 | A | I was still in my vehicle, no. |
| 23 | Q | Okay.  You had your windows rolled up? |
| 24 | A | Right. |
| 25 | Q | Could you hear Trooper Osborn shouting at anybody? |

R & R  COURT  REPORTERS
811 G STREET
(907) 277-0572/Fax 274-8982
ANCHORAGE, ALASKA  99501

Exhibit 5
Page 9 of 54

```
 1   A    We were still in the vehicle moving.....
 2   Q    Okay.
 3   A    .....no.
 4   Q    You don't know what would have been said by Trooper
 5        Osborn to the occupant of that car?
 6   A    No.
 7   Q    Did that car fit the description you were dispatched?
 8   A    Yes.
 9   Q    What was suspicious about this car?
10   A    What was suspicious?
11   Q    Yes.
12   A    Well, the vehicle de- -- was -- that was described in
13        the dispatch was a four door blue sedan and when we
14        arrived there that's what we encountered.
15                              (Exhibit 56 proffered)
16   Q    I'm going to show you a photocopy of Exhibit 56 which
17        was created today by Trooper Osborn.  Is this a fair
18        representation?
19   A    Yes.
20   Q    But the bottleneck we're talking about to Kenai Keys
21        isn't there, is it?
22   A    You mean the -- the opening?
23   Q    Yeah, the opening.  Is it?
24   A    I guess I don't understand what -- if -- if you're.....
25   Q    Is it.....
```

R & R  C O U R T  R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA 99501

Exhibit 5
Page 10 of 54

11

| | | |
|---|---|---|
| 1 | A | .....looking at this as a big bottle and it actually |
| 2 | | comes down, it actually narrows from the parking |
| 3 | | area..... |
| 4 | Q | Okay.  The Kenai Keys is..... |
| 5 | A | .....or the pull-out area..... |
| 6 | Q | .....a road? |
| 7 | A | Right.  The Kenai Keys is a road here. |
| 8 | Q | And it's -- and so this -- this is a roadway here? |
| 9 | A | That is correct. |
| 10 | Q | And the width of this opening from here to here is the |
| 11 | | length of a police car roughly? |
| 12 | A | Negative. |
| 13 | Q | No? |
| 14 | A | No. |
| 15 | Q | What's the length of this opening? |
| 16 | A | I have no idea.  It's -- it's at least -- if I were to |
| 17 | | guess at it and this is purely a guess, I don't know, |
| 18 | | probably a 100 or more feet. |
| 19 | Q | Okay.  So when you pulled in initially you pulled in |
| 20 | | here? |
| 21 | A | That is correct. |
| 22 | Q | And the incident happened on Kenai Keys and not in this |
| 23 | | turn-out? |
| 24 | A | Right.  It -- it -- it's all kind of subject to -- |
| 25 | | everything was black, so I don't know exactly if I was |

R & R  C O U R T  R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit 5
Page 11 of 54

| 1 | | on Kenai Keys Road 'cause it's all the same level. |
|---|---|---|
| 2 | | It's all the same..... |
| 3 | Q | Grade? |
| 4 | A | .....piece of dirt.  Right. |
| 5 | Q | Yeah.  And it's hard to distinguish? |
| 6 | A | Correct. |
| 7 | Q | Okay.  Now initially you pulled in here and stopped? |
| 8 | A | I didn't -- I didn't pull in here and stop. |
| 9 | Q | Where did you..... |
| 10 | A | I didn't pull -- you -- you're indicating that I |
| 11 | | stopped at -- at the.... |
| 12 | Q | Opening? |
| 13 | A | .....intersection. |
| 14 | Q | Right. |
| 15 | A | Right.  And I didn't pull in and stop at the |
| 16 | | intersection. |
| 17 | Q | Okay.  I'd like for you to begin by drawing and putting |
| 18 | | in the Sterling Highway.  And I'd like the Sterling |
| 19 | | Highway -- I'd like your opening to Kenai Keys to be in |
| 20 | | the center of the page. |
| 21 | A | Opening to the Kenai Keys..... |
| 22 | Q | Right. |
| 23 | A | .....the center of the page? |
| 24 | Q | The center of the page.  Okay.  So kind of scale down |
| 25 | | and try not to use the whole sheet of paper for just |

R & R  C O U R T  R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit___5___
Page /2 of 54

13

| | | |
|---|---|---|
| 1 | | the turn-out. |
| 2 | A | Okay. |
| 3 | Q | Put the word Sterling on for the Sterling Highway and |
| 4 | | indicate which direction is north? |
| 5 | A | I don't understand the -- this isn't to scale. |
| 6 | Q | I understand that.  I didn't expect either one of you |
| 7 | | guys to be draftsmen. |
| 8 | A | (Witness complies) |
| 9 | Q | When you came in where did you first stop? |
| 10 | A | It was someplace up in here. |
| 11 | Q | So would you draw..... |
| 12 | A | Or -- or up in here. |
| 13 | Q | Okay.  Would you draw where you believe that your first |
| 14 | | stop was and..... |
| 15 | A | Okay.  I pulled in to -- kind of headed in and then |
| 16 | | turned and stopped someplace.  I -- I would assume |
| 17 | | stopped right in here. |
| 18 | Q | Now which direction was your car facing?  That way? |
| 19 | A | Right. |
| 20 | Q | Okay.  So would you put a number 1 beside that for me |
| 21 | | and circle it so that we know it's number 1 circled? |
| 22 | A | (Witness complies) |
| 23 | Q | Okay.  Did you move? |
| 24 | A | Right, I backed up. |
| 25 | Q | And how far did you back up? |

R & R  C O U R T  R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit _____ 5
Page 13 of 54

14

| | | |
|---|---|---|
| 1 | A | If I was to -- it wasn't very far.  Probably two or |
| 2 | | three feet. |
| 3 | Q | Okay.  Did you back up at high speed? |
| 4 | A | Negative. |
| 5 | Q | Did you back up so that your back wheels spun? |
| 6 | A | Negative. |
| 7 | Q | Okay.  After you backed up can you redraw the position |
| 8 | | of your vehicle a little bit?  Just kind of, I guess, |
| 9 | | show me an overlap. |
| 10 | A | Okay. |
| 11 | Q | And the in the overlap write 2? |
| 12 | A | Okay.  And when I backed up..... |
| 13 | Q | Showing when you backed up? |
| 14 | A | The pro- --..... |
| 15 | Q | Did you back up a particular direction? |
| 16 | A | I just -- I just backed up and..... |
| 17 | Q | Okay. |
| 18 | A | .....turned -- turned my vehicle towards -- so when I |
| 19 | | backed up it was probably looking more this direction. |
| 20 | Q | Okay.  Did you move again? |
| 21 | A | Negative. |
| 22 | Q | So that's the position you were in at the time that |
| 23 | | this event ended? |
| 24 | A | That is correct. |
| 25 | Q | Except that the front of your vehicle had been pushed |

R & R  C O U R T  R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit_____5
Page_14_of_54

1        over?

2    A    That is correct.

3    Q    When you arrived this car began coming toward you?

4    A    That is correct.

5    Q    Did you jockey your car to meet him tit for tat.....

6    A    The only time --.....

7    Q    .....as you.....

8    A    .....the only time I did is the vehicle was already

9        moving out and I pulled up in front and stopped.

10           MR. FLOERCHINGER:  That's position one?

11    A    That's position one.  And then it looked like he might

12        -- might come and hit me on the side and I backed my

13        vehicle up and turned it more towards him.  And then he

14        stopped.  The vehicle stopped.  At that point I didn't

15        move my vehicle anymore.

16    Q    (By Mr. Osterman)  Okay.  Good enough.  Did you get a

17        chance to hear any of the conversation going on between

18        Trooper Osborn and Casey Porter?

19    A    No.

20    Q    You never heard him ordered out?

21    A    Yeah, I -- I heard Trooper Osborn.  As soon as I got

22        out of the vehicle I heard Trooper Osborn giving verbal

23        commands to show of hands, get out of the vehicle.

24                                    **(Exhibit 1 proffered)**

25    Q    I want to show you Exhibit 1.  And we've talked about

R & R  C O U R T  R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit ___5___
Page _15_ of _54_

16

```
 1              Exhibit 1 pages 1 and 2 are the police dispatch and
 2              page 3 on is an interview with you and Dane Gilmore,
 3              okay?  And now J.W. I believe is you.  J.O. is Trooper
 4              Osborn and C.P. is Mr. Porter.  Okay.  Do you recall
 5              when you arrived making a call?
 6    A         Do I remember when I arrived making a call?
 7    Q         Right.  On the.....
 8    A         Making a call.....
 9    Q         .....radio?
10    A         On the radio?
11    Q         Uh-huh.
12    A         Right.  I remember as I was pulling in to Kenai Keys
13              making a call to dispatch.
14    Q         What'd you tell them?
15    A         I told them we had a failure to yield.
16    Q         And what does a failure to yield mean?
17    A         It means that somebody is failing to yield at the
18              direction of -- of a peace officer.
19    Q         Okay.  What was your call sign that night?
20    A         One eight (ph) twenty.  One echo twenty.
21    Q         So I show you here where it says -- I just lost it when
22              I turned the page.  One echo twenty -- I lost it again.
23                   MR. FLOERCHINGER:  What are you on?  Six?
24    Q         One echo twenty.  TJO.  Now, that's not you, is it?
25    A         No.
```

R & R  C O U R T  R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit ____5____
Page _16_ of _54_

1   Q   But that actually was the call you made?

2   A   That is correct.

3   Q   So it says we're having -- and then the dispatcher

4       calls you back, that's the dispatcher isn't it, RG?

5   A   Yes.

6   Q   And she calls you back and asks if that's northbound or

7       southbound?

8   A   That is correct.

9   Q   And she calls you back and asks again?

10  A   That is correct.

11  Q   And you never responded to that particular question,

12      did you?

13  A   No.

14  Q   Okay.  At the time that you arrived to the time of the

15      shooting how long was it?

16  A   It wasn't -- wasn't long.

17  Q   Three.....

18  A   It's....

19  Q   .....minutes?

20  A   It felt like --it -- I -- I can tell you what it felt

21      like, but I know it wasn't that long.

22          MR. FLOERCHINGER:  Object, foundation.

23          MR. OSTERMAN:  Okay.

24  Q   (By Ms. Osterman)  That's one of the other ones.  Kind

25      of form things so.....

R & R  C O U R T  R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit  5
Page 17 of 54

1   A       Yeah.

2   Q       Let's go back here for a second.  Did you see Trooper

3           Osborn pepper spray the occupant of the vehicle?

4   A       Yes.

5   Q       Did you see Trooper Osborn try to get in a back door?

6   A       I don't remember.

7   Q       Do you remember Trooper Osborn trying to get in a front

8           door?

9   A       Yes, I do.

10  Q       Do you remember -- you apparently at one point in time

11          got out and yelled at this person according to Exhibit

12          1?

13  A       As soon as the vehicle stopped.

14  Q       Okay.  So this vehicle stopped and this vehicle is how

15          close to you?

16  A       It's approximately a car length, 15 to 20 feet from my

17          recollection.

18  Q       Could it have been less?

19  A       Could have been.

20  Q       Your estimations depends upon the fact that it's dark

21          out?

22  A       That is correct.

23  Q       There's not a lot to tell you sizes of things?

24  A       That is correct.

25  Q       When you yell at this person to get out of the vehicle,

R & R  COURT  REPORTERS

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit __5__
Page 18 of 54

```
 1              I think, isn't it?  Right there?

 2    A         Right.

 3    Q         Throw up your hands.  And then you say get in your

 4              vehicle -- oops, get out of your vehicle kind of thing,

 5              right?

 6    A         Right -- well, it looks like I didn't even finish get

 7              in your -- get in your ve- -- and then get out of your

 8              vehicle.

 9    Q         Okay.  Later on you say get out now.  So you're also

10              yelling at this person?

11    A         Yes.

12    Q         Do you have any training that more than one person

13              taking command of the situation can create confusion?

14    A         It could be, yes.

15    Q         And if more than one people (sic) are yelling

16              compliance by one to the other could create even

17              greater problems, couldn't it?

18    A         Could be, yes.

19    Q         Okay.  Now we have this indescribable, I guess, would

20              be the right word to put on there, would -- yeah, can't

21              be determined.  Do you know what you said there?

22    A         I can't remember.

23    Q         You're still yelling at him?

24    A         It was probably the -- the same things.

25    Q         Okay.  Do you remember Osborn yelling at you for a
```

R & R  C O U R T  R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit ___5___
Page 19 of 54

1          taser?

2   A      No, I do not remember that.

3   Q      It is on the transcript there?

4   A      Yes, I saw that.

5   Q      Okay.  Did you ever take your service weapon out?

6   A      Yes, I did.

7   Q      When?

8   A      As soon as I exited the vehicle.

9   Q      Why?

10   A      In those situations where we have a failure to yield

11          si- -- situation it becomes -- it then turns in from a

12          regular traffic stop into what we call a felony traffic

13          stop.

14   Q      Well, if it's a failure to yield we're still at a

15          misdemeanor level here, aren't we?

16   A      Right, but we treat it as such.

17   Q      Okay.  So you treat it as a felony stop.  And a felony

18          stop that means weapons drawn?

19   A      Right.

20   Q      In a felony stop you extract the person from the

21          vehicle with hands behind their heads?

22   A      We -- we ask them -- we give them verbal directions on

23          how to exit and what to do.

24   Q      Okay.  Which hand to use to open the door with?

25   A      That is correct.

R & R  C O U R T  R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit 5
Page 20 of 54

```
 1  Q    How to step out, right foot first, left foot first?
 2  A    That is correct.
 3  Q    Down on their knees, cross their ankles?
 4  A    Yes.
 5  Q    And intertwine their fingers through their hair making
 6       it harder for them to get their hands down?
 7  A    Right.
 8  Q    Okay.  Was your vehicle equipped with a shotgun?
 9  A    Yes.
10  Q    Do you normally in a felony situation extract your
11       shotgun?
12  A    If I have the time.
13  Q    Did you consider doing so this day?
14  A    No, I did not.
15  Q    Okay.  These five shots are fired and you're there when
16       it happens?
17  A    That is correct.
18  Q    The five shots are fired.  How long between the last
19       shot and the time that this car strikes the front of
20       yours?
21  A    Seconds.  I mean it's....
22  Q    It's not even a second, is it?  It's less than that?
23  A    I -- I don't remember.  It's.....
24  Q    The car wasn't going very fast?
25  A    It wasn't going -- it wasn't going 90 miles an hour if
```

R & R   C O U R T   R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982
ANCHORAGE, ALASKA  99501

Exhibit      5
Page 21 of 54

22

```
 1             that's what you're implying.
 2   Q    I mean it hit a front brace on your car?
 3   A    That is correct.
 4   Q    Did $100 damage to the front brace?
 5   A    I don't know how much damage it did.
 6                                (Exhibit 35 proffered)
 7   Q    Showing you Exhibit 35.  Recognize that photo?
 8   A    No.
 9                                (Exhibit 34 proffered)
10   Q    Exhibit 34, do you recognize that one?
11   A    No.  Well, other than it looks like a patrol vehicle.
12   Q    Okay.  Don't know that it looks like your particular
13        patrol vehicle?
14   A    It's a similar vehicle that looks like mine, yes.
15   Q    Okay.  The only part of your car this Mazda hit was
16        that front brace.....
17   A    Yes.
18   Q    .....correct?
19             MR. FLOERCHINGER:  Do you know the answer to
20   that?
21   A    I -- I don't actually.
22             MR. FLOERCHINGER:  Well.....
23   Q    (By Mr. Osterman)  You took photographs of it, didn't
24        you?
25   A    Of the vehicles together.
```

R & R  C O U R T  R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit ___5___
Page 22 of 54

23

1    Q    And you didn't see any other places or points of

2         contact, did you?

3    A    I didn't inspect it very closely.  I just took photos.

4    Q    But you took photos you were also a part of -- also a

5         part of this is to investigate this particular scene,

6         isn't that right?

7    A    At the time I just documenting the scene with photos.

8                                          **(Exhibit 24 proffered)**

9    Q    Show you Exhibit 24, is that one of the photos you

10        took?

11   A    It appears to be.

12   Q    Did you find any paint transfer on the front of your

13        car?

14   A    I don't know.

15   Q    Did you note any?

16   A    I didn't note any, no.  I didn't inspect the two

17        vehicles.

18   Q    Did you ram the Osborn vehicle?

19   A    I did not.

20   Q    Or the Porter vehicle?  I'm sorry.

21   A    I did not.

22                                          **(Exhibit 46 proffered)**

23   Q    Showing you Exhibit 46.

24   A    Okay, 46.

25   Q    And that shows the front of your car slid over.....

R & R   C O U R T   R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982
ANCHORAGE. ALASKA  99501

Exhibit___5_____
Page 23 of 54

24

```
 1   A      That is correct.

 2   Q      .....is that right?

 3   A      Yes.

 4   Q      It also shows the front of the Mazda slid?

 5   A      I don't know if it slid over or not.  It's -- it's hard

 6          to determine.

 7   Q      And tire tracks directly associated with that tire,

 8          isn't it?

 9   A      It appears to be.

10   Q      And that officer's foot is in that tire mark, isn't it?

11   A      I don't know if that's an officer.

12   Q      Whoever it is that's standing there?

13   A      It -- it appears from this angle that it could be.

14   Q      Okay.  And from this angle it appears that that tire

15          track mark is outside of the body -- in other words,

16          it's beyond the spot where it should be for that tire?

17   A      It's hard to tell from this angle 'cause I'm shooting

18          from -- from an angle and it could be underneath the

19          vehicle.

20   Q      Okay.

21   A      I can't tell for sure from that -- from that photo.

22                                    (Exhibit 53 proffered)

23   Q      I show you 53.

24   A      Exhibit 53.

25   Q      That's a better picture of the one that we just saw,
```

R & R  C O U R T  R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982
ANCHORAGE  ALASKA  99501

Exhibit ___5___
Page 24 of 54

25

```
 1            isn't it?

 2   A        It's a little closer picture.

 3   Q        Okay.  It shows the slide marks of your tires?

 4   A        That is correct.

 5   Q        And your -- you don't think that that line tracks up

 6            there, that tire mark?

 7   A        It looks like it could, but I don't know if it's made

 8            from this vehicle or another.

 9   Q        Now you admit that you pulled forward and then backed

10            up?

11   A        That is correct.

12   Q        You do not recall pulling forward again and ramming the

13            Porter vehicle?

14   A        I did not pull forward again and ram the Porter

15            vehicle.

16   Q        Did you ever get a chance to view any of the

17            investigation photographs?

18   A        Negative.

19   Q        I know you've had a chance at a distance to see some of

20            the photographs we've had  here today?

21   A        That is correct.

22                                       (Exhibit 40 proffered)

23   Q        Now showing you Exhibit 40.  If that orange mark right

24            here is supposed to be the track mark of the front of

25            this Mazda can you account for why that front wheel is
```

Exhibit    5

Page 25 of 54

26

| | | |
|---|---|---|
| 1 | | that far out of line? |
| 2 | A | I cannot. |
| 3 | Q | At the time of this particular incident you expressed |
| 4 | | some concerns about why Mr. Porter was killed? |
| 5 | A | At what particular time? |
| 6 | Q | When you made your statement to Inspector Gilmore? |
| 7 | A | Yes, I made the -- some statements in regards to that. |
| 8 | Q | You were concerned 'cause you didn't believe that it |
| 9 | | was necessary to shoot him? |
| 10 | A | Yes. |
| 11 | Q | You later retracted that position? |
| 12 | A | Yes. |
| 13 | Q | Why did you retract it? |
| 14 | A | On further explaining on what had happened with -- |
| 15 | | further indepth with Investigator McPherron I realized |
| 16 | | that although the perceived danger wasn't there and I |
| 17 | | didn't feel that I was in danger, but my actions, in |
| 18 | | other words, must have indicated so because when I |
| 19 | | withdrew from the vehicle again I had taken some steps |
| 20 | | that I hadn't really consciously made note of to begin |
| 21 | | with. |
| 22 | Q | Okay.  You -- following this incident you were taken to |
| 23 | | the hospital for urine analysis or blood work? |
| 24 | A | Yes, I believe so. |
| 25 | Q | Okay.  So point in time you were asked to remove your |

R & R   C O U R T   R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit  5
Page 26 of 54

| | | |
|---|---|---|
| 1 | | uniform? |
| 2 | A | That is correct. |
| 3 | Q | Your uniform was photographed? |
| 4 | A | That is correct. |
| 5 | Q | There were no marks on your uniform showing that this |
| 6 | | police vehicle had slid into you, were there? |
| 7 | A | I have no idea. |
| 8 | Q | You didn't point them out to anyone, did you? |
| 9 | A | No one asked me to point them out. |
| 10 | Q | In fact, you heard the statements here today that |
| 11 | | Trooper Osborn said that you told him the vehicle slid |
| 12 | | into you but--..... |
| 13 | A | That is correct. |
| 14 | Q | .....but that's not anywhere on any of the tape |
| 15 | | recorded statements, is it? |
| 16 | A | I don't know. |
| 17 | Q | It's not on any of your statements either, is it? |
| 18 | A | I'm not real sure. |
| 19 | Q | Have you had a chance to review your statements? |
| 20 | A | Briefly. |
| 21 | Q | When did you review them? |
| 22 | A | Yesterday. |
| 23 | Q | Do you recall what statements you reviewed? |
| 24 | A | Both -- both interviews with Investigator Gilmore and |
| 25 | | McPherron. |

R & R   C O U R T   R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE. ALASKA  99501

Exhibit  5
Page 27 of 54

28

| | | |
|---|---|---|
| 1 | Q | Did you ever tell any of them that the car slid into |
| 2 | | you? |
| 3 | A | I don't recall. |
| 4 | Q | Now you stated in your statement that this person |
| 5 | | rolled down his window? |
| 6 | A | That is correct. |
| 7 | Q | But you heard Trooper Osborn testify that he rolled his |
| 8 | | window up? |
| 9 | A | He also rolled his window up. |
| 10 | Q | Okay. But you didn't say that in your statement, did |
| 11 | | you? |
| 12 | A | That he rolled his window up? |
| 13 | Q | Yes. I'm sorry, you did. You said he rolled his |
| 14 | | window up at the time that he was pepper sprayed? |
| 15 | A | That is correct. |
| 16 | Q | And you saw the pepper spray strike the side of the |
| 17 | | head of Mr. Osb- -- or Mr. Porter? |
| 18 | A | From my advantage it appeared that way. |
| 19 | Q | At the time you gave your statement to Investigator |
| 20 | | Gilmore had you heard the statement of Trooper Osborn? |
| 21 | A | Negative. |
| 22 | Q | Now you said you heard the engine rev up? |
| 23 | A | That is correct. |
| 24 | Q | But the distance that it had it couldn't get very fast, |
| 25 | | could it? |

R & R  C O U R T  R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA 99501

Exhibit __5__
Page _28_ of _54_

29

```
 1  A      That is correct.

 2  Q      In fact on a slick road and between 15 and 20 feet it

 3         probably couldn't get more than a mile an hour or two

 4         mile an hour?

 5  A      I don't.....

 6                 MR. FLOERCHINGER:  Objection, foundation.

 7  A      .....know that.

 8  Q      (By Mr. Osterman)  Well, you heard the engine revved up

 9         at high speeds?

10  A      That is correct.

11  Q      Was this a stick shift or an automatic?

12  A      I don't know.

13  Q      You never looked?

14  A      No, sir.

15  Q      You took photographs of the interior of the vehicle and

16         the exterior of the vehicle?

17  A      That is correct.

18  Q      You never noticed whether it was a stick shift or not?

19  A      I didn't.

20  Q      Did you see the cane that was inside the car?

21  A      I did not.

22                                    (Exhibit 2 proffered)

23  Q      I'm going to show you what's been marked as Exhibit 2

24         pa- -- page 3 through page 6.  Have you ever reviewed

25         that document?
```

R & R  C O U R T  R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982
ANCHORAGE, ALASKA  99501

Exhibit    5
Page 29 of 54

1   A   Yes, I have.

2   Q   And what is that document of?

3   A   It appears to be a transcript of the interview between

4       Investigator Gilmore and myself.

5                                    (Exhibit 5 proffered)

6   Q   Showing you Exhibit 5 page 1, have you ever seen that

7       document before?

8   A   I have not.  Oh, liability accident.  Yes, I have.

9   Q   You prepared that document, didn't you?

10  A   I did not.  This is not my handwriting.

11  Q   Okay.  Did you know it had been prepared?

12  A   I have seen a form similar to this, but I don't believe

13      I've seen this form before.

14  Q   Tell me what color was this vehicle?

15  A   Other than looking at the pictures I -- I don't really

16      remember.  It was a darker color.

17  Q   But it wasn't blue?

18  A   No.  It -- .....

19  Q   It's.....

20  A   .....it doesn't appear to be.  It appears to be

21      grayish.

22  Q   So it was not the vehicle that was described by DOT?

23  A   People -- whenever we receive a call people give

24      different -- different recollections of what they have

25      seen.

R & R  COURT  REPORTERS

811 G STREET
(907) 277-0572/Fax 274-8982
ANCHORAGE, ALASKA  99501

Exhibit  5
Page 30 of 54

31

1    Q    So you didn't want the vehicle to hit you so you put it

2         in reverse?

3    A    That is correct.

4    Q    But you wanted to stop the vehicle?

5    A    That is correct.

6    Q    And you believe that stopping the car would -- it would

7         be appropriate to shoot somebody to stop the car if

8         they were resisting a police officer?

9    A    I -- I don't understand your.....

10   Q    You believe that it was proper for Trooper Osborn to

11        shoot somebody because he wouldn't stop his car for

12        Trooper Osborn?

13   A    I guess that -- I don't understand -- you -- you.....

14   Q    I'll try it one more time.

15   A    Right.

16   Q    Do you believe it was proper for a police officer to

17        shoot and kill a citizen just because that person would

18        not stop for that Trooper?

19   A    No.  If -- it was just a standard contact with nothing

20        else there, no.

21   Q    What other contact would contribute to that?

22   A    If there was somebody else in danger.

23   Q    So who was in danger?

24   A    At the time it would have been myself.

25   Q    But at the time you were behind a patrol car.....

R & R  C O U R T  R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982
ANCHORAGE  ALASKA  99501

Exhibit  5
Page 31 of 54

32

```
 1   A      That is correct.

 2   Q      .....if not in a patrol car?

 3   A      I was behind it -- the.....

 4   Q      Okay.

 5   A      .....patrol vehicle.

 6   Q      And the likelihood of you being harmed behind that

 7          patrol car, was that great?

 8   A      I didn't perceive it as so.

 9   Q      And so your perception then would be that firing a

10          weapon to stop a citizen from hitting your patrol car

11          'cause he wasn't aiming at you, was he?

12   A      I can't tell for sure.

13   Q      In fact nobody can really tell for sure, can they?

14   A      I don't know.

15   Q      You know a lot of things now about the person that was

16          in that car?

17   A      That is correct.

18   Q      You know that person was operating a cane to use the

19          clutch?

20   A      I found that out afterwards.

21   Q      Okay.  And so pepper spraying that particular

22          individual if they had the clutch engaged with their

23          hand using a cane when they were pepper sprayed it

24          would cause that car to lurch forward, wouldn't it?

25   A      But his hands were free.
```

R & R  C O U R T  R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982
ANCHORAGE, ALASKA  99501

Exhibit 5
Page 32 of 54

1    Q      Okay.  Most people try to avoid pepper spray, don't

2           they?

3    A      I would assume so.

4    Q      After they're sprayed they try to get out of the area,

5           don't they?

6    A      Most people.

7    Q      They don't want to be sprayed again, do they?

8    A      No.

9    Q      So pepper spraying somebody in a motor vehicle in a

10          driver's seat oftentimes is not a good idea, is it?

11   A      It's hard to say.  It all depends on the situation.

12   Q      You don't pepper spray people that are in a precarious

13          position or operating machinery, do you?

14   A      I don't.

15   Q      Okay.  You've had chemical training?

16   A      That is correct.

17   Q      Chemical training deals with whether or not -- when it

18          is and when it is not appropriate to use sprays?

19   A      It's just another tool on our -- our belt that we use

20          if force is necessary.  It's a lesser -- lesser use of

21          force.

22   Q      But usually you give somebody the opportunity to make

23          the decision as to the level of force they're going to

24          utilize?  Their actions and reactions dictate it,

25          right?

34

| | | |
|---|---|---|
| 1 | A | I -- I'm sorry, you confused me there. |
| 2 | Q | Well, let's go back to your training. |
| 3 | A | Right. |
| 4 | Q | Part of your training deals with when to use certain |
| 5 | | levels of force? |
| 6 | A | That is correct. |
| 7 | Q | And normally they ask you to explain to people that if |
| 8 | | you don't do this I'm going to have to go to the next |
| 9 | | level? |
| 10 | A | That is incorrect. |
| 11 | Q | That is? |
| 12 | A | Yes. |
| 13 | Q | You're not told to explain that to people? |
| 14 | A | That is -- that is correct..... |
| 15 | Q | So.... |
| 16 | A | .....we're not -- we're not told to explain what the |
| 17 | | next level of force that we're going to be using. |
| 18 | Q | But if you have that opportunity to say you don't want |
| 19 | | to do this, you're going to get pepper sprayed if you |
| 20 | | don't straighten up? |
| 21 | A | We don't warn people that we're going to be pepper |
| 22 | | spraying them. |
| 23 | Q | Okay.  And you don't warn them you're going to taser |
| 24 | | them either? |
| 25 | A | Negative. |

R & R  C O U R T  R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982
ANCHORAGE  ALASKA  99501

Exhibit  5
Page 34 of 54

1    Q    Okay.  You just decide that that's an okay thing to do?

2    A    If the situation warrants it.

3    Q    Now in this particular situation where someone may have

4         been awakened from a sound sleep?

5              MR. FLOERCHINGER:  Object, foundation.

6    A    That I -- I wouldn't know how to answer.

7    Q    (By Mr. Osterman)  Okay.  Well, you've heard the

8         testimony here.....

9    A    Right.

10   Q    .....that this person was apparently reclined back in

11        their seat.....

12   A    Right.

13   Q    .....made a surprising move, startled the police

14        officer, started to move their vehicle out of the way,

15        may have had bright lights shining in their face,

16        right?

17   A    That's right.

18   Q    And when they finally stopped the car it was less than

19        20 feet from yours?

20   A    Approximately, yes.

21   Q    Okay.  And that happened in less than probably two

22        minutes?

23   A    Yeah, it was -- it was quick.

24   Q    It was quick.  So this person who's just been awakened

25        from this sleep has had bright lights shined in its

Exhibit       5
Page 33 of 54

36

```
 1          face and people screaming at him, okay, does something
 2          that you deem might be inappropriate, he's worthy then
 3          of pepper spray?
 4   A      There was enough dialogue where he was looking at
 5          Trooper Osborn.  I don't know what the dialogue was,
 6          all I know is that there was some dialogue between the
 7          two of them.
 8   Q      Well, you heard the dialogue here, right?
 9   A      Right.  I -- I've heard the dialogue here today, but at
10          the time I didn't know what it was.
11   Q      You think that's an appropriate level of dialogue?
12   A      There was appropriate -- there was enough time that I
13          felt that it was appropriate that whoever was in the
14          vehicle should have known by then who he was dealing
15          with.
16   Q      Okay.  You had ultra brights on your car?
17   A      Ultra brights, what do you mean by that?
18   Q      You had those oversized driving lights, the one that
19          you guys write tickets for when people use them and
20          they're illegal?
21   A      The moose lights or the.....
22   Q      Yeah, the moose lights.....
23   A      .....light -- lightning force lights.
24   Q      Yeah, the lightning force lights?
25   A      Yes.
```

R & R  C O U R T  R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982
ANCHORAGE  ALASKA  99501

Exhibit  5
Page 36 of 54

37

| | | |
|---|---|---|
| 1 | Q | You had them on that night? |
| 2 | A | I believe I did. |
| 3 | Q | You had them trained on Mr. Osborn's car -- Mr. |
| 4 | | Porter's car? |
| 5 | A | Over the hood area. |
| 6 | Q | Okay.  You also had spotlights? |
| 7 | A | I had a spotlight, but it wasn't in use. |
| 8 | Q | Well, they're illegal because they're extremely bright |
| 9 | | for people to use as driving lights? |
| 10 | A | Right.  In a head on sit- --- situation. |
| 11 | Q | Okay.  And basically you were in a head on situation? |
| 12 | A | I was at an angle to his vehicle. |
| 13 | Q | And the angle that you had though was still allowing |
| 14 | | those lights to shine in his face? |
| 15 | A | I don't know if it was directly in his face, but enough |
| 16 | | to light up the interior of his vehicle. |
| 17 | Q | You said in your statement you didn't turn the |
| 18 | | spotlight on until after it had happened? |
| 19 | A | That is correct. |
| 20 | Q | Where did you direct your spotlight then? |
| 21 | A | After the medics had arrived on the scene I turned on |
| 22 | | my spotlight and directed it directly at Mr. Porter. |
| 23 | Q | Did you ever get out and inspect the damage to the two |
| 24 | | vehicles? |
| 25 | A | I didn't. |

R & R  C O U R T  R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit  5
Page 32 of 54

38

1    Q    Let's talk about your training.  When did you join the
2         Alaska State Troopers?

3    A    I was hired by the Alaska State Troopers August 2001.

4    Q    Prior to that where were you?

5    A    Department of Corrections.

6    Q    What area -- where did you work at?

7    A    Bethel.

8    Q    In August 2001 did you attend the academy?

9    A    I did.

10   Q    How long were you there?

11   A    Approximately four and a half months.

12   Q    Is that normal training for a Alaska State Trooper?

13   A    That is correct.  19 weeks or something.  I don't -- I
14        don't know exact amount of weeks.

15   Q    Did you have training in shoot, don't shoot?

16   A    I did.

17   Q    How much training, do you remember?

18   A    Three or four days.

19   Q    In that shoot, don't shoot scenarios were there issues
20        concerning when to shoot and when not to shoot?

21   A    Yes.

22   Q    Where there discussions about a case out of Memphis,
23        Tennessee where a person scaling a fence running away
24        from the police was shot in the back?

25   A    I don't remember such a case.

R & R   C O U R T   R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit  5
Page 38 of 54

39

| | | |
|---|---|---|
| 1 | Q | Do you remember any discussions about firing a gun on |
| 2 | | someone was considered to be the ultimate seizure? |
| 3 | A | I don't -- I don't recall. |
| 4 | Q | Do you recall any discussion about the use of deadly |
| 5 | | force in situations where no deadly force is |
| 6 | | demonstrated? |
| 7 | A | I'm sorry.  Rephrase that again. |
| 8 | Q | Do you recall any training about the use of deadly |
| 9 | | force by a officer where no other deadly force is being |
| 10 | | demonstrated? |
| 11 | A | I'd like to say yeah, but I -- I can't recollect |
| 12 | | anything..... |
| 13 | Q | I'll cut to the..... |
| 14 | A | .....right off the top of my head. |
| 15 | Q | .....chase and make it a real simple question.  Did |
| 16 | | anybody ever tell you it was proper to use deadly force |
| 17 | | when the other person didn't have deadly force? |
| 18 | A | No. |
| 19 | Q | Is it proper to shoot someone who doesn't and is not |
| 20 | | armed and is posing no immediate threat to the officer |
| 21 | | shooting? |
| 22 | A | Well, armed is -- is, you know, a subjectable..... |
| 23 | Q | Well, let's take the word down.  I am posing a |
| 24 | | likelihood of giving somebody a fat lip if I knock them |
| 25 | | off their bicycle? |

R & R   C O U R T   R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982
ANCHORAGE. ALASKA  99501

Exhibit ___5___
Page 39 of 54

40

```
 1  A      Uh-hum.

 2  Q      Is that a reason to shoot me?

 3  A      No.

 4  Q      Is a reason to shoot me if my conduct or actions by

 5         negligence or carelessness or otherwise will likely

 6         cause a fender bender?

 7  A      No.

 8  Q      Is it appropriate to use deadly force if I am appearing

 9         to and have established a course of conduct that will

10         likely result in some substantial physical harm to

11         another person?

12  A      Okay.  Rephrase that, substantial?

13  Q      If I -- my conduct is likely to substantially result in

14         severe physical harm to another person, is it

15         permissible for a police officer to use deadly force?

16  A      Possibly.

17  Q      Okay.  In this situation was there a likelihood that

18         you were in any severe danger?

19  A      There possibly was.

20  Q      There's a -- you stated you backed your vehicle out of

21         the way to avoid being hit?

22  A      That is correct.

23  Q      And undoubtedly if this person struck only that front

24         extended bumper brace of your car he was likely to miss

25         you, right?
```

R & R  COURT  REPORTERS

811 G STREET
(907) 277-0572/Fax 274-8982
ANCHORAGE, ALASKA  99501

Exhibit ____5____
Page 40 of 54

1  A      I don't know that.

2                      (Exhibit 10 proffered)

3  Q      Okay.  Have you seen Exhibit 10 before?

4  A      Just earlier today.

5  Q      Okay.

6  A      From a distance.

7  Q      Go ahead and take a look at it.

8         (Pause)

9  Q      Does that demonstrate the track of the vehicle that you

10         recall?

11 A      It's pretty close.

12                     (Exhibit 20 proffered)

13 Q      Okay.  And you've seen 20 which I believe is the basis

14         for the diagram on Exhibit 10.  Can you see the orange

15         markers where the Porter vehicle moved?

16 A      I can see the orange marker, yes.

17 Q      You see several of them here, don't you?

18 A      Yeah, there's a whole dotted line of them.

19 Q      Okay.  And i believe that this also -- this diagram

20         seems to demonstrate that the Porter car was traveling

21         in a straight line?

22 A      It appears that way.

23                     (Exhibit 26 proffered)

24 Q      Now realizing it may not be drawn to scale and so on

25         and so forth and all those other things, and based on

R & R  C O U R T  R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982
ANCHORAGE, ALASKA  99501

Exhibit   5
Page 41 of 54

42

1       the photographs that you took at the scene, now this is
2       a photograph taken again of these particular orange
3       markers.  Okay.....
4   A   That is correct.
5   Q   Also demonstrates the connection between your car and
6       this particular car?
7   A   That is correct.
8   Q   An expert witness went out to this car at Soldotna Post
9       and if I tell you that the preliminary report that he
10      made orally to me is that it appears that the Porter
11      vehicle was struck by your car what would be your
12      statement to that?
13  A   That he's lying.
14          COURT REPORTER:  What exhibit was that?
15          MR. OSTERMAN:  That is.....
16  A   I'm sorry.
17          MR. OSTERMAN:  .....Exhibit 26.
18  A   Exhibit 26.  Exhibit 20.  Exhibit 10.
19  Q   (By Mr. Osterman)  So you would not have rammed his car
20      to stop it?
21  A   That is correct, I would not have.
22  Q   Even though police do it quite a bit in high speed
23      chases?
24  A   As police would do it on TV, that is correct.
25  Q   You say when you turned you cocked your wheels back?

R & R  C O U R T  R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit  5
Page 42 of 54

1 A    I don't remember if I cocked my wheels back or not.

2 Q    Well, you said you changed position?

3 A    Right.

4 Q    Okay.  And I think what you said was you swung your
5      front end more over toward Trooper Osborn's car?

6 A    Right.

7 Q    And that was on our diagram that you drew for us right
8      there?

9 A    Right.

10

     **(Exhibit 45 proffered)**

11 Q    And we're going to make that an exhibit here in a
12     second, but showing you 45, did you take that picture?

13 A    It's dark and it appears that I took this picture, but
14     I'm not -- I never got to see the negatives or the ---=
15     the pictures that I took.

16 Q    Okay.  Is that your tread mark right there?

17 A    It would appear so.

18 Q    So as I'm looking at this if you pulled forward and
19     backed up then you did so and never turned your wheels?

20 A    That appears so.

21 Q    And then at the point of impact then your wheels slid
22     sideways?

23 A    Yes.

24

     **(Exhibit 48 proffered)**

25 Q    48 -- that was 46 by the say.  48, that shiny mark

R & R   C O U R T   R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982
ANCHORAGE, ALASKA  99501

Exhibit      5
Page 43 of 54

44

| | | |
|---|---|---|
| 1 | | right there lines up with your tire, doesn't it? |
| 2 | A | Yes, it does. |
| 3 | Q | And that shiny mark is usually an indication that |
| 4 | | somebody has stepped on the gas a little hard and spun |
| 5 | | their tires? |
| 6 | A | Not usually. |
| 7 | Q | You -- it had recently snowed that night? |
| 8 | A | I can't remember if it did or not. |
| 9 | | (Exhibit 28 proffered) |
| 10 | Q | Looking at Exhibit 28, you would agree with me that |
| 11 | | that spot between the tire and the back of that police |
| 12 | | officer's leg would seem to be the track of the front |
| 13 | | tire of the Mazda? |
| 14 | A | It appears from this angle that it could be. |
| 15 | Q | And it appears that it made a radical change in its |
| 16 | | position? |
| 17 | A | I can't tell that from this photo. |
| 18 | Q | You've had accident reconstruction, haven't you, |
| 19 | | Officer? |
| 20 | A | No, I have not. |
| 21 | Q | You don't take police reports of traffic accidents in |
| 22 | | them? |
| 23 | A | I do, but I haven't been an accident reconstructionist. |
| 24 | Q | Expert, but you do do accident scenes? |
| 25 | A | Yes. |

R & R  C O U R T  R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit  5
Page 44 of 54

1  Q    You do draw them up?

2  A    Yes.

3  Q    You do write them up?

4  A    You do estimate the damage?

5  A    Yes.

6                                   **(Exhibit 24 proffered)**

7  Q    Okay.  Exhibit 24, can you tell me whether there was

8       any other marks on your squad car with this color of

9       paint off this gray car on the front bumper?

10 A    From this picture I can't tell.

11 Q    Okay.  In fact, the only damage you're aware of was to

12      that cross brace, right?

13 A    Right.

14                                  **(Exhibit 18 proffered)**

15 Q    I show you Exhibit 18, I Asked this question earlier of

16      Trooper Osborn, is that your car and the Porter car?

17 A    It appears to be.

18 Q    And that's the spot nearest the stop sign and that

19      appears to be the Osborn car?

20 A    That appears to be.

21 Q    And so this is how this is probably laid out that

22      night?

23 A    It looks like it.

24 Q    Okay.  You took that picture of Kenai Keys sign?

25 A    Yes, I did.

R & R   C O U R T   R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit ___5___
Page _45_ of _54_

46

1  Q    Do you remember which side of the street that sign's

2       on?

3  A    It's -- I believe it's right -- you can't see it

4       because it's angled, but I think it's right on this --

5       it's right on the top stop sign.

6  Q    Okay.  So at the top of that stop sign then?

7                      **(Exhibits 17 and 18 proffered)**

8  A    Right.  You can't see it because it's -- it's -- well,

9       the thin weight (indiscernible) so it's not showing up.

10      COURT REPORTER:   What is that number?

11  A    Exhibits 17 and 18.

12                         **(Exhibit 50 proffered)**

13  Q    (By Mr. Osterman) Showing you Exhibit 50, again, if

14       that's the front wheel track of this Mazda you can't

15       explain why that wheel is so far out of track with

16       this, can you?

17  A    If this is the front wheel mark.....

18  Q    Yes.

19  A    ....and the question is?

20  Q    You can't explain why that front wheel is so far out of

21       align with that track?  If it struck your vehicle why

22       would it push itself out unless it was pushed out by

23       your vehicle?

24  A    I have no idea other than my vehicle was bigger than

25       his.

R & R  C O U R T  R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit _____5_____
Page 46 of 54

1                                    (Exhibit 45 proffered)

2    Q    Exhibit 45.  Is that the track of the front wheel?

3    A    It's hard to tell from here.

4    Q    Does it appear the front wheel's turned to the right?

5    A    It's hard to tell from here.

6    Q    Have you had any subsequent training in shoot, don't

7         shoot since you left the academy?

8    A    No, I have not.

9    Q    Do you weapons qualify every year?

10   A    Yes.

11   Q    They do not have shoot, don't shoot as a part of

12        weapons qualification?

13   A    No.

14   Q    Do you know what other departments may have or may

15        require for shoot, don't shoot?

16   A    I have no idea.

17   Q    Have you ever tried to seek additional training in

18        shoot, don't shoot?

19   A    No, I have not.

20   Q    Since this particular incident have you ever had any

21        curiosity about the extent of shoot, don't shoot?

22   A    No.

23   Q    Did you ever see a videotape using a shoot, don't shoot

24        technique where the video is stopped and asked if you

25        had to shoot or not shoot?

R & R  COURT  REPORTERS

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit    5
Page 47 of 54

```
 1  A      Only of that at the academy.
 2  Q      Okay.  That three days of training that you may have
 3         had on shoot, don't shoot?
 4  A      Right.
 5  Q      Was that shoot, don't shoot entirely or was that just
 6         weapons training generally?
 7  A      That was -- some of it was weapons training and some of
 8         it was shoot, don't shoot.
 9              MR. OSTERMAN:  I have no other questions.
10              MR. FLOERCHINGER:  I have just a couple.
11                    CROSS EXAMINATION
12  BY MR. FLOERCHINGER:
13  Q      What was the position of your body when your vehicle
14         came in contact with the suspect vehicle?
15  A      I was standing in the -- in the open doorway of my
16         vehicle with my arms over the windshield and-- and in
17         front of my door, but the door was open.  I was
18         standing in that wedge in -- in the corner with my left
19         foot forward and my right foot kind of back a little
20         bit.
21  Q      All right.  You weren't behind the wheel of your
22         vehicle?
23  A      I was not behind the wheel.
24  Q      You mentioned something that on further reflection you
25         believe your actions indicated, I can't remember
```

R & R COURT REPORTERS
811 G STREET
(907) 277-0572/Fax 274-8982
ANCHORAGE, ALASKA  99501

Exhibit 5
Page 48 of 54

49

1      exactly what your phraseology was, but you mentioned

2      that you actions on further reflections indicated that

3      perhaps you were in greater danger than you thought or-

4      -- initially, something to that effect?

5    A  Right.

6    Q  What actions were you talking about?

7    A  I was referring to the actions of after I was in my

8      vehicle and heard the -- the revving up, when I came

9      back out -- withdrew my service weapon and was coming

10     back out into the guard pointing that and actually

11     putting my finger and was actually getting ready to --

12     to pull the trigger myself.

13   Q  Was that -- earlier in Mr. Osborn's testimony we heard

14     about that last safety?

15   A  Right.

16   Q  Yeah.  Had you released that last safety?

17   A  The -- the safety was.....

18   Q  On the trigger is the one I want to....

19   A  Right.  The -- the safety -- the -- the gun itself

20     doesn't really have an on and off switch per se other

21     than the -- the safety that's on the trigger guard.

22     And it sticks out just a little bit more than the

23     trigger.  And I had already depressed that and released

24     that safety and was starting to take up a little bit of

25     the slack on the -- on the trigger.

R & R  C O U R T  R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit ___5___
Page _49_ of _54_

50

```
 1   Q     So you were within a hair of firing yourself?

 2   A     That is correct.

 3   Q     You didn't fire any weapons.....

 4   A     No, I did not.

 5                              (Exhibit 1 proffered)

 6   Q     .....that night?  From your position -- well, let's go

 7         to Exhibit number 1 down here just towards the bottom

 8         or five lines from the bottom, Trooper Osborn tell him

 9         he's been sprayed.  Did you attempt to do that to radio

10         in that information?

11   A     I was attempting to at the time, yes.

12   Q     What do you mean you were attempting to?

13   A     Trooper Osborn had -- had sprayed Porter through the

14         window, heard the scream.  I quickly reholstered my

15         weapon.  My mic was -- I can't remember if it was on

16         the seat or actually dangling from -- it may have been

17         on the floor.  And I reached in, placed my left hand

18         down and reached across with my right hand just as I --

19         and at -- this whole time I'm looking through my win-

20         -- my car windshield watching what's going on in front

21         of me.  And right as I pick up the mic to say something

22         is when I hear everything going on and I'm -- I'm

23         pushing back out of my vehicle.....

24   Q     When you hear everything going on what are you hearing?

25   A     I'm hearing the -- the engine rev up, the tires
```

R & R  C O U R T  R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit ____5____
Page 50 of 54

51

1    spinning on the -- on the ice and I'm already pushing

2    back out of the vehicle.

3  Q    So you're pushing back out of the vehicle?

4  A    Right.

5  Q    What did you see through your front windshield?

6  A    What I saw through the front windshield as I'm

7    attempting to grab a hold of my mi- -- radio mic was --

8    it looked like Mr. Porter had gone down and was kind in

9    a fetal position and he came up and what to me looked

10    like he wiped his eyes, the -- the palms of both hands

11    and -- and it was -- it was a grab.  It wasn't just,

12    you know, putting hands on it.  It was a -- a fairly

13    forceful grab and he was looking right straight ahead.

14    And that's when I was pushing out.

15  Q    All right.  And then you pushed out, what happened

16    next?

17  A    I pushed out, re- -- redrew my weapon, stepped back

18    forward so that I can clear my vehicle, the windshield

19    and the door jamb.  And -- and that's when I was coming

20    up through guard, fingers moving to -- to get on the

21    trigger, starting to pull up a little bit of slack and

22    -- and by then shots were already fired and the car was

23    already decelerating and I determined that it was -- I

24    -- I determined that shots from me weren't warranted.

25  Q    And that's before or after he hit your car or at the

Exhibit ___5___
Page _51_ of _54_

52

1      same time?  I'm just trying to.....

2  A   It's like -- like seconds, if not like a half second

3      before.  I mean it -- it was all so quick in there, but

4      I remember feeling it wasn't hard, it was just kind of

5      like a little push on my leg and -- and I took a step

6      back.  It wasn't like something hit me.  It was just a

7      real gentle kind of push.

8  Q   Okay.

9          MR. FLOERCHINGER:  That's all I have.

10              REDIRECT EXAMINATION

11  BY MR. OSTERMAN:

12                          (Exhibit 3 proffered)

13  Q   You said -- Exhibit 3 page 23 of 32.....

14          MR. FLOERCHINGER:  Hold on, let me get there.

15  Q   I have marked it with a little bit of blue here at the

16      bottom.  You might want to read a couple of lines above

17      just to feel comfortable with it. By the way, could you

18      look at Exhibit 3 on the face?

19  A   Exhibit 3 on the face.

20  Q   Do you recognize it?

21  A   It looks like it's interview transcript of me and

22      Sergeant McPherron.

23  Q   Okay.  And so what -- page what again? I'm sorry, I

24      lost my own place.

25  A   Page 23.



Exhibit _5_
Page 52 of 54

1   Q       Page 23.  I think I said 32 so I apologize.  So at page
2           23 you were asked the question you elected not to
3           shoot, why is that?  Your answer there was you didn't
4           (sic) want to err on the side of caution, right?
5   A       Where's that?  Yeah.  Err --.....
6   Q       Bottom of 32 (sic).....
7   A       .....err on the side of caution.  That's correct.
8   Q       And you said it was an extremely short time?
9   A       That is correct.
10  Q       Within seconds?
11  A       That is correct.
12  Q       Okay.  So we're not talking minutes here, we're talking
13          seconds this whole thing boils down, right?
14  A       Right.
15  Q       Turn the page to page 24 at the very top you stated
16          that there was disbelief, that you felt that what may
17          have happened was premature?
18  A       That is correct.
19  Q       You didn't feel that deadly force wasn't (sic)
20          necessary at that time and that was your feelings?
21  A       Right.
22  Q       And you've changed your mind since then?
23  A       That is correct.
24               MR. OSTERMAN:  No other questions.
25                                  (Exhibit 57 marked)

R & R   C O U R T   R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit    5
Page 53 of 54

1          MR. OSTERMAN:  Now I do want to put one thing

2  on the record.  We do have Exhibit 57 which is the handrawn

3  statement of Trooper Whittom.  And if he will -- if you'll sign

4  that for me up here by Exhibit 57.

5  A        (Witness complies)

6          MR. OSTERMAN:  Then I have the thrill of

7  putting all these things back in order for the court reporter.

8  Thank you.  No other questions.

9          MR. FLOERCHINGER:  I have nothing further.

10         (Off record)

11                  (END OF PROCEEDINGS)

12              *  *  *  *  *  *

13

14

15

16

17

18

19

20

21

22

23

24

25

R & R  C O U R T  R E P O R T E R S

811 G STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit    5
Page 54 of 54

1                            S I G N A T U R E

2    UNITED STATES OF AMERICA              )
                                           ) ss.
3    STATE OF ALASKA                       )

4               I, **JOSEPH WHITTOM**, having read the foregoing

5    deposition testimony, do hereby certify it to be true and

6    accurate, subject to corrections, if any, as indicated on the

7    attached errata sheet.

8                              _____

9                              JOSEPH WHITTOM

10                             DATE:_____

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit_____

Page____of____

1                    C E R T I F I C A T E

2    UNITED STATES OF AMERICA)
                            )ss.
3    STATE OF ALASKA         )

4         I, Rebecca Nelms, Notary Public in and for the State of
     Alaska, and Reporter for R & R Court Reporters, Inc., do hereby
5    certify:

6         THAT the annexed and foregoing Deposition of **JOSEPH**
     **WHITTOM** was taken before Meredith L. Downing, on the 30th day
7    of August 2006, commencing at the hour of 12:43 o'clock p.m. at
     the offices of R & R Court Reporters, 811 G Street, Anchorage,
8    Alaska, pursuant to Notice to take said Deposition of said
     Witness on behalf of Plaintiffs;
9
          THAT the above-named witness, before examination, was
10   duly sworn to testify to the truth, the whole truth and nothing
     but the truth;
11
          THAT this Deposition, has heretofore annexed, is a true
12   and correct transcription of the testimony of said Witness,
     taken by Meredith Downing and thereafter transcribed by myself;
13
          THAT the original of the Deposition will be loaded in a
14   sealed envelope, with the attorney requesting transcription of
     same, as required by Civil Rule 30(f)(1) amended, that being:
15   MR. MARK D. OSTERMAN, Osterman Law Office, PC, 215 Fidalgo,
     Suite 106, Kenai, Alaska 99611.
16
          THAT I am not a relative, employee or attorney of any
17   of the parties, nor am I financially interest in this action.

18        IN WITNESS WHEREOF, I have hereunto set my hand and
     affixed my seal this 30th day of September 2006.
19
20                      _____
                        Notary Public in and for Alaska
21                      My Commission expires:10/10/06

22

23

24

25

Exhibit_____
Page_____of_____